1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,      : 19CR08(MKB)
4                              :
           Plaintiff,          :
5                              :
           -against-           : United States Courthouse
6                              : Brooklyn, New York
ISKYO ARONOV, ET AL,           :
7                              :
           Defendant.          : Tuesday, December 3, 2019
8                              : 10:00 a.m.
                               :
9
- - - - - - - - - - - - - X
10      TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
            BEFORE THE HONORABLE MARGO K. BRODIE
11             UNITED STATES DISTRICT JUDGE

12                  A P P E A R A N C E S:

13 For the Government: RICHARD P. DONOGHUE, ESQ.
                      United States Attorney
14                    Eastern District of New York
                      271 Cadman Plaza East
15                    Brooklyn, New York 11201
                  BY:  SHANNON JONES, ESQ.
16                    JOHN VAGELATOS, ESQ.
                      Assistant United States Attorneys
17
   For Defendant      LAW OFFICE OF KEVIN J. KEATING
18 Aranov:            666 Old Country Road
                      Garden City, NY 11530
19                BY: KEVIN KEATING, ESQ.

20
   For Defendant      LAW OFFICES OF GORDON MEHLER, PLLC
21 Konstantinovskiy:   747 Third Avenue 32nd Floor
                      New York, NY 10017
22                BY: GORDON MEHLER, ESQ.

23 Court Reporter:    **SOPHIE NOLAN**
                      225 Cadman Plaza East/Brooklyn, NY 11201
24                    NolanEDNY@aol.com
   *Proceedings recorded by mechanical stenography, transcript*
25 *produced by Computer-Aided Transcription*

SN      OCR      RPR

2

1    APPEARANCES:   (Continued.)

2    For Defendant Tarshish:        HAFETZ & NECHELES LLP
                                     10 East 40th Street, 48th Floor
3                                    New York, NY 10016
                                    BY:KATHLEEN CASSIDY, ESQ.
4                                       CAROLINE M. GROSSHANS, ESQ.

5    For Defendant Herskowitz:      ADDABBO & GREENBERG
                                     118-21 Queens Blvd. Suite 306
6                                    Forest Hills, NY
                                    BY:TODD D. GREENBERG, ESQ.

7
     For Defendant Tomer Dafna:    LAW OFFICES OF ALAN FUTERFAS ESQ.
8                                    565 Fifth Avenue 7th Floor
                                     New York, NY 10017
9                                   BY:ALAN FUTERFAS, ESQ.
                                       ELLEN RESNICK, ESQ.

10

11
     PRETRAIL SERVICES:  CELINE FERGUSON
12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

Proceedings                                        3

1               (In open court.)

2           (The Hon. Margo K. Brodie, presiding.)

3               (Defendants present.)

4   THE COURTROOM DEPUTY:  Criminal cause for a status conference,

5    docket number *19-CV-408, United States versus Aronov, et al.*

6           Counsel, please state your name for the record.

7           MS. JONES:  Shannon Jones and John Vagelatos for the

8   United States.  Good morning, Your Honor.

9           THE COURT:  Good morning to both of you.

10          MR. KEATING:  Good morning, Your Honor.  Kevin

11  Keating for Mr. Aronov.

12          THE COURT:  Good morning, Mr. Keating and Mr.

13  Aronov.

14          MR. MEHLER:  Good morning, Your Honor.  Gordon

15  Mehler for Mr. Konstantinovskiy, 747 Third Avenue, New York,

16  New York.

17          THE COURT:  Good morning to both of you.  Did you

18  already file a notice of appearance?

19          MR. MEHLER:  Yes, I have.

20          THE COURT:  Okay.

21          MS. CASSIDY:  Good morning, Your Honor.  Kate

22  Cassidy and Caroline Grosshans for Avraham Tarshish to my

23  left.

24          THE COURT:  Okay, good morning.

25          MR. GREENBERG:  Good morning, Your Honor.  Todd

Proceedings                                              4

1  Greenberg for Mr. Herskowitz.

2            THE COURT:  Good morning.

3            MR. FUTERFAS:  Good morning, Your Honor.  Alan

4  Futerfas and Ellen Resnick for Mr. Dafna, who is here.

5            THE COURT:  Good morning to everyone.

6            Since you were last here back in October what has

7  happened?  Where are we with this matter?

8            MS. JONES:  Your Honor, unfortunately discovery has

9  moved slower than I would have liked.

10           THE COURT:  Tell me what's going on with that.

11           MS. JONES:  Okay, so first, I believe we have an

12  agreement about the PII stips.  I have signed stipulations

13  from four of the five defendants.  I believe Mr. Herskowitz is

14  the only defendant who hasn't given me a signed stipulation

15  yet.  So I have four of them here to be submitted.

16           THE COURT:  Okay, I will take a look at them once

17  we're done.

18           MS. JONES:  Okay.  Once I have those, then we've

19  just got our first big-load file prepared for discovery.

20  That's available at First Choice, so as soon as the PII stip

21  is so ordered, I will send out the first discovery letter with

22  instructions on how to obtain the discovery load file from

23  First Choice.  This is the bulk of the discovery; it's not

24  everything.  It does not include any of materials seized from

25  Tomar Dafna as we are still working with Mr. Dafna's counsel

Proceedings                                          5

1   to do a privilege review, in a reasonable fashion, based on

2   the needs of the attorneys that he gives us.

3           THE COURT:  Okay.

4           MS. JONES:  And then that would be the -- that

5   should take care of the bulk of the discovery that we have and

6   that's ready to go.

7           THE COURT:  And you anticipate that as soon as I've

8   reviewed those --

9           MS. JONES:  Yes, I actually have the discovery

10  letter here.  I can give them the letter and the index and

11  then I can give them of the order number to order the

12  materials from First Choice as soon as the stipulation is so

13  ordered.

14          THE COURT:  Okay.  Do you expect to have the last

15  stipulation today?

16          MR. GREENBERG:  Your Honor, I'm so sorry.  Yes, I do

17  have it here for you to sign.

18          THE COURT:  Okay, so I will review them all at the

19  end of the proceeding so that way you can have discovery

20  disclosed today.

21          MS. JONES:  Thank you, Your Honor.

22          THE COURT:  So I assume that the defendants will be

23  seeking time to look into discovery.  How much time do the

24  parties need?

25          MR. KEATING:  Your Honor, I think sixty days to

1   start our review would be sufficient.

2          THE COURT:  Okay.  February 4th?  Are the parties

3   all available?

4          MR. GREENBERG:  Judge, Todd Greenberg.

5          Your Honor, I just want to alert the Court that

6   after I've reviewed the discovery, I do anticipate motions

7   being filed.

8          THE COURT:  Okay, I would expect motions.

9          MR. GREENBERG:  Okay.

10         THE COURT:  So this is a control date so that

11  parties can look at the discovery and at our next appearance,

12  hopefully, you would have reviewed the discovery and you can

13  tell me what motions you anticipate making and we can set up a

14  motion schedule.  Okay?

15         Does that date work, February 4th, for everyone?

16         MS. JONES:  Yes, Your Honor.

17         MR. KEATING:  Yes, Your Honor.

18         MR. FUTERFAS:  I have a conflict in the morning.  If

19  we could do it in the afternoon, Your Honor, that's fine.

20         THE COURT:  Okay.

21         MR. GREENBERG:  I'm available on that date.

22         THE COURT:  Everyone else is available in the

23  afternoon?

24         (A chorus of yeses.)

25         THE COURT:  Okay, so I will make it at 2:00 on

Proceedings                                            7

1   February 4th.  I'm excluding time between now and then, in the

2   interest of justice, in view of the fact that discovery needs

3   to be disclosed to the defendants so that they can proceed.

4           I have two matters that I need to deal with as to

5   Mr. Tarshish and Mr. Aronov.  Is there anything else as to all

6   defendants?

7           Nothing?  Okay, then we are adjourned.

8           As to the status conference, those two defendants,

9   can you remain?

10          MR. FUTERFAS:  Your Honor, if I may?  Not to all

11  defendants, but on behalf of Mr. Dafna, there was one issue

12  that we seek Your Honor's clarification on.

13          THE COURT:  Yes.  You may have a seat.

14          I believe you made an application for Mr. Dafna to

15  work in real estate; is that correct?

16          MR. FUTERFAS:  Yes, it was twofold; it was to create

17  a curfew to which Pretrial agreed and Your Honor so ordered.

18  And the second part was to allow him to work in real estate.

19  The identical conditions to the conditions that Mr. Tarshish

20  had.  And I guess there was some -- I guess Pretrial wanted

21  clarification from Your Honor whether that was part of Your

22  Honor's order and if Your Honor approved --

23          THE COURT:  I hadn't ordered as to that.  I believe

24  you had submitted letters requesting that relief and I had not

25  decided that application.  Would you like to be heard now on

Proceedings                                    8

1   that application?  And I will hear from the Government and

2   from Pretrial and rule on it now.  The other defendants don't

3   have to stay.

4           MR. FUTERFAS:  Okay, very well.  We can at least

5   have a conversation about it.

6           THE COURT:  We can do it now.

7           We are adjourned as to all defendants on the

8   collective matters on the status conference because there is

9   nothing further to discuss.  I do need Mr. Tarshish and

10  Mr. Aronov to remain, and now Mr. Dafna, so I can deal with

11  this other issue.

12          MR. FUTERFAS:  Thank you, Your Honor.

13          THE COURT:  Mr. Mehler, you are looking at me like

14  you are a little confused.

15          MR. MEHLER:  Your Honor, well, that's the general

16  state that I find myself in often in life.

17          We're just going to stip because we have some

18  similar issues, as the prosecution knows, so we will put them

19  in writing, but we will remain listening intently.

20          THE COURT:  Similar issues with regard to?

21          MR. MEHLER:  Well, it's the same -- it's a similar

22  issue and the prosecution, to its credit, understands that we

23  need to come to court.  The way things are set now, the

24  prosecution sort of has an untrammeled veto over our client's

25  livelihood and, in essence, this is very different.  This

Proceedings                                              9

1   condition is very different than the prosecution signing off

2   on a travel request.

3           THE COURT:  Which condition?

4           MR. MEHLER:  Well, the condition to say that any

5   real -- our client's position is that he can do any real

6   estate transaction only if the prosecution signs off on it.

7   But what that has amounted to is, again, an untrammeled

8   veto --

9           THE COURT:  I don't recall that condition at all.

10          Is there such a condition?

11          MS. JONES:  It is actually a condition.  It's not a

12  veto.  That's signed by Magistrate Judge Bloom, I believe, as

13  part of an initial condition.  Mr. Konstantinovskiy, unlike

14  the other defendants, told Pretrial and the Government that he

15  was no longer in the real estate business and he --

16          THE COURT:  How do any of the court reporters keep

17  up with you?

18          MS. JONES:  I'm sorry.  Mr. Konstantinovskiy, it's

19  my understanding, has a different business now that he's in

20  financing litigations -- providing financing to people who are

21  engaged in litigation.  So he has a different business that he

22  representing to the Court and Pretrial that was his source of

23  income at the present.  He had said, during the initial

24  appearance, that he may have real estate of his own that he

25  owned that he might want to sell and the condition that

Proceedings                                    10

1   Magistrate -- I believe it was Magistrate Bloom set was that
2   you can sell your own property that you own, like you want to
3   sell your house or you want to sell property that you own, as
4   long as you run it by the Government to make sure that it's
5   not part of the charged scheme.  And if that was fine then he
6   could do it.  So that was the condition.
7            THE COURT:  I see.  But it was also with the
8   understanding that he was not engaging in the business of real
9   estate absolutely?
10           MS. JONES:  That is my recollection, Your Honor,
11  because I think his representation was that he was no longer
12  in that business.
13           THE COURT:  I see.
14           So you seem to be raising with the Court now the
15  fact that that is part of his business and this restriction is
16  limiting his ability?
17           MR. MEHLER:  Well, let me clarify.  It's very
18  simple.
19           THE COURT:  Okay.
20           MR. MEHLER:  He came to this country a hard-working
21  immigrant, spent ten years in real estate.  After this, he had
22  started a new business, but it could be years before he gets
23  income to support his family.
24           THE COURT:  So he wants to engage in real estate
25  transactions?

Proceedings                                              11

1            MR. MEHLER:  Well, he has properties that -- he has

2    a particular property that we submitted to the Government that

3    if it is not sold it's going to go to foreclosure and, you

4    know, a lot of money is going to be lost.

5            THE COURT:  So what is the issue and what are you

6    asking the Court to do?

7            MR. MEHLER:  We have tried with the prosecution, in

8    good faith, to go to them and even to reveal information that

9    makes us uncomfortable from a Fifth Amendment perspective, but

10   sadly the prosecution says no.  And when we consult with the

11   other lawyers --

12           THE COURT:  Said no about what?

13           MR. MEHLER:  That they can't approve it.  Right?

14           THE COURT:  What, a sale?

15           MR. MEHLER:  That's right.  And there's no incentive

16   to do that.

17           THE COURT:  Hold on.

18           What is the issue, Ms. Jones?

19           MS. JONES:  As is set forth in the indictment,

20   Mr. Konstantinovskiy, Mr. Tarshish and Mr. Aronov were

21   involved in the short sale of real estate business for

22   multiple years and --

23           THE COURT:  I understand that, but what's the issue

24   with him selling this property?

25           MS. JONES:  My understanding was that they were not

Proceedings                    12

1    supposed to sell properties that could be part of -- that are

2    part of the charged scheme, so there were supposed to be no

3    short-sale transactions that the Government was going to

4    approve.

5            THE COURT:  And is it your understanding that this

6    property is part of the scheme?

7            MS. JONES:  The problem is that I cannot tell based

8    on the information provided because, when I looked at the

9    property that was the address that he gave me, I could see

10   that it was listed for sale by Mr. Konstantinovskiy, as a real

11   estate broker, as a short sale property.  That was how it was

12   originally marketed.  In this case, even though the properties

13   were listed on MLS as short sales, they weren't actually for

14   sale.  Nobody else could come in and make a competing and

15   higher offer to get that property.  That was part of the

16   scheme and that was part of the fraud.

17           Therefore, they could try to get the property for a

18   lower price by not actually letting anyone else come in and

19   make, you know, close to a fair market value offer for that

20   property.  Mr. Konstantinovskiy purported to represent the

21   homeowner, who was under water and who was trying to, you

22   know, sell the property.  And he was working with Mr. Aronov

23   and others so that Mr. Aronov and others could buy that

24   property.

25           THE COURT:  And we are speaking about this specific

Proceedings                                          13

1   property?

2           MS. JONES:  Well, with this particular property, all

3   I could tell was that Mr. Konstantinovskiy had listed it on

4   MLS as a short sale with him as the broker, and then

5   Mr. Mehler providing the information indicating that it looked

6   like the short sale did not happen.  Instead,

7   Mr. Konstantinovskiy bought the deed from the homeowner, the

8   mortgage is still on the property.  The bank still is -- it

9   has the lien on the property, which is why it's in

10  foreclosure, because Mr. Konstantinovskiy bought the deed from

11  the homeowner but has not satisfied the mortgage.

12          THE COURT:  Okay, what is the issue with him selling

13  the property if it is in foreclosure and he can sell it, even

14  if we put a hold on the funds, if you believe that somehow

15  this fraud -- this property is involved in the fraud?

16          MS. JONES:  That was my first proposal.  My first

17  proposal was I have no objection to doing this if the money

18  goes into an escrow account held by the Marshal Service that

19  could be released at the end of the case if it's determined

20  that this is his property.

21          THE COURT:  Well, why do we have to wait until the

22  end of the case to make that determination?  That is the

23  issue, right?  Because if it is not, there is no reason for

24  the Government to be holding on to the money.

25          MS. JONES:  If this transaction was fraudulent --

Proceedings                                    14

1   and we haven't interviewed the homeowner, so we don't know if

2   the homeowner was misled about selling his deed to

3   Mr. Konstantinovskiy, and I have not gotten information from

4   the bank; the bank has the right, I believe, to foreclose on a

5   property if the deed is transferred and they don't have the

6   permission to do that transfer.  So I don't have those things.

7   I don't know if there's going to be a victim here, either the

8   homeowner or the bank, based on the transaction.  So my

9   concern was, at the end of this case, there will be forfeiture

10  amounts due and there will be restitution amounts due and that

11  money may not be available if the property is sold and he

12  takes it.

13          THE COURT:  I understand all of that.  But my issue

14  is you need to be able to determine whether it is part of the

15  scheme or not.  Because if it is not, it is unduly burdensome

16  for the Government to prevent him from selling the property or

17  hold on to the funds when it sounds like there is a way for

18  you to determine one way or the other if it's involved.

19          MS. JONES:  Your Honor, we can always interview the

20  homeowner, and can request the bank file, but that would take

21  a little bit of time.  We have only started that process.  We

22  have asked Mr. Konstantinovskiy, you know, can you tell me the

23  source of the funds that was used for the purchase of the deed

24  and he hasn't.  So, you know.

25          THE COURT:  Well, like his counsel says, there is

SN        OCR        RPR

Proceedings                                              15

1   some information that he may not want to share with the

2   Government.

3            MS. JONES:  That's fine and that's why I did not

4   consent, and I said we should ask the Judge to approve this

5   transaction, because I do not feel comfortable giving my

6   consent when I don't know if there's going to be a victim who

7   is going to be harmed by my consent.

8            MR. MEHLER:  Your Honor, if I may just paraphrase.

9   What the Government has said repeatedly is I don't know, I

10  don't know and instead of complying with processes that give

11  my client elementary due process, the prosecution says no.

12  And, by the way, has said no and no to other people.  There is

13  a far better alternative here and that is, in Mr. Tarshish's

14  case, and as Mr. Futerfas will point out, he was prohibited

15  from doing short sales and he submits a -- he submits a report

16  at the end of the month that goes to the Court and goes to

17  Probation, so there are no Fifth Amendment issues, but there

18  are even Sixth Amendment issues here because in the *Luis* case,

19  which was decided a couple of years ago --

20           THE COURT:  Well, counsel, one thing at a time.

21           MR. MEHLER:  Okay, I'm sorry.

22           THE WITNESS:  The Court is having issues with

23  Mr. Tarshish, which is why he's sticking around, because I'm

24  not getting the report as I should.  So there are a number of

25  issues going on here and we need to figure them out.  Right?

Proceedings                                              16

1          MR. MEHLER:  All I'm saying is let's do that.  That

2    is all that is.  But having it become --

3          THE COURT:  Okay.  Have a seat.

4          The issue is, the defendants are charged in a fraud

5    scheme.  The Government needs to figure out the breadth of

6    that scheme.  I understand their issues.  This is their

7    livelihood and obviously the goal is not to prevent them from

8    engaging in their livelihood, but I also cannot allow them to

9    engage in any activity that affects what's charged in the

10   indictment.  So the Government needs to be able to determine

11   whether or not, in this particular case, the property at issue

12   is part of the fraud scheme or not.  And whether it means

13   going out and speaking to the homeowner or getting whatever

14   information you need from the bank.  You could subpoena the

15   bank and have them comply, give them several days to comply,

16   but we need to figure that out because this is an issue.

17         And if you can determine that it's part of the fraud

18   scheme, then the secondary issue is whether or not your client

19   still wants to sell the property, but the money will have to

20   be put in escrow if it's determined that it's part of the

21   scheme.  There is no way around that.

22         The Government has to conduct whatever investigation

23   it needs to so that we can make that determination properly.

24         MS. JONES:  Okay, Your Honor, and I do want to note

25   that there have been requests made of me to approve

1  transactions where I was told it's not a short sale, and then

2  I looked at it and it was a short sale.  So there has also

3  been that issue also.

4         THE COURT:  I can appreciate that.  And so the

5  parties are going to have to raise the issues with the Court

6  if it's an ongoing problem.

7         We need to, together, or the prosecutor needs to

8  investigate if, in fact, your clients are attempting to make

9  short sales.  Your clients don't want to be in violation of

10  their bond conditions.

11         MR. MEHLER:  Exactly, Your Honor, and that's really

12  the hook that the Court has here.  The bail condition is you

13  should not commit any crimes.  So all of us are responsible

14  counsel and we're going to be sure that our clients are not

15  committing crime.

16         THE COURT:  Correct.  But, if your clients believe

17  that they're making a sale that is not a short sale but the

18  Government has evidence to suggest that it is, then that is a

19  problem and that seems to be the issue here.

20         MR. MEHLER:  Sure, but in the case that we're

21  talking about, it is clear that this property, 846 Hancock, is

22  not a short sale.  It does not involve the renegotiation of a

23  mortgage --

24         THE COURT:  Why is it so clear that it's not a short

25  sale?

Proceedings                                                        18

1          MR. MEHLER:  Because it's not.  The prosecution,

2    itself, says I don't know; and because I don't know, too bad,

3    the answer is no; take it up with the Judge.  But I am

4    representing to the Court that my understanding is it is not a

5    short sale, it does not involve the renegotiation of the

6    mortgage, and the bank will be repaid in full when the sale is

7    made.  And the prosecution says, well, we have to check that

8    out.  But these clients were indicted three months ago and he

9    has got to make a living.

10         THE COURT:  I understand that, Mr. Mehler.  Please

11   have a seat.

12         So, I'm going to give you two weeks to figure this

13   out.

14         MS. JONES:  Okay.

15         THE COURT:  Figure it out and let counsel know one

16   way or the other.  If you were to determine that, in fact, it

17   is part of the scheme and counsel disagrees, then you are

18   going to have to write to the Court and explain why you

19   disagree with whatever evidence the Government is relying on

20   to show that this is a problematic sale.

21         MR. MEHLER:  Perfect, Your Honor.

22         THE COURT:  Okay?

23         MR. MEHLER:  Great.

24         THE COURT:  Does that take care of that issue?

25         MR. MEHLER:  I think so.  Thank you, Your Honor.

```
                        Proceedings                    19
```

1       THE COURT:  Okay.

2       MR. FUTERFAS:  Your Honor, Alan Futerfas.

3       THE COURT:  You can have a seat, please, or stand if

4   you prefer.  Just pull the mic forward.

5       MR. FUTERFAS:  Your Honor, all I request is actually

6   very simple.  We simply ask Your Honor, if there are issues

7   with whatever those issues might be with Mr. Tarshish, I don't

8   know, we're not involved in that, but all we are asking for is

9   that the conditions that Your Honor sets with respect to

10  reporting to Pretrial Services and Your Honor of any real

11  estate transactions, but permitting real estate work be

12  applicable to Mr. Dafna.

13      And I want to say -- and this is what our letter

14  went into a little bit -- from 2004, for ten to fifteen years,

15  the vast majority of the real estate-type work that Mr. Dafna

16  did had nothing to do with short sales.  It had nothing to do

17  with renegotiating or negotiating mortgages, nothing to do

18  with that.  Many of the projects that he worked on were vacant

19  land, where he has done with investors; people wanting to

20  invest in real estate, who bought vacant land and built

21  developments having nothing to do with this case.

22      Mr. Dafna has built 40 or 50 double- and

23  triple-family homes throughout Brooklyn, Queens and elsewhere.

24  These have nothing to do with the kinds of charges in this

25  case.

Proceedings                                    20

1          So what we were proposing is just taking off --

2   jumping off from the precise order and conversation that Your

3   Honor had with Ms. Necheles on behalf of Mr. Tarshish, was

4   just to -- when he gets involved or if he's going to be

5   involved buying with investors, buying a piece of vacant land

6   or doing whatever it is, we create a report of that, we give

7   it to Pretrial.  We make sure that there was no renegotiation

8   or negotiation of a mortgage, if there happens to be a

9   mortgage.  Many of these deals there is not an existing

10  mortgage because they're buying something for cash and or they

11  are buying vacant land outright on which they're going to be

12  building a development.  So you don't even get close to the

13  issues that are in this case.

14         So we thought, particularly given the kinds of

15  business that Mr. Dafna historically did, that this would be

16  actually easy because there would be no -- you wouldn't be

17  abutting a situation where you've got to look to see was a

18  mortgage renegotiated, was a deed transferred from a prior

19  owner, any of the things that the Government was worried about

20  in this case.  And to the extent that anything like that came

21  up, we would be aware of it, Mr. Dafna would be aware of it,

22  and we would look at it and discuss it with Pretrial.

23         And if there was an issue we were not comfortable

24  with, or he wasn't, he would say no.  But there would be a

25  record just like Your Honor ordered, a record of whatever

Proceedings                                    21

1    transactions or whatever things that he's doing.

2           So that's why, at least from our perspective -- and

3    that's how he supported his life, that's for his family, and

4    he did that for many years having nothing to do with the

5    charges here at all.  So he has investors calling him.  He has

6    people he has worked with in real estate business for decades

7    who are calling him and these have nothing to do with short

8    sales.  These are cash purchases of land or investments in

9    something that's going to be a development.  They are very,

10   very different from the activity that's charged here.

11          THE COURT:  Okay, so that's your application.

12          MR. FUTERFAS:  So that's really where we are and we

13   would make, obviously, a very clear record of what the

14   transaction is, what's his involvement, how is he getting

15   paid, et cetera, et cetera, to pretrial and to Your Honor.

16          THE COURT:  Okay.  Ms. Jones?

17          MS. JONES:  Your Honor, I really don't have anything

18   to add to this other than what I had put in my letter.  You

19   know, when I asked Mr. Futerfas -- when we talked about

20   Mr. Dafna having employment and I asked what would he be

21   doing, he said basically what he said right here.  And that

22   raised concerns for the Government because Mr. Dafna, he was

23   working from home before he was arrested.  He didn't seem to

24   have a business address.  He didn't seem to have a business in

25   his own name.  He didn't have assets in his own name, he

Proceedings                                            22

1   didn't have anything in his own name, and it was very vague

2   and undetermined what he would be doing, who would he be

3   working for, who would be paying him and what exactly would he

4   be doing and what were his qualifications to do any of that

5   stuff.

6           I was told he was going to manage construction, and

7   there is a construction company that he's associated with, but

8   the agents told me during the course of the investigation it

9   doesn't actually do any real construction.  It doesn't

10  actually build anything.  And nothing is in his name.  It's

11  all held in the names of other people.  So it just seemed like

12  this was not going to be something that we would be able to

13  monitor and know what he was doing, and there was going to be

14  no employer, nobody to say this is what he's doing and no

15  accountability.

16          THE COURT:  Okay.  This here is my understanding of

17  the application of what Mr. Dafna will be doing.  In effect,

18  he will be putting deals together and so he is not working for

19  anyone, and he doesn't need to have an actual location other

20  than his home.  He is going to be on his phone, making phone

21  calls and putting together deals.  And I appreciate that in

22  that business that could all be done with very little paper

23  trail.

24          But here is what I will need for you to do as to

25  each of those:  you have to report -- you don't necessarily

Proceedings                                    23

1    have to say who he is working with because some of that

2    information may not be public information even though the

3    information that you will be providing to Pretrial and to the

4    Court won't be made public in any way.

5              But you do need to report as to what he is and isn't

6    doing so that it is clear and so that both Pretrial and the

7    Court can monitor to make sure that Mr. Dafna is not, in fact,

8    engaging in activities that is in violation of or consistent

9    with what's charged in the indictment.  So I will modify the

10   bond conditions to allow that, with the understanding that you

11   will be reporting the information to Pretrial Services.

12             Are we clear on that?

13             MR. FUTERFAS:  Yes, Your Honor.

14             THE COURT:  Does the Government have any question

15   about that?

16             MS. JONES:  No.

17             I just want to clarify one thing.  There has been a

18   lot of discussion about Mr. Tarshish's bond conditions, and

19   the ongoing reporting to Pretrial, but it was my understanding

20   that, even with those real estate transactions, he is not

21   supposed to be engaging in transactions where he acquires

22   property pursuant to a short sale arrangement.

23             THE COURT:  No short sale transactions.  I thought

24   that was clear.

25             MS. JONES:  Right.  And that means property that he

SN        OCR        RPR

Proceedings                          24

1    had acquired even if he acquired it years ago in a short sale.

2              THE COURT:  I don't know what that means.

3              MS. JONES:  Okay.

4              THE COURT:  And to the extent that you believe that

5    means that he can't subsequently sell a property that he may

6    have acquired --

7              MS. JONES:  And that he did acquire in a short sale.

8              THE COURT:  Right.  If that's your understanding of

9    the limitation, then you should try to work it out with

10   counsel, and if you can't, come to the Court.

11             Is it part of the charged scheme, because if it's

12   not, then he gets to do whatever he wants to do.

13             MS. JONES:  That is the charged scheme, Your Honor.

14             THE COURT:  Okay.  And so then the issue is really

15   the breadth of the indictment.

16             MS. JONES:  Which is very broad.

17             THE COURT:  And if you can't work it out with

18   counsel, the Court can resolve that.

19             MS. JONES:  That is true, but with Mr. Tarshish, the

20   Government has no visibility into what he's doing.

21             THE COURT:  What do you mean no visibility?

22             MS. JONES:  He only reports to Pretrial and the

23   Court and not to the Government.  I don't know what real

24   estate transactions he's doing.  I don't know what he's

25   selling.  I don't know how he acquires those properties he's

Proceedings                                                 25

1   selling because he's not required to tell me.

2              THE COURT:  I see.  Okay.

3              So this is an issue that we need to resolve on a

4   broader level because there is a question as to what

5   properties or sales or transactions are covered by the

6   indictment as is and what activities the defendants can engage

7   in.  And we need to resolve that because I can't -- I am not

8   going to be able to, by looking at the reports, assuming that

9   I get them monthly, nor will Pretrial, be able to determine if

10  any of these properties are actually part of the charged

11  fraud.

12             So, counsel, I am going to have to require that you

13  check the properties with the Government.  I don't see how

14  else we get around that.

15             MS. CASSIDY:  Your Honor?

16             THE COURT:  Yes, do you have a suggestion?

17             State your name for record.

18             MS. CASSIDY:  My name is Kathleen Cassidy for

19  Mr. Tarshish.  It would be helpful to hear what Your Honor's

20  concern was about the report that we submitted, which just

21  basically said that Mr. Tarshish has not engaged in any real

22  estate transactions.

23             THE COURT:  Well, actually, it's not Mr. Tarshish

24  with regard to that issue.  It is with -- no, it is.  Okay, I

25  will hear from Pretrial.  Pretrial is here on that.

Proceedings                                                    26

1          But the concern, as I understand it with regard to

2     Mr. Tarshish, is that he has made a number of travel trips to

3     New York for purposes of engaging in real estate transactions,

4     but never provided any information to Pretrial in addition to

5     the fact that he has just made a number of trips without

6     getting permission because he does have a restriction.

7          MS. CASSIDY:  Oh, that is not my understanding.

8     Mr. Tarshish has been regular -- very, very regular --

9          THE COURT:  Well, why don't we hear from Pretrial

10    first on that issue, and then hear from you.  But let me make

11    sure.  Let's deal with the other issues first as I consider

12    that to be a bond issue.

13         MS. CASSIDY:  Okay.

14         THE COURT:  With regard to transactions, generally,

15    so that we are all on the same page and months or a year from

16    now you are not in a position where your client has sold

17    property and the Government is coming to the Court and

18    basically saying they've violated their bail conditions, they

19    shouldn't have sold this property.  This is for purposes of

20    transparency.  I understand this is not how the parties would

21    prefer to operate, but to the extent your clients are looking

22    to sell property, can you at least run the addresses by the

23    Government and Ms. Jones?

24         You cannot just simply say no.  If you believe that

25    they are part of the scheme, then you explain that to counsel.

Proceedings                                                27

1   Because if that is your response then counsel gets an

2   opportunity to come to the Court and say, Judge, why/how this

3   doesn't fit within the context of the indictment.

4           There has to be some way to work this out.

5           MS. JONES:  That's absolutely fine, Your Honor, and

6   that is what I have done.  They have given me property

7   addresses.  I have looked them up.  I have reviewed whatever

8   documents we might have on them.  I have reviewed the public

9   documents.  And I've said this looks like a short sale and I

10  am not going to consent to it.  So, if you want, bring it to

11  the Court.  I know that I don't have the final say here.

12          THE COURT:  So I don't know any other way to resolve

13  this; not that I want to be in the middle of this and to be

14  having to decide on a property-by-property basis whether or

15  not the property falls within the contours of the indictment,

16  but the parties have to try to work it out.  And if you can't,

17  that's my job.  I have to figure it out if it is part of the

18  scheme or not.  And then, if it is, is there an alternative

19  way to deal with whatever concerns the clients may have as to

20  that particular property.

21          If, as you pointed out, Mr. Mehler, the fact that

22  your client can't sell the property means it will go into

23  foreclosure and then the property is lost to everyone, is

24  there an alternative, right?  So we have to figure that part

25  of it out so that -- I don't want your clients to be in a bad

1    place at the end of this case, and I don't know any other way

2    to do it other than for you to at least check each property

3    with the Government.

4              Yes?

5              MS. CASSIDY:  I think we do have an issue from a

6    Fifth Amendment perspective.  What we have represented to this

7    Court is that Mr. Tarshish will not engage in any real estate

8    transactions that have anything to do with a short sale,

9    whether the property was acquired in a short sale or whether

10   he intends to sell it in a short sale.  He will not engage in

11   those activities.

12             THE COURT:  And you believe that should be

13   sufficient and that your client should not have to check with

14   the Government as to any property?

15             MS. CASSIDY:  That's correct.

16             THE COURT:  Okay, and if you want to engage in this

17   that way, that's fine, but understand that at the end of this,

18   if your client did in fact sell properties that the Government

19   proves are part of this scheme then that will be to your

20   client's detriment.  All I am trying to do is to prevent that

21   from happening, but if that's how you want to proceed, you

22   have the right to proceed that way.

23             MS. CASSIDY:  That is, for now, how we would prefer

24   to proceed.

25             THE COURT:  Okay, but your client still has a

Proceedings                29

1    reporting requirement, which we will get to in a minute.

2            MS. CASSIDY:  Yes.

3            THE COURT:  But, yes, if that's how you want to

4    proceed.  And that's true for any of you defendants, you do

5    that at your own risk, right?  Understanding that at the end

6    of the day, if the Government proves that any property your

7    client has sold is part of the scheme, that carries a problem.

8            So are we clear on that?

9            MS. CASSIDY:  Yes, Your Honor.

10           THE COURT:  Yes?

11           MR. GREENBERG:  Thank you, Your Honor.  I just

12   wanted to --

13           THE COURT:  Just state your name and who you're --

14           MR. GREENBERG:  Oh, I'm sorry.  It's Todd Greenberg

15   on behalf of Mr. Herskowitz.

16           I think some of the problem is what does real estate

17   transaction mean?  How is it defined in general because

18   many -- if we get the definition, it's so broad we may not

19   even have to -- we not even be able to fall into that.

20           THE COURT:  Well, I don't know --

21           MR. GREENBERG:  I know Mr. Herskowitz, who is an

22   attorney --

23           THE COURT:  It is a broad indictment, as Ms. Jones

24   pointed out, and so my suggestion would be to check with

25   Ms. Jones if you have any questions, but to the extent you

Proceedings                                              30

1    don't want to proceed that way, then your client is going to

2    incur the risk of engaging in transactions that might violate

3    the indictment.  I don't know, I don't know what else to tell

4    you about that.  You are a lawyer.  Read it.  If you believe

5    what your client is doing is not in violation of either the

6    indictment; in other words, he's not engaging in any activity

7    similar to what's in the indictment or in violation of any

8    bond conditions, then that's your advice to your client.  I

9    can't help you there, right?

10            I was trying to assist the parties by suggesting

11   that to ensure that your client is in fact not violating his

12   bond conditions, that you run it by the Government.  But if

13   your client feels strongly about not doing that, that's your

14   client's right with the understanding that the Court can't

15   assist the client if, ultimately, he violates the terms of his

16   bond.

17            MR. GREENBERG:  I understand.  Thank you so much.

18            THE COURT:  Okay.  Anything else we need to discuss

19   generally from the parties?

20            From the Government?

21            MS. JONES:  Not from the Government.  We just have

22   those two other matters.

23            THE COURT:  Yes, we still have those two other

24   matters.  Okay.

25            So are the other parties going to leave now?

```
                        Proceedings                    31
```

1           MR. FUTERFAS:  If you don't mind, we will leave,

2    Your Honor.

3           THE COURT:  Yes.

4           Okay, so let's hear from Pretrial as to

5    Mr. Tarshish.

6           MS. FERGUSON:  Celine Ferguson from Pretrial

7    Services.

8           THE COURT:  Come on up to the table.

9           MS. JONES:  I am sorry, I don't think defense

10   counsel has seen the violation report.

11          THE COURT:  Oh, I see, no wonder you were so

12   confused.  So why don't you read that and we will take a

13   minute and it will give counsel an opportunity to read the

14   violation report.

15          So, Mr. Keating, should we be -- let's deal with the

16   issue as to your client.

17          MR. KEATING:  Yes.

18          THE COURT:  So, has your client seen the November

19   24th letter from the Government?

20          MR. KEATING:  He has.

21          THE COURT:  He has seen the letter.

22          MR. KEATING:  He has.

23          THE COURT:  Okay, and so the Government is asking me

24   to conduct a Curcio hearing here with regard to both your

25   meeting with Mr. Dafna, and also your representation of the

Proceedings                                    32

1    prior individual.

2              MR. KEATING:  Correct.

3              THE COURT:  That could potentially create a

4    conflict, so the question for your client is whether or not he

5    would like me to appoint conflict-free counsel.

6              Let me go through the issues with him and make sure,

7    Mr. Aronov, that you understand the issues that are at play

8    here.  Have you reviewed a copy of the Government's November

9    24, 2019 letter?

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  Okay, and so because of the issues

12   raised in the letter, I need to determine whether there is a

13   potential conflict here with Mr. Keating continuing to

14   represent you.  Do you understand?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  So, before I begin, tell me how old you

17   are.

18             THE DEFENDANT:  Thirty-two.

19             THE COURT:  How far did you get in school?

20             THE DEFENDANT:  I graduated from Queens College.

21             THE COURT:  And you read and understand English and

22   have no problems communicating with Mr. Keating; correct?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  Have you been under the care of a doctor

25   or psychiatrist recently?

Proceedings                                    33

1          THE DEFENDANT:  No, Your Honor.

2          THE COURT:  Are you currently taking any medication?

3          THE DEFENDANT:  No, Your Honor.

4          THE COURT:  Have you had any alcoholic beverages in

5    the last 24 hours?

6          THE DEFENDANT:  No, Your Honor.

7          THE COURT:  What about drugs or pills?

8          THE DEFENDANT:  No, Your Honor.

9          THE COURT:  Okay.  So, according to a November 24th

10   letter from the Government, Mr. Keating met with your

11   co-defendant, Mr. Dafna, and discussed potential

12   representation of him.  In addition, Mr. Keating previously

13   represented an individual who could be a co-conspirator in

14   this case or could be a potential witness.

15         And, Mr. Keating, if I understand correctly, you

16   represented that individual who was charged, convicted and

17   sentenced; correct?

18         MR. KEATING:  Correct.

19         THE COURT:  Okay.  And does your client know who

20   that individual is, the identity of them?

21         MR. KEATING:  I've discussed it with him, yes.

22         THE COURT:  Okay.  And so with these two things, it

23   creates a potential conflict in Mr. Keating's representation

24   of you, or it could, and I want to make sure that you are

25   aware of that, you understand that, and to the extent that you

Proceedings                                        34

1   would like to, that you discuss representation with someone

2   who doesn't have any similar potential conflict, because you

3   have a right to conflict-free counsel.

4            Do you understand that?

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  So some of the ways in which this could

7   potentially affect Mr. Keating's representation of you is, for

8   example, if Mr. Keating learns information in his

9   representation of the prior individual, or from Mr. Dafna when

10  he met with him, that he can't use in representing you, to

11  your detriment somehow; maybe he learned information that

12  ultimately may prevent him from pursuing certain defense on

13  your behalf.  I can't think of all the possible ways in which

14  it could come up, but there is a potential.

15           And so the question is, do you understand those

16  potential conflicts and how they may affect Mr. Keating's

17  ability to represent you?

18           THE DEFENDANT:  Yes, Your Honor, I'm fully aware.

19           THE COURT:  Would you like to meet with and discuss

20  with an attorney, who is not conflicted in any way, whether or

21  not you should continue to have Mr. Keating represent you or

22  do you want to waive any potential conflict?  And I would give

23  you an opportunity -- first, I would appoint counsel for you

24  to meet with, just for this limited purpose, and I would give

25  you time to meet with that individual.

Proceedings                                    35

1          THE DEFENDANT:  I waive my right, Your Honor, thank

2    you.

3          THE COURT:  Okay, so you have no interest in

4    speaking to anyone else, you fully understand the potential

5    conflict posed by Mr. Keating's representation and you want to

6    proceed with Mr. Keating anyway?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  Okay.  Would the Government like me to

9    inquire further?

10         MS. JONES:  No, Your Honor.

11         Your Honor, as noted in my letter, the Government's

12   concern is primarily with the representation of individual

13   one, and as long as Mr. Aronov understands that that could

14   create issues in the future for the reasons set forth in my

15   letter then I don't have any further questions.

16         THE COURT:  Mr. Aronov seems fully aware of what the

17   potential conflict is and is willing to waive that conflict.

18         Do you have any questions, Mr. Aronov?

19         THE DEFENDANT:  No, Your Honor.

20         THE COURT:  About anything raised in the

21   Government's letter?

22         THE DEFENDANT:  No, Your Honor.

23         THE COURT:  Okay.  Then I am satisfied that you are

24   knowingly and intelligently waiving any potential conflict.

25         You do appreciate that you can't later on say to

Proceedings                                              36

1   this Court, or on appeal, that, in fact, your attorney had a

2   conflict and didn't properly represent you.

3          THE DEFENDANT:  I understand that, Your Honor.

4          THE COURT:  Okay.

5          THE DEFENDANT:  Thank you.

6          THE COURT:  Anything further you would like me to

7   inquire about, Mr. Keating?

8          MR. KEATING:  No, Your Honor.  Thank you.

9          THE COURT:  Okay.

10         Back to Mr. Tarshish, have you had an opportunity to

11  review that with your client?

12         MS. CASSIDY:  I have not, Your Honor.  This letter

13  says that we were informed of this and we were not informed of

14  this.

15         THE COURT:  I believe it was just generated today,

16  if you would like an opportunity to come back and discuss it.

17         MS. CASSIDY:  Yes, I would like to speak to

18  Mr. Tarshish's supervising officer in Florida, who I have

19  spoken to on a few occasions.  He has informed her of each

20  trip he has taken to New York for employment purposes.  Those

21  were trips that were taken either to meet with us or to have

22  meetings related to potential real estate transactions.  I

23  have been copied on many of those e-mails informing Pretrial

24  that he was taking those trips, and she was -- she was fully

25  informed, as far as I'm aware.

Proceedings                                            37

1          The reason why there is no documentation of real

2     estate transactions is because nothing has come of those

3     meetings yet.  So Mr. Tarshish, who is obviously under

4     indictment, is having a little bit of trouble completing real

5     estate transactions.  He is diligently meeting with people, in

6     Florida and here, trying to get something done so he can earn

7     income to support his family, but nothing has come to fruition

8     yet.  So there is no documentation.  If Pretrial needs more

9     information about those meetings, we can provide that to them,

10    but this is the first that we are hearing that she needs more

11    information.

12          THE COURT:  Okay.

13          MS. CASSIDY:  He has given her names of people he's

14    meeting with, locations, times when he's going to be there

15    when he is meeting in New York.  In Florida, you know, he has

16    been in regular contact with her and my understanding is that

17    he has followed all of the rules that she has set for him and

18    she told him to report to her to Florida, only, and so there

19    may be some miscommunication here between Florida and New

20    York.

21          THE COURT:  I don't believe so.  This is all coming

22    from Florida, not from New York.

23          MS. CASSIDY:  Okay.

24          THE COURT:  And so my concern is more with regard to

25    all of the dates and times and locations.  It looks like

Proceedings                    38

1    sixteen different times between mid-November and December 1st

2    where your client has taken a number of trips to a number of

3    different locations without permission from Pretrial.

4           MS. CASSIDY:  So I know that some of these were for

5    business meetings, some of them are -- there is -- his

6    synagogue is located on the beach, and so I think some of

7    these are for religious purposes, but I would like the

8    opportunity to speak further to my client about this and to

9    Officer Morales to get a better understanding of what the

10   communications have been and what the issue is.

11          THE COURT:  Okay, why don't I hear from Pretrial.

12          MS. FERGUSON:  Your Honor, first of all I just want

13   to apologize for her not getting the memo.  I'm covering for a

14   colleague and he e-mailed it out this morning.  It was all

15   very rushed and just an oversight that she wasn't included in

16   the e-mail.

17          The issues Officer Morales conveyed to us is that he

18   has not provided any sort of employment verification

19   documents, as directed by Your Honor to do, since the

20   commencement of supervision, and he has reported that he is

21   traveling to New York for the purpose of real estate

22   transactions, but then has not followed up with any

23   documentation to prove that's why he was there, this is what

24   he was doing.  Again, this is what Officer Morales conveyed to

25   us.

Proceedings                          39

1      THE COURT:  Right.  And so I think part of the issue

2  here is the types of jobs that these defendants engage in;

3  they are not the types of jobs that generate paperwork in the

4  way that Pretrial is used to seeing, some verification and

5  that I interviewed with so-and-so on this date.  But it sounds

6  like counsel is providing as much information as possible with

7  regard to each time he flies to New York for purposes of

8  engaging in transactions.

9           So a representation from his counsel as to who he

10  met with or what he's doing, as counsel seems to have been

11  provided, should be sufficient here as opposed to -- I'm not

12  sure what other documentation Ms. Morales has in mind in terms

13  of showing potential employment, but it's not that he is in

14  fact working somewhere where it would generate some form of

15  employment paperwork.  So she should be mindful of that in

16  terms of what paperwork is expected or what information she

17  expects from Mr. Tarshish when he makes these trips.

18           MS. FERGUSON:  I assume she's been advised, Officer

19  Morales, of the e-mails between herself and counsel.

20  Otherwise, you know, we can accept that as verification.

21  Maybe there is some sort of miscommunication there, so I will

22  confirm with him or directly with Officer Morales.  So I will

23  confirm and I will speak to her about that and let her know

24  that you said simple communication from defense counsel

25  suffices as verification.

SN        OCR        RPR

Proceedings                                    40

1          In terms of the -- not abiding by the location

2    monitoring condition, all of these events here were times that

3    he was allowed out to attend religious services, so it's clear

4    when reviewing the GPS points and seeing where he is, there's

5    times when he's in the pool, he's out at the gas station, he's

6    at the mall.  As Your Honor can see in the report, he was not

7    given permission to leave the house to do those things.  He

8    was given permission to go to religious services, and time and

9    time again she's addressed the non-compliance with him and he

10   continues to do it.  So at this time we're requesting that he

11   be placed on home incarceration and that's our position at

12   this time.

13         THE COURT:  Okay.

14         So, counsel, I am going to give you an opportunity

15   to review this with your client, but I think you can

16   appreciate what Pretrial is basically representing to the

17   Court, which is that your client is getting permission to

18   leave home for religious purposes, but is engaging in other

19   activities during those time periods, which is a concern to

20   the Court.  And, so, I will consider their request, but I will

21   give you an opportunity to discuss it with your client.

22         When would you like to put this on for a further

23   hearing on this issue?

24         MS. CASSIDY:  You anticipate an additional hearing

25   in person that Mr. Tarsish has to travel back up to have in

Proceedings                               41

1   New York?

2           THE COURT:  Well, we can do it on a date when he's

3   going to be here for business, because the Court is flexible,

4   or I can have him appear by phone if you're willing to do

5   that.  I'm not going to have him incur the cost of coming back

6   up just to be heard further on this issue.

7           MS. CASSIDY:  Would next Tuesday be okay, Your

8   Honor?  Tuesday the 10th?

9           THE COURT:  Okay, Tuesday the 10th it is.  At what

10  time?

11          MS. CASSIDY:  10 a.m.?

12          THE COURT:  Okay.  And do you want your client to

13  appear by phone or is he going to be in New York otherwise?

14          MS. CASSIDY:  He will come up to New York.

15          THE COURT:  Okay, so we will put this matter on for

16  Tuesday, the 10th at 10 a.m.  You will get an opportunity to

17  speak to the Pretrial Services officer who is supervising your

18  client in Florida and we will have a better hearing at that

19  date and time.

20          MS. CASSIDY:  Thank you, Your Honor.

21          THE COURT:  Anything else we need to discuss today?

22          MS. JONES:  Not from the Government, Your Honor.

23          THE COURT:  Any of the parties?

24          (Chorus of noes.)

25          THE COURT:  Mr. Mehler, you are still --

```
                        Proceedings                    42
```

1           MR. MEHLER:  It's just my natural state.  I don't

2    want you to read too much into it.

3           THE COURT:  Okay.  I will remember that.

4           MS. JONES:  I have the signed stipulation and order.

5           THE COURT:  Why don't you give them to me so I will

6    review them now.

7           MS. JONES:  I just included one copy and then the

8    signature pages.

9           THE COURT:  Okay.

10          We are adjourned.

11          (Matter adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25