## OPERATING AGREEMENT
## OF
## 180 MARSTUY LLC

This OPERATING AGREEMENT (this "**Agreement**") of **180 MARSTUY LLC** a New York limited liability company (the "**Company**") is entered into as of this May 2015, by and among **EHNY LLC**, a New York limited liability company with an address at 914 Bedford Avenue, Brooklyn, New York (the "**Developer**") and **3 SPEC INVESTORS LLC**, a Delaware limited liability company with an address at c/o 613 Summit Corp., 100 Merrick Road, Suite 400, East Rockville Center, New York, New York 11570 (the ("**Investor**"; and together with Developer, the "**Members**.").

## EXPLANATORY STATEMENT

**WHEREAS**, the Members desire to operate the Company pursuant to the terms and conditions set forth in this Agreement, and;

**WHEREAS**, 613 Summit Corp., the manager of Investor and an Affiliate of BHRE Group LLC (the "**Facilitator**"), has facilitated the business relations between the Developer and the Investor, and formed the business joint venture between the Members;

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE 1 - DEFINITIONS

1.1    **Definitions.**  Each of the following capitalized terms shall have the meaning specified in this Article 1. Other terms are defined in the text of this Agreement and those terms shall have the meanings respectively ascribed to them throughout this Agreement.

(a)    "**Agreement**" means this Operating Agreement, and the Exhibits and Schedules annexed hereto, all as amended from time to time in accordance with the provisions hereof.

(b)    "**Affiliate**" means any person or entity which directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with a specified person or entity. For purposes hereof, the terms "control", "controlled", or "controlling" with respect to a specified person or entity shall include, without limitation, (i) the ownership, control or power to vote ten percent (10%) or more of (x) the outstanding shares of any class of voting securities or (y) beneficial interests, of any such person or entity, as the case may be, directly or indirectly, or acting through one or more persons or entities, (ii) the control in any manner over the managing member(s) or the election of more than one director or trustee (or persons exercising similar functions) of such person or entity, or (iii) the power to exercise, directly or indirectly, control over the management or policies of such person or entity.

(c)     **"Articles of Organization"** means the Articles of Organization of the Company, as filed with the New York Secretary of State on April 24, 2015 (the **"Date of Formation"**) as the same may be amended from time to time.

(d)     **"Business Plan"** means the Business Plan attached hereto as <u>Schedule B</u>.

(e)     **"Capital Account"** means the account to be maintained by the Company for each Member as described in Section 6.4.

(f)     **"Capital Contribution"** means the total amount of cash and the fair market value of any other asset contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject, as determined by the Manager.

(g)     **"Claim"** or **"Claims"** shall mean any notice, letter and/or request containing a demand for payment and/or compensation and/or remedy, or the taking of any other action including, without limitation, the commencement of legal proceedings, any orders, decrees, injunctions or judgments, any private or governmental or class actions, suits, litigation, investigation, inquiries, or arbitration proceedings;

(h)     **"Closing"** means the closing of the transfer of the Properties pursuant to the Transfer Agreements or the date Investor becomes a Member of the Company.

(i)     **"Code"** means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision or provisions of any succeeding law.

(j)     **"Company"** has the meaning set forth in the preamble to this Agreement.

(k)     **"Loans"** means that loan or loans, in the aggregate amount of approximately $2,540,981.00 that the Company intends to obtain for the purpose of funding the acquisition, development and construction of the Properties in accordance with the Business Plan.

(l)     **"Distribution"** means any cash and other property paid to a Member by the Company from the operations of the Company, including the sale of the Properties.

(m)     **"Encumbrance"** means any mortgage, charge, pledge, lien, restriction, assignment, hypothecation, security interest, title retention or any other agreement or arrangement that effect of which is the creation of security; or any other interest, equity or other right of any person (including any right to acquire, option, right of first refusal or right of pre-emption); or any agreement or arrangement to create any of the same.

(n)     **"Escrow Agent"** shall mean the Law Office of Michael Herskowitz, Esq., or such other party designated pursuant to the terms of Section 4.6 herein and approved by Developer and the Investor Representatives.

(o)     **"Fiscal Year"** means the fiscal year of the Company, which shall be the year ending December 31.

(p)     **"Investor Representative"** means Tzvi Ben-David or Aaron Harow on behalf of Investor.

(q)     **"Manager"** shall mean Scott Kushnick, who, along with Tomer Dafna, are members of Developer.

(r)     **"Member"** means each person signing this Agreement and any Person who subsequently is admitted as a member of the Company and any reference herein to the Members of the Company shall be to the then Members of the Company.

(s)     **"Membership Interests"** means all of the rights of a Member in the Company, including such Member's: (i) right to share in the Profits and Losses of the Company; (ii) right to inspect the Company's books and records; (iii) the right to participate in the management of and vote on matters coming before the Members, to the extent provided in this Agreement, and (iv) to the extent permitted under this Agreement, the right to act as an agent of the Company.

(t)     **"New York Act"** means the New York Limited Liability Company Act.

(u)     **"Person"** means any individual, corporation, governmental authority, limited liability company, partnership, trust, unincorporated association or other entity.

(v)     **"Properties"** means, collectively, the three properties specified in Sections 1.1(w)-(y).

(w)     **"Property 1"** means the premises located at 235 51st Street, Brooklyn, New York 11220, and any other property (real or personal), rights or interests appurtenant or relating thereto.

(x)     **"Property 2"** means the premises located at 120 Marcus Garvey Boulevard, Brooklyn, New York 11206, and any other property (real or personal), rights or interests appurtenant or relating thereto, including membership interests in 120 Marcus Garvey LLC.

(y)     **"Property 3"** means the premises located at 354 Stuyvesant Avenue, Brooklyn, New York 11233, and any other property (real or personal), rights or interests appurtenant or relating thereto, including membership interests in 354 Stuyvesant LLC.

(z)     **"Project"** means the purchase, renovation and sale of the properties in Sections 1.1(w)-(y) as described in the Business Plan.

(aa)     **"Reserve"** means reasonable amounts set aside and deemed sufficient by the Manager, as of the date of determination, for working capital and to pay taxes, insurance, debt service, or other costs and expenses incident to the operation of the Company.

(bb)     **"Treasury Regulations"** means the treasury regulations, including any temporary regulations, promulgated under the Code from time to time, as the same may be amended from time to time.

(cc)     **"Transfer Agreements"** means, collectively, the purchase contract and two assignment agreements specified in Sections 1.1(dd)-(ff).

(dd)     **"Purchase Contract"** means that certain purchase contract entered into as of May ___, 2015 between 235 51 ST LLC as seller (the **"Seller"**) and the Company, whereby the Seller has agreed to sell to the Company and the Company has agreed to purchase from the Seller Property 1.

(ee)    "**Assignment Agreement 1**" means that certain assignment and assumption of membership interests agreement entered into as of May ___, 2015 between Tomer Dafna, as assignor (the "**Assignor**") and the Company, whereby the Assignor has agreed to assign all membership interests in 120 Marcus Garvey LLC to the Company and the Company has agreed to assume from the Assignor all membership interests including ownership of Property 2.

(ff)    "**Assignment Agreement 2**" means that certain assignment and assumption of membership interests agreement entered into as of May ___, 2015 between Tomer Dafna, as assignor (the "**Assignor**") and the Company, whereby the Assignor has agreed to assign 49% of membership interests in 354 Stuyvesant LLC to the Company and the Company has agreed to assume from the Assignor 49% of membership interests including ownership of Property 3.

## ARTICLE 2 - ORGANIZATION

2.1    **Formation.**    The Company was formed upon the filing of the Articles of Organization with the New York Secretary of State pursuant to the New York Act.

2.2    **Name.**   The name of the Company is **180 Marstuy LLC**.

2.3    **Principal Place of Business.**    The principal place of business of the Company within the State of New York shall be at 914 Bedford Avenue, Brooklyn, New York.   The Company may establish any other places of business as the Manager may from time to time deem advisable in its sole discretion.

2.4    **Term.**    The term of the Company began upon the filing of the Articles of Organization and shall continue until terminated pursuant to this Agreement or the New York Act.

2.5    **Purposes.**

(a)    The Company is formed for any lawful business purpose or purposes.

(b)    The initial purpose for which the Company has been formed is to own, hold, lease, sell, transfer, exchange, operate, finance, develop and manage the Properties and to act on behalf of its Members in connection with the forgoing and engaging in any and all activities necessary or incidental to the foregoing. Legal title to all property of the Company and membership interests in 120 Marcus Garvey LLC and 354 Stuyvesant LLC shall be held, vested and conveyed in the name of the Company and no real or other property of the Company shall be deemed to be owned by the Members individually.   The Membership Interests of each Member shall constitute personal property.

## ARTICLE 3 - MEMBERS

3.1    **Names and Addresses.**   The names and addresses of the initial Members and their respective initial Membership Interests, and their respective Initial Capital Contributions are as set forth in Schedule "A" to this Agreement.   From time to time after the date hereof Schedule "A" shall be deemed amended to reflect the admission or withdrawal of a Member or the issuance or redemption of a Membership Interest.

3.2 **Additional Members & Adjustment to Membership Interests.** A Person may be admitted as a Member after the date of this Agreement only upon the consent of the Manager and with the consent of the Investor Representative as provided in Section 4.1 below. In addition, a Member's Membership Interests shall not be increased or diluted without the prior consent of the Manager and the consent of the Investment Representative, except as otherwise provided in this Agreement. Upon making an additional Capital Contribution to the Company, the Membership Interests of the Investor and the Developer shall be adjusted to correspond to the capital contributions made by each Member.

3.3 **Books and Records.** The Company shall keep books and records of accounts and minutes of all meetings of the Members. Such books and records shall be maintained on a cash basis in accordance with this Agreement.

3.4 **Information.** Each Member may inspect during ordinary business hours and at the principal place of business of the Company the Articles of Organization, the Operating Agreement, the minutes of any meeting of the Members and any tax returns of the Company for the immediately preceding three Fiscal Years.

3.5 **Limitation of Liability.** Each Member's liability shall be limited as set forth in this Agreement, the New York Act and other applicable law. A Member shall not be personally liable for any indebtedness, liability or obligation of the Company, except that such Member shall remain personally liable for the payment of the Capital Contribution of such Member and as otherwise set forth in this Agreement, the New York Act and any other applicable law.

3.6 **Priority and Return of Capital.** Except as provided in Article 7 and Article 8, no Member shall have priority over any other Member, whether for the return of a Capital Contribution or for Profits, Losses or a Distribution;

3.7 **Liability of a Member to the Company.** A Member who or which rightfully receives the return of any portion of a Capital Contribution is liable to the Company only to the extent now or hereafter provided by the New York Act. A Member who or which receives a Distribution made by the Company in violation of this Agreement or made when the Company's liabilities exceed its assets (after giving effect to such Distribution) shall be liable to the Company for the amount of such Distribution.

3.8 **Financial Adjustments.** No Members admitted after the date of this Agreement shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Members may, in their discretion, at the time a new Member is admitted, close the books and records of the Company (as though the Fiscal Year had ended) or make pro rata allocations of loss, income and expense deductions to such Member for that portion of the Fiscal Year in which such Member was admitted in accordance with the provisions of the Code.

## ARTICLE 4 - MANAGEMENT

4.1 **Management.**

(a) The Company does hereby designate and appoint Scott Kushnick as the initial Manager of the Company.

(b) The Manager shall have the sole authority to bind the Company with respect to any matter except as otherwise expressly provided for herein.

(c)     Subject to Section 4.1(e) below, the Manager may take all steps, which in his sole but reasonable determination are required or necessary to further the business aims and goals of the Company and the Project, including without limitation, all day to day decisions, policy setting, approving the overall direction of the Company and making all decisions affecting the business and affairs of the Company. The Manager is expressly authorized to execute all documents in connection with the Loans, including but not limited to, a mortgage note, mortgage and security agreement, guaranty and pledge agreement. The Manager shall provide to Investor and Investor shall have the right to review the terms and conditions of the Loans.

(d)     The Manager may be removed for Cause by either Investor Representative and replaced with a substitute Manager designated by the Investor Representative. The phrase **"Cause"** shall mean any of the following:

(i) the Manager's conviction of or plea of guilty or *nolo contendere* to a felony, whether or not in connection with the Company, which would materially prevent the Manager from managing the ongoing operations of the Company and the pursuit of the Project;

(ii) an action by the Manager involving dishonesty, fraud, gross negligence, gross misconduct, embezzlement or any other crime in connection with the Company

(iii) the Manager's filing for a voluntary petition in bankruptcy, or becoming the subject of an order of being declared insolvent in any federal or state bankruptcy or insolvent proceeding ;

(iv) the death of the Manager or physical incapacity of the Manager which prevents him from performing his duties as Manager for longer than one (1) month (**"Physical Incapacity"**);

(v) if the Manager ceases to own all the beneficial interests in the Developer;

(vi) in the event that a Primary Representation is untrue in any material respect;

(vii) in the event that the Manager or the Developer commits a material breach of a Primary Obligation under this Agreement and the breach of such Primary Obligation is not cured within fourteen (14) business days of receiving written notice thereof.

For the purposes of this paragraph, a Primary Representations means those representations included in Sections 12.1 (Ownership of Properties), 12.6 (Purchase Price and Closing Liabilities), 12.7 (Fees to Developer), 12.10 (Claims), and 12.12 (Developer Ownership Interests), 12.13 (Due Incorporation and Authority), and 12.15 (Membership Interests).

For the purposes of this paragraph, a Primary Obligation means the obligations of the Manager or the Developer under Section 4.1 (Management), Section 4.5 (Sale of Properties), Article 6 (Capital Contributions), Section 6.9 (Buy-Out), Article 8 (Distributions), Article 10 (Transferability), and Article 13 (Books, Records and Reports).

In the event that the Manager is removed for Cause other than (i) the death or Physical Incapacity of the Manager which occurs after the material permits for the Project and financing for the Project have been obtained; or (ii) the Manager's breach of its obligations under Article 13 (Book, Records and Reports), then (x) Tzviki Ben David and/or Tomer Dafna shall be appointed as a replacement Manager at the choice of the Investor Representative and (y) from the date of such removal, any "promote" distributions to be paid to the Developer under Section 8.1(a)(vii)-(viii) (i.e. Distributions other than in respect of the Developer's pro rata Membership Interests) shall be paid to an entity designated by the Investor Representative.

(e)     Notwithstanding any other provision of this Agreement, the Manager shall not have the authority to take the following actions on behalf of the Company (each, a **"Major Decision"**) without the prior written consent of the Investor Representative, which consent shall not be unreasonably withheld:

(i)     make any amendment to this Agreement;

(ii)     admit any Member to or remove any Member from the Company;

(iii)     make any change in the nature or character of the business of the Company;

(iv)     incur indebtedness or borrow money in excess of twenty thousand dollars ($20,000.00) on behalf of the Company, other than the Loans;

(v)     lend any Company funds or other assets to any person;

(vi)     confess a judgment against the Company; settle, compromise or release, discharge or pay any claim, demand or debt in excess of $50,000.00, including claims for insurance;

(vii)     conduct any sale, reorganization or recapitalization of the Company, whether directly or pursuant to a merger, consolidation, share exchange or otherwise;

(viii)     conduct any sale, lease, exchange, assignment, transfer or other disposition of all or a portion of the Properties other than a sale of a condominium unit to an unaffiliated third party for a purchase price that is not less than the sale price per square foot for the relevant unit as provided in the Business Plan;

(ix)     acquire additional property or any other material assets;

(x)     hire or retain any employees of the Company;

(xi)     enter into any transaction, other than with Extreme Homes NY LLC or Brooklyn Construction Management (each a **"Developer Contractor Affiliate"**) (the terms of which transaction shall be subject to the approval of the Investor Representative) with: (a) an Affiliate of the Manager or of a Member of the Company (other than an arrangement between the Company and an Affiliate whereby the Affiliate purchases appliances or materials for the Properties on behalf of the Company and passes through the cost only of the acquisition to the Company) or (b) with a third party in which the Manager or his Affiliate will be paid a fee or receive an independent economic benefit;

(xii)    wind-up of the Company.

4.2    **Officers, Agents and Manager.**  The Manager may from time to time designate such officers, agents and manager as it may deem necessary to carry out the day-to-day operations of the Company.    Such officers, agents and manager shall have such duties, powers, responsibilities and authority as may from time to time be prescribed by the Manager, and may be removed at any time, with or without cause, by the Manager.  The appointment of any officer or agent or manager other than Scott Kushnick or Tomer Dafna shall require the prior approval of the Investor Representative.

4.3    **Indemnification.**  The Company shall indemnify and hold harmless any Member, officer or agent of the Company from and against all claims and demands made by third parties as a consequence of such person's good faith actions or activities on behalf of the Company.  The Company shall not indemnify the Manager, its principals or any other person acting on behalf of the Company if the claim for indemnification arises from their grossly negligent, willful or wanton acts.

4.4    **Sale of the Properties**.  The Members and Manager agree that prior to marketing the Properties for sale to the public, the Company will offer certain members of the Investor (who shall be designated by the Investor Representative) the opportunity to purchase the multi-family houses at the price at which said Property(ies) will be offered to the public.

4.5    **Forced Sale of the Properties**.  Notwithstanding anything herein to the contrary, the Members and Manager agree that in the event that if within nine (9) months after the Closing, the Properties (or any one or more them) have been fully renovated, then the Investor Representative shall have a right to cause the Company to sell the Properties (or any one or more of them) to a third party purchaser on market terms.  Developer shall have the right of first refusal to purchase the Properties (or any one or more of them) on the same terms and condition as any interested third party.

4.6    **Net Sale Proceeds**.  Upon any sale, the proceeds thereof shall be paid to the escrow account of Escrow Agent, which proceeds shall thereafter be disbursed in accordance with the terms herein and upon prior written approval of the Developer and the Investor Representative.

4.7    **Outside Interests, Conflicts**

(a)    Except as otherwise expressly provided for in this Agreement, any Member, Manager or Affiliate of any Member or Manager shall have the right to engage in and/or possess an interest in any other business of every kind, nature and description, independently or with other Persons, irrespective of whether competitive with any property or business directly or indirectly owned or engaged in by the Company. Neither the Company nor any Member shall have or be entitled to any rights, solely by virtue of this Agreement, in and to such independent ventures or to the income and profits derived therefrom, nor shall any such Member, Manager or such Affiliated Person have any obligation whatsoever to offer, share or offer to share any business opportunity of any kind to or with the Company or any other Member.  The Members acknowledge that the Manager is engaged, and will continue to be engaged, in other business activities and will not be devoting full time to the business of the Company.

(b)    The Developer and Facilitator have disclosed that they (or their Affiliates) may receive a portion of the purchase price to be paid by the Company for the Properties (or any one or more of them) pursuant to the Transfer Agreements.

4.8     **Project Management Fee**.  After Closing, the Company shall pay a project management fee in an aggregate amount equal to one and forty-nine hundredths percent (1.49%) of the estimated total project costs as stated in the Business Plan to the Facilitator.

## ARTICLE 5 - MEETINGS OF THE MEMBERS

5.1     **Meetings**.  Meetings of the Members for any purpose or purposes, may be called by the Manager.

5.2     **Place of Meetings**.  Meetings of the Members may be held at any place, within or outside the State of New York, designated in any notice of such meeting.  If no such designation is made, the place of any such meeting shall be the office of the Company. The meetings may be conducted by means of communication systems, including e-mail, skype and telephone.

5.3     **Notice of Meetings**.  Written notice stating the place, day and hour of the meeting indicating that it is being issued by or at the direction of the person or persons calling the meeting, stating the purpose or purposes for which the meeting is called shall be delivered no fewer than ten and no more than sixty days before the date of the meeting.

5.4     **Record Date**.  For the purpose of determining the Members entitled to notice of or to vote at any meeting of Members or any adjournment of such meeting, or Members entitled to receive payment of any Distribution, or to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring Distribution is adopted, as the case may be, shall be the record date for making such a determination.

5.5     **Quorum**.  Subject to the provisions of this Agreement, all Members are required to be present, in person or by proxy, to constitute a quorum at any meeting of Members.

5.6     **Manner of Acting**.  If a quorum is present at any meeting, the unanimous vote or unanimous written consent of the Membership Interests shall be required, unless the vote of a greater or lesser proportion or number is otherwise required by the New York Act, the Articles of Organization or this Agreement.  Any action that may be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by the Members that would be necessary to take such action at a meeting. A facsimile or other reproduction of a writing (including, without limitation, an electronic mail signature) signed by a Member shall be regarded as signed by the Member for purposes of this Section.

5.7     **Waiver of Notice**.  Notice of a meeting need not be given to any Member who submits a signed waiver of notice, in person or by proxy, whether before or after the meeting.  The attendance of the Manager at a meeting, in person or by proxy, without protesting prior to the conclusion of the meeting the lack of notice of such meeting, shall constitute a waiver of notice by such Manager.

## ARTICLE 6 - CAPITAL CONTRIBUTIONS

6.1     **Capital Contributions**.  Each Member has contributed or shall contribute the amount set forth in Schedule A to this Agreement as the Initial Capital Contribution to be made by such Member. The Capital Contribution of the Developer shall be made at or prior to the Closing.  The Capital Contribution of the Investor shall be made as follows:

(a)       One Million Six Hundred and Ten Thousand Dollars ($1,610,000.00) (the "**Capital Contribution**") to the escrow account of the Investor's counsel no later than three (3) days prior to Closing or in the event the Company or 120 Marcus Garvey LLC or 354 Stuyvesant LLC has already purchased any of the Properties, within forty-five (45) days from the date the parties execute this Agreement (or such earlier date as has been agreed upon by the Members).  Said amount shall be used for acquisition and construction as per the Business Plan. The entire funds allocated for construction, including the contingencies, shall be deemed earned by Developer once the construction is completed (said funds will cover hard and soft costs, and Developer's construction and site management and other fees).

6.2       Any portion of such capital contributions that are not paid out at the closing or otherwise used to pay a cost that is associated with the purchase of the Properties and is not noted in the closing statements at Closing shall be deposited into the bank account of the Company.

6.3       **Additional Contributions**.

(a)       There shall be no obligation by the Investor to contribute any additional capital other than as provided above and pursuant to Schedule A.  Any additional contributions necessary shall be made by the Developer as a Cost Overrun Loan.

(b)       Notwithstanding anything contained herein to the contrary, in the event that additional contributions are required to be paid for project costs (including, without limitation, any interest payments due on the Loans) as a result of a delay in the Project or for any other reason, the Developer alone shall make such contributions as a non-interest bearing loan (and not as a Capital Contribution) to the Company in the amount of the deficiency (a "**Cost Overrun Loan**").  A Cost Overrun Loan shall be repaid in the manner provided in Section 8.1 below.

6.4       **Capital Accounts**.  A Capital Account shall be maintained for each Member.  Each Member's Capital Account shall be increased by the value of each Capital Contribution made by the Member, the amount of any Company liabilities assumed by the Member (or which are secured by Company property distributed to such Member), allocations to such Member of the Profits and any other allocations to such Member of income pursuant to the Code.  Each Member's Capital Account will be decreased by the value of each Distribution made to the Member by the Company, the amount of any liabilities assumed by the Company (or which are secured by property contributed to the Company by such Member), allocations to such Member of Losses and other allocations to such Member pursuant to the Code.

6.5       **Transfers**.  Upon a permitted sale or other transfer of a Membership Interest in the Company, the Capital Account of the Member transferring such Member's Membership Interest shall become the Capital Account of the Person to which or whom such Membership Interest is sold or transferred in accordance with Section 1.704-1 (b)(2)(iv) of the Treasury Regulations.

6.6       **Modifications**.  The manner in which Capital Accounts are to be maintained pursuant to this Section is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder.  If in the opinion of the Members the manner in which Capital Accounts are to be maintained pursuant to this Agreement should be modified to comply with Code Section 704(b) or the Treasury Regulations, then the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

6.7     **Deficit Capital Account.**  Except as otherwise required in the New York Act or this Agreement, no Member shall have any liability to restore all or any portion of a deficit balance in a Capital Account.

6.8     **Withdrawal or Reduction of Capital Contributions.**  Subject to Section 8.1, a Member shall not receive from the Company any portion of a Capital Contribution until all indebtedness, liabilities of the Company, except any indebtedness, liabilities and obligations to Members on account of their Capital Contributions, have been paid or there remains property of the Company, in the sole discretion of a majority in interest of the Members, sufficient to pay them.  A Member, irrespective of the nature of the Capital Contribution of such Member, has only the right to demand and receive cash in return for such Capital Contribution.

6.9     **Investor Buy-Out Rights.**  If (a) within six (6) months after the Closing, the Company shall not have obtained all permits, licenses and/or approvals from government, statutory and/or municipal authorities ("**Permits**") that may be necessary or required for the purposes of the carrying out the implementation of the Business Plan pertaining to the demolition of the existing structure (if applicable) and construction of the Project in accordance with all applicable relevant laws, (b) within six (6) months after the Closing, a binding commitment from the lender providing the construction loan shall not have been obtained, or (c) if at any time after the Closing, it is determined that the construction of the Project on the Properties (or any one or more of them) cannot be built as contemplated in the Business Plan, then, if and when requested thereafter in writing by the Investor, at the sole option and discretion of said Investor, Investor shall have the right to require the Developer to buy-out Investor's interest in the Company and pay Investor an amount equal to Investor's actual Capital Contributions made and still outstanding plus an amount representing a cumulative annualized return of ten percent (10%) (the "Buy-Out Yield") for Investor on Investor's entire Capital Contributions including (without limitation) its entire Initial Capital Contribution amount actually contributed.  If the foregoing provisions of this Section apply, Investor may exercise its right by giving notice in writing to Developer in which case Investor shall transfer its Membership Interest in the Company to Developer upon payment by the Developer of its payment obligations under this Section 6.9.  The closing of any such transaction and full payment by the Developer shall be completed within forty-five (45) days of notice being delivered by the Investor as provided above.

### ARTICLE 7 - TAX ALLOCATIONS

7.1     **Allocations of Profits and Losses.**  After giving effect to the special allocations set forth in Section 7.2 which is given priority over this Section 7.1, the Company's Profits and Losses (as such terms are hereinafter defined) shall be allocated to the Members as follows:

(a)     Profits.

(i)     First, to the Members in the reverse order that Net Losses were allocated pursuant to Section 7.1(b), and in the same ratio that such Net Losses were allocated under each subsection of Section 7.1(b), until cumulative Net Profits allocated pursuant to this Section 7.1(a) are equal to the cumulative Net Losses allocated pursuant to Section 7.1(b) for all prior periods;

(ii)     Second, to the Members in accordance with, and in the order, priority and to the extent of, the cumulative Distributions pursuant to Section 8.1 with respect to the current taxable year and for all prior taxable years, until the aggregate amount allocated to each Member pursuant to this Section 7.1(a)(ii) equals the aggregate amount distributed or distributable to each such Member pursuant to Section 8.1;

(iii)    Finally, to the Members in accordance with their respective Membership Interest percentage.

(b)    Losses.

(i)     First, to the Members in the reverse order that Net Profits were allocated pursuant to Section 7.1(a), and in the same ratio that such Net Profits were allocated under each subsection of Section 7.1(a), until the cumulative Net Losses allocate pursuant to this Section 7.1(b)(i) are equal to the cumulative Net Profits allocated pursuant to Section 7.1(a) for all prior periods; provided, however, that for purposes of this Section 7.1(b)(i), Net Profits allocated under Section 7.1(a)(i) shall not be deemed to be allocated under Section 7.1(a)(i), but instead shall be treated as being allocated under Sections 7.1(a)(ii) or (iii) in the manner and amount that such Net Profits were originally allocated under those Sections.

(ii)    Second, to the Members in proportion to the positive balances in their respective capital accounts, until such time as their capital account balances equal zero; and

(iii)   Finally, to the Members in accordance with their respective Membership Interest percentage.

(c)    Definition of Profits and Losses.  The terms "Profits" and "Losses" mean, for any taxable year, the Company's taxable income or loss, respectively, as calculated under Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(I) of the Code shall be included in taxable income or loss), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(ii)    Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as such pursuant to Treasury Regulation §1.704-1 (b)(2)(iv)(i), and which are not otherwise taken into account in computing such Profits or Losses, shall be subtracted from such taxable income or loss;

(iii)   In the event the value of any Company asset is adjusted pursuant to Section 7.4, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv)    Gain or loss resulting from the disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value (as defined below) of the asset disposed of (as reduced by depreciation, amortization or other cost recovery deduction), notwithstanding that the adjusted tax basis of such asset differs from its Book Value;

(v)     Depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such fiscal period shall be based on its Book Value;

(vi)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) or Section 743(b) of the Code is required pursuant to Treasury Regulation §1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining capital accounts as a result of a distribution other than in liquidation of a Member's interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset, and shall be taken into account for purposes of computing Profits or Losses; and

(vii)     All items of income, gain, loss or deduction specially allocated pursuant to Section 7.2 shall not be taken into account in computing Profits or Losses.

(d)     Definition of Book Value.  The "Book Value" of a Company asset shall mean the cost of such asset to the Company except that the initial Book Value of any asset contributed to the Company shall be its fair market value at the time of such contribution, and Book Value shall take into account any adjustments made pursuant to Section 7.4 and any adjustment made pursuant to Section 7.1(c)(vi).

7.2     **Special Allocations**.

(a)     Losses for any taxable year that would otherwise be allocated with respect to a Membership Interest owned by a Member and which would cause such Member to have an Adjusted Capital Account Deficit (as defined in Section 7.2(e)) with respect to his, her or its Membership Interest as a Member shall instead be allocated pro rata among the remaining Members.

(b)     Nonrecourse deductions for a fiscal year shall be allocated to the Members in the same manner as Losses are allocated pursuant to Section 7.1(b) in accordance with Treasury Regulation § 1.704-2(f), (g) and (h).  Upon the recapture (or other reversal) of nonrecourse deductions, items of income or gain of the Company shall be allocated to the Members in proportion to the amount of such nonrecourse deductions previously allocated to them pursuant to the preceding sentence (and not previously recaptured pursuant to this sentence). With respect to a liability (or portion thereof) of the Company that is considered nonrecourse for purposes of Treasury Regulation §1.1001-2 but with respect to which a Member bears (or is deemed to bear) the economic risk of loss under Treasury Regulation §1.752-2, deductions associated with such liability (and the recapture or other reversal of such deduction) shall be allocated in accordance with Treasury Regulation §1.704-2(i) and (6).

(c)     If any Member receives an adjustment allocation, or distribution described in Treasury Regulation §1.704-1(b)(2)(ii)(d)(4), (5), or (6), items of Company gross income shall be specifically allocated to such Member in an amount and manner sufficient to eliminate as quickly as possible any Adjusted Capital Account Deficit created by such adjustments, allocations, or distributions. The provisions of this Section 7.2(c) are intended to constitute a "qualified income offset" within the meaning of Treasury Regulation §1.704-1(b)(2)(ii)(d) and shall be interpreted and implemented as therein provided.

(d)     After satisfaction of any allocations required by Section 7.2(b), Profits for a fiscal year shall be allocated pro rata among the Members until the Members have received allocations of Profits equal in the aggregate to any Losses previously allocated to them pursuant to Section 7.1(b).

(e)     An "Adjusted Capital Account Deficit" is a deficit balance, if any, in a Member's capital account as of the end of a fiscal year determined, solely for purposes of this definition of Adjusted Capital Account Deficit, by crediting the Member's capital account with the amount of any deficit balance in such capital account that the Member is obligated to restore or is treated as obligated to restore pursuant to Treasury Regulation §1.704-1(b)(2)(ii)(B)(3) or 1.704-1(b)(2)(ii)(C) or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulation §1.704-2(g)(1) and 1.704-2(i)(5) (determined after taking into account any nonrecourse deduction or recapture of nonrecourse deductions, as provided in Section 7.2(b), for such period), and by the Member's capital account with any adjustment, allocation, or distribution described in paragraph (4), (5), or (6) of Treasury Regulation §1.704-1 (b)(2)(ii)(D).

7.3     **Tax Allocations.**

(a)     For federal, state and local income tax purposes, all items of taxable income, gain, loss, and deduction for each fiscal year shall be allocated among the Members in accordance with the manner in which the corresponding items were allocated under Section 7.1 and 7.2, except as provided in this Section 7.3.

(b)     The character of any income recognized pursuant to Section 1245 or 1250 of the Code and any investment credit recapture recognized pursuant to Section 47 of the Code shall be allocated among the Members in the same proportions as the cost recovery deductions and investment credits giving rise to such income recapture were allocated among such Members and their respective predecessors in interest.

(c)     If an asset is contributed to the Company by a Member and there is a difference between the basis of such asset to the Company for federal income tax purposes and the fair market value at the time of its contribution, then items of income, gain, deduction and loss with respect to such asset and other assets, as computed for federal income tax purposes (but not for book purposes), shall be allocated among the Members so as to take account of such book/tax difference as required by Section 704(c) of the Code.

(d)     If an asset of the Company (other than an asset described in Section 7.3(c)) is reflected in the capital accounts of the Members and on the books of the Company at a book value that differs from the adjusted basis of such asset for federal income tax purposes by reason of a revaluation of such asset, then items of income, gain, deduction and loss with respect to such asset and other assets, as computed for federal income tax purposes (but not for book purposes) shall be allocated among the Members in a manner that takes account of the difference between the adjusted basis of such asset for federal income tax purposes and its book value in the same manner as differences between adjusted basis and fair market value are taken account in determining the Members' share of tax items under Section 704(c) of the Code.

(e)     In making the tax allocations provided for in this Section 7.3, appropriate adjustments shall be made as necessary to take into account the effects of any election under Section 754 of the Code.

(f)     If any property is distributed in kind, it shall be deemed sold for its then fair market value and resulting gain or loss shall be allocated among the Members in accordance with this Article 7.

7.4     **Certain Adjustments**. "Gross Asset Value" means, with respect to any asset of the Company, such asset's adjusted basis for federal income tax purposes; provided that if the Members determine in their reasonable discretion at any time that an adjustment is necessary or appropriate to reflect the relative economic interests of the Members, the Gross Asset Values of all Company assets shall be adjusted, if permitted by the regulations under Section 704(b) of the Code, to equal their respective gross fair market values, as reasonably determined by the Members, at such time.

7.5     **Liquidation**. Notwithstanding anything to the contrary contained in Section 7.1, but subject to the special allocation provisions set forth in Section 7.2, in connection with the liquidation of the Company, Net Profits and items thereof, and Net Losses and items thereof attributable to the year in which such liquidation takes place shall be allocated among the Members in such a manner that the Capital Account balance of each Member shall, to the extent possible, be the same amount as the liquidation proceeds to be distributed to such Members pursuant to Section 11.2. To the extent that such allocations fail to produce such final Capital Account balances, such allocations of items of income (including gross income) and deductions for the year shall be made among the Members to the extent necessary to produce Capital Account balances in the same amount as the liquidation proceeds to be distributed to such Members pursuant to Section 11.2.

## ARTICLE 8 - DISTRIBUTIONS

8.1     **Distributions**.

(a)     Distribution of Proceeds.  Notwithstanding any other provision herein or elsewhere to the contrary, funds of the Company shall be distributed to the Members not less than quarterly and in any event as soon as possible following the sale of all or part of the Properties in the following order of priority:

(i)     First, to pay any outstanding principal and interest indebtedness of the Company that are due under the Loan(s);

(ii)     Second, to pay any other debts or obligations of the Company including without limitation, any construction costs or any other obligations to vendors, materialmen, professionals and the like that are due;

(iii)     Third, to the Members, pro rata in accordance with their Membership Interests, until each Member has received a return of their entire Capital Contribution;

(iv)     Fourth, to the Members, pro rata in accordance with their Membership Interests, until each Member has received (in addition to the amounts distributed in (iii) above), an amount equal to an annual, non-compounded return of eight percent (8%) on their aggregate Capital Contributions, calculated from the date on which the Capital Contributions were paid to the Company (the **"Preference Amount"**);

(v)     Fifth, to the Developer to pay the outstanding principal under any Cost Overrun Loans;

(vi)     Sixth, to the Developer and Facilitator, until (a) the Developer has received the nominal amount of forty-four and seven tenths percent (44.7%) of the aggregate distributions under Paragraph (iv) (the Preference Amount) and under this Paragraph (vi), and (b) the Facilitator has received the nominal amount of twenty-two percent (22%) of the aggregate distributions under Paragraph (iv) (the Preference Amount) and under this Paragraph (vi);

(vii)     Seventh, sixty percent (60%) to the Members, pro rata in accordance with their Membership Interests, twenty-seven percent (27%) to the Developer as a promoter, and thirteen percent (13%) to the Facilitator, until the Members have received, in addition to the return of their Capital Contribution in Paragraph (iii) above, the nominal amount of nine and fifteen hundredths percent (9.15%) of their aggregate Capital Contribution (including the Preference Amount paid to the Members in Paragraph (iv) above); and

(viii)     Eighth, fifty percent (50%) to the Members, pro rata in accordance with their Membership Interests, thirty-three (33%) to the Developer as a promotor, and seventeen percent (17%) to the Facilitator, until the Members have received, in addition to the return of their Capital Contribution in Paragraph (iii) above, the nominal amount of fifteen and thirteen hundredths percent (15.13%) of their aggregate Capital Contribution (including the Preference Amount paid to the Members in Paragraph (iv) above and distributions made pursuant to Paragraph (vii) above).

(ix)     Thereafter, thirty percent (30%) to the Members, pro rata in accordance with their Membership Interests, forty-seven percent (47%) to the Developer and twenty-three percent (23%) to the Facilitator.

A numerical example of the possible distributions under this Section 8.1 is attached as Schedule C.

(b)     Adjustment of Distribution Percentages. Notwithstanding the schedule of distributions set forth in Section 8.1(a), the percentages set forth in Paragraphs (vii), (viii) and (ix) of Section 8.1(a) shall be adjusted as follows:

(i)     Developer estimates the duration of the Project to be nine (9) months from the Closing.

(ii)     In the event that the Members receive the return of their entire Capital Contribution prior to seven (7) months after the Closing (hereinafter, the "**Developer's Target Date**"), then the percentages of distributions due to the Developer and Facilitator pursuant to Paragraphs (vii), (viii) and (ix) of Section 8.1(a) shall be increased by an amount equal to one and one-half percent (1.5%) for each complete calendar month prior to the Developer's Target Date that such event occurs, and the percentages of distributions due to the Members pursuant to said Paragraphs shall be correspondingly reduced; provided, however, that any increase to the percentages of distribution due to the Developer and Facilitator pursuant to this Section 8.1(b)(i) (and the corresponding reduction to the distribution due to the Members) shall not exceed six percent (6%).

(iii)   In the event that the Members do not receive the return of their entire Capital Contribution at or prior to eleven (11) months after the Closing, then the percentages of distributions due to the Members pursuant to Paragraphs (vii), (viii) and (ix) of Section 8.1(a) shall be increased by an amount equal to one and one-half percent (1.5%) for each complete calendar month that passes thereafter, and the percentages of distributions due to the Developer and Facilitator pursuant to said Paragraphs shall be correspondingly reduced; provided, however, that any increase to the percentages of distribution due to the Members pursuant to this Section 8.1(b)(ii) (and the corresponding reduction to the distribution due to the Developer and Facilitator) shall not exceed six percent (6%).

(iv)   Notwithstanding the above, in the event that the sellable square footage of the Properties (or any or more of them) is decreased by an amount greater than two percent (2%) of the sellable square footage as stated in the Business Plan, then the percentages set forth in Paragraphs (vii), (viii) and (ix) of Section 8.1(a) shall be adjusted, so that the percentage due to the Members will increase (and the percentage due to the Developer and Facilitator will correspondingly decrease) so that the projected return on the investment, based on the projected sale of the units, will be the same as the projected return prior to the adjustment to sellable square footage.

8.2   **Limitation Upon Distributions.**  No Distribution shall be declared and paid unless, after such Distribution is made, the assets of the Company are in excess of all liabilities of the Company, unless so decided by the Manager.

8.3   **Interest on and Return of Capital Contributions.**  No Member shall be entitled to interest on such Member's Capital Account or to a return of such Member's Capital Contribution, except as specifically set forth in this Agreement.

8.4   **Accounting Period.**  The accounting period of the Company shall be the Fiscal Year.

### ARTICLE 9 - TAXES

9.1   **Tax Returns.**  The Members shall cause to be prepared and filed all necessary federal and state income tax returns for the Company.  Each Member shall furnish to the Company all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

9.2   **Tax Elections.**  The Company shall make the following elections on the appropriate tax returns:

(a)   To adopt the calendar year as the Fiscal Year;

(b)   To elect to amortize the organizational expenses of the Company and the startup expenditures of the Company under Code Section 195 ratably over a period of sixty months as permitted by Code Section 709(b); and

(c)   Any other election that the Company may deem appropriate and in the best interests of the Members.

Neither the Company nor any Member may make an election for the Company to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state law, and no provisions of this Agreement shall be interpreted to authorize any such election.

9.3   **Tax Matters Partner.**   The Developer shall be the "tax matters partner" of the Company pursuant to Code Section 6231(a)(7).  Any Member who is designated "tax matters partner" shall take any action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Code Section 6223.  The Tax Matters Partner shall reasonably take into account the tax positions of all other Members prior to taking any actions that could likely affect the tax position of such Members.

### ARTICLE 10 - TRANSFERABILITY

10.1   **General**.

(a)   **Transfers of Membership Interests**.  Subject to the provisions of Section 10.1(b), a Member may not gift, bequeath, sell, assign, pledge, hypothecate, exchange or otherwise transfer ("**Transfer**") to another Person all or any portion of such Member's Membership Interest without the written consent of the Manager and the Investor Representative.

(b)   **Transfers Subject to Terms of Operating Agreement**.  Any Membership Interest Transferred pursuant to any of the provisions of this Article 10 shall be subject to all of the terms, restrictions, liabilities and rights of this Agreement, all of which shall survive the Closing of such Transfer.  As a condition of the effectiveness of any Transfer to a Person not theretofore a party to this Agreement, such transferee shall indicate his agreement to become a party to this Agreement and to receive and hold such Membership Interest subject to all of the terms, restrictions, liabilities and rights of this Agreement by executing an appropriate written agreement to that effect and delivering a copy thereof to the Company and to each Member.

10.2   **Transferee Not a Member**.  No Person acquiring a Membership Interest pursuant to this Article 10 shall become a Member unless such Person is approved by the vote or written consent required by Section 10.1(a), if any.  A transferee of a Membership Interest who has not been admitted as a Member shall have no right to vote or participate in the management of the business and affairs of the Company or to become a Member, but shall be entitled to receive the share of Profits, Losses and Distributions to which the transferor would otherwise be entitled with respect to the transferred Membership Interest.  Furthermore, such transferee is not entitled to have access to information concerning Company transactions, or to inspect or copy any of the Company's books or other records.

### ARTICLE 11 - DISSOLUTION

11.1   **Dissolution.**   The Company shall be dissolved and its affairs shall be wound up upon the first to occur of the following:

(a)   The latest date on which the Company is to dissolve, if any, as set forth in the Articles of Organization; or

(b)   The written consent of the Manager and Investor Representatives; or

(c)     The death, dissolution, expulsion, incapacity or withdrawal of any Member or the occurrence of any other event that terminates the continued membership of any Member, unless within 180 days after such event the Company is continued by the vote or written consent of a majority in interest of all of the remaining Member(s).

11.2   **Winding Up.**   Upon the dissolution of the Company, the Members may, in the name of and for and on behalf of the Company, prosecute and defend suits, whether civil, criminal or administrative, sell and close the Company's business, dispose of and convey the Company's property, discharge the Company's liabilities and distribute to the Members any remaining assets of the Company, all without affecting the liability of Members.  Upon winding up of the Company, the assets shall be distributed as follows:

(a)     First, to creditors, including any Member who is a creditor (but specifically excluding any Cost Overrun Loans), to the extent permitted by law, in satisfaction of liabilities of the Company, whether by payment or by establishment of adequate reserves, other than liabilities for distributions to Members under Section 507 or Section 509 of the New York Act;

(b)     Next, to Members and former Members in satisfaction of liabilities for Distributions under Section 507 or Section 509 of the New York Act; and

(c)     Any balance remaining to the Members in accordance with Section 8.1.

11.3   **Articles of Dissolution.**   Within ninety (90) days following the dissolution and the commencement of winding up of the Company, or at any other time there are no Members, Articles of Dissolution shall be filed with the New York Secretary of State pursuant to the New York Act.

11.4   **Deficit Capital Account.**   Upon a liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other adjustments for all Fiscal Years, including the Fiscal Year in which such liquidation occurs), the Member shall have no obligation to make any Capital Contribution, and the negative balance of any Capital Account shall not be considered a debt owed by the Member to the Company or to any other Person for any purpose.

11.5   **Nonrecourse to Other Members.**   Except as provided by applicable law or as expressly provided in this Agreement, upon dissolution, each Member shall receive a return of such Member's Capital Contribution solely from the assets of the Company.  If the assets of the Company remaining after the payment or discharge of the debts and liabilities of the Company are insufficient to return any Capital Contribution of any Member, such Member shall have no recourse against any other Member.

11.6   **Termination.**   Upon completion of the dissolution, winding up, liquidation, and distribution of the assets of the Company, the Company shall be deemed terminated.

## ARTICLE 12 - REPRESENTATIONS AND UNDERTAKINGS OF THE DEVELOPER AND MANAGER

The Developer and Manager hereby declare, represent, undertake and obligate themselves hereunder as of the date hereof and separately as of the Closing of the acquisition or transfer pursuant to the Transfert Agreements of the Properties and/or as of any other date thereafter as may be applicable or specified below, as follows:

12.1 **Ownership of Properties.** At Closing, or at the time of execution of this Agreement if the Company already owns the Properties, the Properties will be transferred pursuant to the Transfer Agreements, or owned, as the case may be, by the Company for a total purchase price not exceeding that amount as contemplated by the Business Plan. The Company will obtain a policy of title insurance, insuring it as the owner of the entire ownership rights in Property 1. Title insurance is already in place and shall maintained naming 120 Marcus Garvey LLC and 354 Stuyvesant LLC for Properties 2 and 3, respectively.

12.2 **Ability and Expertise**. The Developer has the extensive professional abilities, expertise, experience, knowledge and know-how required for the completion and implementation of the Project and the activities contemplated by the Business Plan.

12.3 **Due Diligence.** The Developer has in good faith conducted due diligence in connection with the Properties and the Project, including, without limitation, an economic analysis as to the viability of the Project and viable projected returns, an investigation of the physical condition of the Properties, an investigation of any and all legal rights and relevant legal issues relating to the Properties and its suitability for the Project as contemplated by the Business Plan, and relating to the proposed activities for the implementation of the Business Plan.

12.4 **Business Plan**. The Developer has in good faith conducted and completed the due diligence as referred to above, and has to the best of its knowledge found the Properties suitable and appropriate for purchase by the Company for the purpose of the execution and implementation of the Business Plan and all relevant building and environmental permits, restrictions (if any) and regulations, and other law and legal requirements in connection with the Properties.

12.5 **Projections**. All written assumptions, forecasts and projections supplied by or on behalf of the Developer as part of and for the purposes of the Business Plan to the Investor has been prepared in good faith and with professional care by the Developer and believed by the Developer to be accurate and not misleading. A true and correct copy of the Architect's Plans for the Project are attached hereto as Exhibit A.

12.6  **Purchase Price and Closing Liabilities.** The Company shall pay the purchase price of Two Million Five Hundred and Twenty-Five Thousand Dollars ($2,525,000.00) for the Properties at Closing ("**Base Purchase Price**"), which represents the price and consideration payable by the Company for the purchase of the Properties (which Base Purchase Price includes, but is not limited to, the amount due pursuant to the Transfer Agreements), and there is and shall be no other liability, obligation or payment of any other kind due to the owner(s) for the completion of the purchase of the Properties by the Company, other than the standard closing costs (including, without limitation, mansion tax, mortgage tax, title insurance and related title fees, survey, registration fees, legal fees, recording fees, property & casualty insurance, and lender fees as contemplated by the Business Plan), such costs not exceeding the costs as contemplated by the Business Plan.  Investor hereby acknowledges that it is possible that the actual price Developer (or an Affiliate thereof) has paid for the Properties, or that the actual price Developer (or an Affiliate thereof) is under contract to purchase the Properties for may be lower than the Base Purchase Price the Company will pay for the Properties, and that a portion of the difference between the price that Developer (or an Affiliate thereof) has paid or will be paying for the Properties and the Base Purchase Price the Company has paid or will pay for the Properties will be retained by Developer and Facilitator (or their Affiliates) to cover various costs and expenses and as profit for Developer and Facilitator.

12.7  **Fees to Developer.** Neither the Developer nor the Manager (nor any Person engaged on their behalf) shall be entitled to any management or other like fees and/or reimbursement of costs and expenses from the Company, except as specified herein and in the Business Plan.

12.8  **Permits and Approvals.**  Any and all permits, licenses and/or approvals from government, statutory and/or municipal authorities that may be necessary or required for the purposes of the carrying out of the Project and implementation of the Business Plan will have been obtained and will be in place according to all applicable relevant laws.

12.9  **Insurance.**  The Developer shall arrange for the Properties, and the Company and its affiliates 120 Marcus Garvey LLC and 354 Stuyvesant LLC, and the Developer Contractor Affiliates, to have full and comprehensive liability and loss insurance with reputable and licensed insurance companies in such coverage amounts that are in accordance with good industry practice immediately upon Closing. The Developer will provide copies of certificate(s) of insurance to the Investor Representative upon purchase or renewal of the required insurance coverages (including, without limitation, the Closing of the Properties) and at any other time, upon reasonable request thereof.

12.10  **Claims.**  To the Developer's knowledge, other than the Disclosed Claims, there is no Claim pending or threatened affecting the Properties, nor is there any basis for the foregoing. "**Disclosed Claims**" means Claims disclosed on the commitment for title insurance for the Properties (a copy of which has been provided to each of the Investors) and which shall be omitted as exceptions to the final title insurance policy for the Properties issued as of Closing.

12.11  **Management of Properties.** Following the purchase or transfer of the Properties, the Developer will manage and/or assume responsibility for the day to day management of the Properties and Project for the Company in accordance with the Business Plan and for the carrying out and implementation of all the activities required and/or contemplated by the Business Plan for the implementation of the Project (including, without limitation, refurbishing, developing and constructing, operating, (and if applicable, leasing), liaison with relevant government and municipal authorities, and re-sale).

12.12  **Developer Ownership Interests.**  Without limiting the generality of the foregoing, Scott Kushnick or Tomer Dafna shall continue at all times to beneficially own at least five percent (5%) of the Company's Membership Interests and shall at all times control the Developer.

12.13  **Due Incorporation and Authority.**

(a)  Each of Developer and Company is duly incorporated and validly existing under the laws of the State of New York, and has the capacity and authority to execute and deliver this Agreement, to perform hereunder and to consummate the transactions contemplated hereby without the necessity of any further act or consent of, or to notify, any other person, governmental authority or third party whomsoever.  This Agreement and each and every other agreement, document and instrument to be executed, delivered and performed by or on behalf of Developer and Company respectively pursuant hereto has been duly executed and delivered by a duly authorized representative of Developer and Company respectively, constitutes or will, when executed and delivered, constitute the legal, valid and binding obligations enforceable against Developer and Company respectively in accordance with its terms.

(b)  Each of Developer and Company has taken all corporate and other actions necessary to enable it to enter into and perform this Agreement. The execution and delivery of this Agreement by each of the Developer and Company does not, and the performance by the Developer and Company of its respective obligations under this Agreement, will not, with or without the giving of notice or the lapse of time or both, (i) conflict with or violate the organizational documents of Developer and Company respectively, or (ii) violate any law, statute, ordinance, rule, regulation, order, judgment or decree applicable to Developer and Company respectively, or any Affiliate or subsidiary of Company respectively or by which any of their respective properties or assets is bound or affected, or (iii) violate any license or contract or agreement or undertaking of the Developer and Company and/or any Affiliate thereof with any third party.

(c)  The Company is a newly formed entity, formed as of the Date of Formation, and prior to the Closing, the Company shall not have any debts, liabilities or obligations of any kind whatsoever, except as otherwise expressly disclosed in the Business Plan.

12.14  **Material Omissions.**  The Developer does not know of any information which is or may reasonably be regarded as material to the Properties and/or Project and which has not been disclosed in writing to the Investor. Neither this Agreement nor any Annex or schedule hereto contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein not misleading.

12.15  **Membership Interests.**

(a)  The Investor's Membership Interests in Company shall be free and clear from any Encumbrances and represent the total Membership Interests of the Investor in the Company, all as more particularly set forth on Schedule A attached hereto (which Schedule A may be amended from time to time pursuant to the terms of this Agreement).

(b)  The Developer's Membership Interests in Company shall be free and clear from any Encumbrances and represent the total Membership Interests of the Developer in the Company, all as more particularly set forth on Schedule A attached hereto (which Schedule A may be amended time from time pursuant to the terms of this Agreement).

12.16 **Reliance.** The Developer acknowledges that the Investor is entering into this Agreement (and each of the transactions to take place under it) upon the basis of, and in reliance on, the declarations, representations, and undertakings given by the Developer hereunder, and which shall remain in full force and effect and survive after the Closing date notwithstanding that the Closing shall have taken place.

12.17 **Investor Acknowledgement**. Notwithstanding anything in this Agreement to the contrary, the Investor acknowledges and agrees that, without derogating from the representations of the Developer above, (i) it has conducted its own due diligence, and (ii) while the Developer and the Manager will use their best efforts to achieve the goals of the Business Plan, the returns budgeted under the Business Plan are not guaranteed.

## ARTICLE 13 - BOOKS, RECORDS AND REPORTS

13.1 **Company Documents**. The Company shall maintain at the principal office of the Company or at such other place as the Manager may determine the following documents: (a) a current list of the full name and last known business address of each Member; (b) a copy of the Certificate of the Company, together with executed copies of any powers of attorney pursuant to which such articles or any amendment thereto has been executed; (c) copies of the Company's federal, state and local income tax returns and reports, if any, for each fiscal year during which the Company has been, in existence; (d) copies of this Agreement, as it may be amended and/or restated, and as then in effect, and (e) copies of any financial statements of the Company for each fiscal year during which the Company has been in existence. Such documents are subject to inspection and copying at the reasonable request, and at the expense, of any Member during ordinary business hours and on reasonable prior written notice.

13.2 **Financial Books.** The Manager shall keep or cause to be kept complete and accurate financial books with respect to the Company's business.

13.3 **Bank Accounts**. Except as otherwise set forth in Section 4.6, funds deposited in such bank account or accounts shall be designated by the Manager and withdrawals therefrom shall be made upon the signature of a designee of the Manager. Notwithstanding the foregoing, but subject to Section 4.6, any withdrawals for Distributions pursuant to Article 8 shall be made upon the signatures of two designees. The Manager and the Investor Representative shall each have the right to appoint one designee. The Investor Representative shall have visual access to such bank accounts and will be provided AIA form 703 on an ongoing basis in order to track the progress of construction and payments made. The funds of the Company shall be maintained in a segregated account(s) and shall not be commingled with the funds of any other Person, including, without limitation, the Manager. Each depository of the Company's funds shall forward an additional copy of the statements to each non-Manager.

13.4 **Reports**.

(a)      The Manager, at the expense of the Company, shall use commercially reasonable efforts to cause to be prepared and distributed to each Person who was a Member during any fiscal year of the Company no later than February 15th of the following tax year, all information relating to the Company that is necessary for the preparation of the Members' federal, state and local income tax returns.

(b)     The Manager shall cause the Company to provide each Member promptly with copies of all financial statements and reports delivered to any lender with respect to the Company pursuant to the documents that evidence or secure a loan made by such lender to the Company.

(c)     The Manager shall send annual estimated financial reports to each Member no later than January 31st of the following tax year for the purpose of enabling each Member to prepare its tax estimation on behalf of foreign partners in a timely manner.

(d)     Within seven (7) business days following the sale of any portion of the Properties, the Manager shall send a written notification to the Investor Representative which shall include all material details regarding the sale and regarding the application of the sale proceeds.

(e)     The Developer shall send a written notification to the Investor Representative within seven (7) business days of the occurrence of any of the following events: (i) any Claim filed against the Company or regarding the Properties, (ii) any insurance claim made by the Company, (iii) the revocation of any material permit granted for the Project.

(f)     Within seven (7) business days prior to both (i) the six-month anniversary of the Closing and (ii) the twelve-month anniversary of the Closing, the Developer shall send a written certification to the Investor Representative stating (a) whether the demolition permit(s), if applicable, and all other permits required to build and construct the Project in accordance with applicable laws and the Business Plan have been obtained (together with copies of such permits) and (b) whether the Company has received a binding commitment from a lender to provide the Loans (attaching a copy of such commitment).

(g)     The Developer shall prepare or cause to be prepared and furnished to the Investor Representative as soon as practicable, but not later than 10 days after the end of each calendar quarter, a report which shall include, without limitation, (i) a balance sheet, (ii) pictures of the site progress, (iii) details of the work completed within the past quarter (a progress report), (iv) copies of all permits obtained, (v) a detail accounting of what is planned for the upcoming quarter (work schedule, etc.), (vi) to the extent applicable, copies of all plans not already provided, or if revised, copies of new updated plans, and (vii) any other information reasonably requested by the Investor Representative.

13.5    **Tax Returns**.

(a)     The Manager shall, at the expense of the Company, retain the Accountants and cause to be prepared all tax returns for the Company and shall further cause such returns to be timely filed with the appropriate authorities. Without derogating from the generality of the foregoing, the Manager shall cause the Company to provide each Member, by February 15 following each taxable year of the Company, all federal and state income tax returns of the Company for such taxable year, which the Manager shall ensure are filed, on or before their respective due dates (as the same may be extended, in which event February 15 shall be deemed modified to the date which is 14 days prior to the due date), and the Manager shall take all action as may be necessary to permit the Company's regular accountants to prepare and timely file such returns. Schedule K-1 of Form 1065 shall be sent to each Member by February 15 (or such extended date) following the end of each taxable year reflecting the Member's pro rata share of income, loss, credit and deductions for such taxable year. All of Manager's responsibilities in the subsection are dependent upon receipt of all necessary documentation and information from each of the members.

(b)    It is contemplated that the Company will be classified as a "partnership" for federal, state and local income tax purposes. The Company and its Members will take such reasonable action as may be necessary or advisable, and as determined by the Manager, including the amendment of this Agreement to cause or ensure that the Company shall be treated as a "partnership" for federal, state and local income tax purposes.

13.6    **Tax Matters Partner**. In the event the Company is subject to administrative or judicial proceedings for the assessment and collection of deficiencies for federal taxes or for the refund of overpayments of federal taxes arising out of a Company's distributive share of income, losses, gain, credits and deductions, the Manager shall act as the tax matters partner ("**TMP**") and shall have all the powers and duties assigned to the TMP under Sections 6221-6232 of the Code and the Regulations thereunder. The Members agree to perform all acts necessary under Section 6231 of the Code and the Regulations thereunder to designate such designated Person as the TMP. In the event of resignation by the Manager as the TMP, the Members shall appoint another person as a TMP.

13.7    **Fiscal Year and Accounting Method**. The Company shall adopt a fiscal year ending on the last day of such month of each year and a method of accounting selected by the Manager with the advice of the accountants for the Company; provided, however, that the Manager in his sole discretion may, subject to any approval required by the Internal Revenue Service and the applicable state taxing authorities, at any time change the Company's method of accounting.

13.8    **Tax Elections**. The TMP shall have the authority to cause the Company to make any election required or permitted to be made for income tax purposes. The TMP may cause the Company to make, in accordance with Section 754 of the Code, a timely election to adjust the basis of Company property as described in Sections 734 and 743 of the Code in the sole discretion of the TMP.

13.9    **Title to Company Assets**. Title to, and all right and interest in, the Company's assets, shall be acquired in the name of and held by the Company, or, if acquired in any other name, be held for the benefit of the Company.

13.10   **Ongoing Status Reports.** The Investor Representative, with information provided by the Developer, shall be responsible for and shall provide to the Investor monthly and annual reports on the progress of the Project, which reports shall, on a quarterly basis, also include photographs of the progress of the Project, unit sales reports, leasing status reports, operating statements, variance analysis, tax reporting and cash flow projections, as well as such other information relating to the financial condition, business, prospects or corporate affairs of the Company as the Investor may from time to time request, without derogating from the Investor's statutory rights. In addition, the Developer shall be responsible to ensure that Company shall prepare and deliver to Parties a full set of financial reports (including, without limitation, a profit and loss statement, balance sheet and cash flow report) on a quarterly and annual basis, with the annual reports verified by the relevant entities' accountants. The Investor has the option to request the auditing of the financial statements of the Company.

13.11   **Loan**. The Manager shall provide to the Investor Representative the terms and conditions of the Loans for review and approval. The Investor Representative shall have the right to review the loan documents (the "**Loan Documents**"). Notwithstanding the foregoing, the decisions of the Manager regarding the Loan Documents shall control and be final, provided the Loan Documents are on the terms and conditions approved by the Investor Representative and are otherwise usual and customary for arms-length transactions of a similar kind.

## ARTICLE 14 - GENERAL PROVISIONS

14.1    **Notices.**  Any notice, demand or other communication required or permitted to be given pursuant to this Agreement shall have been sufficiently given for all purposes if (a) delivered personally to the party or to an executive officer of the party to whom such notice, demand or other communication is directed or (b) sent by registered or certified mail, postage prepaid, addressed to the Member or the Company at his, her or its address set forth in this Agreement.  Except as otherwise provided in this Agreement, any such notice shall be deemed to be given three business days after the date on which it was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as set forth in this Section. Any notice sent to the Members shall also be sent to their respective attorneys as follows:  If to Developer: 914 Bedford Avenue, Brooklyn, New York and if to Investor:  A.Y. Strauss LLC, Attn:  Aaron Strauss, Esq., 101 Eisenhower Parkway, Suite 300, Roseland, New Jersey 07068.

14.2    **Amendment.**  This Agreement contains the entire agreement among the Members with respect to the subject matter of this Agreement, and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by the Members with respect thereto, whether or not relied or acted upon.  No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the Members, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect any Member's obligations pursuant to this Agreement or any rights and remedies of a Member pursuant to this Agreement.  No amendment to this Agreement shall be effective unless made in a writing duly executed by all of the Members.

14.3    **Construction.**  Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine gender and vice versa.

14.4    **Headings.**  The headings in this Agreement are for convenience only and shall not be used to interpret or construe any provision of this Agreement.

14.5    **Waiver.**  No failure of a Member to exercise, and no delay by a Member in exercising, any right or remedy under this Agreement shall constitute a waiver of such right or remedy.  No waiver by a Member of any such right or remedy under this Agreement shall be effective unless made in a writing duly executed by all of the Members and specifically referring to each such right or remedy being waived.

14.6    **Severability.**  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law.  However, if any provision of this Agreement shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

14.7    **Binding.**  This Agreement shall be binding upon and inure to the benefit of all Members, and each of the successors and assigns of the Members, except such right or obligation of a Member under this Agreement that may not be assigned by such Member to another Person without first obtaining the written consent of all other Members.

14.8    **Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. A facsimile or electronic mail signature hereof shall be deemed an original.

14.9    **Governing Law.**  This Agreement shall be governed by, and interpreted and construed in accordance with, the laws of the State of New York, without regard to principles of conflict of laws.

14.10   **Entire Agreement.**  This Agreement shall constitute the entire agreement among the Members with respect to the subject matter hereof and shall supersede all previous promises, agreements, conditions, understandings, representations and warranties among the Members with respect to the Company and the business of the Company.

14.11   **Confidentiality and Non-Circumvent.**  The Members acknowledge and agree to keep all of the terms and conditions of this Agreement and any and all information pertaining to the underlying asset confidential provided that any information which is required to be disclosed to the parties respective legal counsel, accountants, or governmental agencies shall not be deemed to be a breach hereof. The Members are prohibited from discussing any matters pertaining to any part of this agreement or the underlying transaction with anyone else. Neither Member shall circumvent one another and shall not approach a contact introduced by the other member, its contacts and/or anyone on its behalf, throughout the duration of this Agreement and for the first four years subsequent to the termination of this Agreement.

*[Remainder of page intentionally left blank. Signature page follows.]*

**IN WITNESS WHEREOF**, the parties have signed or caused this Operating Agreement to be duly signed as of the date first above written.

COMPANY

**180 MARSTUY, LLC**, a New York limited liability company

By: _____

    Name: Scott Kushnick

    Title: Manager

By: _____

    Name: Tomer Dafna

    Title: Manager

MEMBERS

exclusive

~~Extreme~~ Homes NY LLC, a New York limited liability company

By: _____

    Name: Tomer Dafna

    Title: Managing Member

**3 SPEC INVESTORS LLC**, a Delaware limited liability company

By:    613 Summit Corp., a New York corporation, its manager

By: _____

    Name: Tzvi Ben David

    Title: CEO

By: _____

    Name: Aaron Harow

    Title: Partner

**FACILITATOR**

**ACKNOWLEDGED AND ACCEPTED**
As to Sections 4.7, 4.8, 8.1 and 12.6 only

**613 SUMMIT CORP.**, a New York corporation

By: _____
     Name:  Tzvi Ben David
     Title:

By: _____
     Name:  Aaron Harow
     Title:  Partner

## SCHEDULE A
(Members' Interest and Capital Contribution)

| Name and Address | Capital Contribution | Membership Interest |
|---|---|---|
| **EHNY LLC**<br>914 Bedford Avenue<br>Brooklyn, NY | $178,889.00 | **10%** |
| **3 SPEC INVESTORS LLC**<br>c/o 613 Summit Corp.,<br>100 Merrick Road, Suite 400<br>East Rockville Center<br>New York, New York 11570 | $1,610,000.00 | **90%** |
| **TOTAL** | $1,788,889.00 | **100.00%** |

## SCHEDULE B
(Business Plan)

| 3 spec | | | Business Plan |
|---|---|---|---|
| BROOKLYN, NY | | | |

**Basic Project Assumptions**

| Project duration (months) | +/- 5% | 9 |
|---|---|---|

| Item | Remark | Amount |
|---|---|---|
| Purchase Price | Incl. Closing Costs | $2,600,750 |
| Construction Costs | Hard costs | $1,044,889 |
| Soft Costs | Incl. P. Management + Financing | $621,737 |
| Contingency | | $62,495 |
| **Total Project Cost** | | **$4,329,870** |

**Investment Summary**

| | | |
|---|---|---|
| Acquisition & Construction Loan | | $2,540,981 |
| Developer's Equity | | $178,889 |
| BHRE Group Investor's Equity - Stage 1 | | $1,610,000 |
| **Total Investment** | | **$4,329,870** |

**Financing Cost**

| | | |
|---|---|---|
| Loan amounts | | $2,540,981 |
| Loan Interest | | $240,853 |
| Mortgage tax & Title fee | | $26,709 |
| **Total Financing cost** | | **$267,562** |

**Expected Profit Estimate**

| | | Conservative | |
|---|---|---|---|
| Total gross sales income | | | $4,845,000 |
| Broker fee and selling costs | | 5% | $242,250 |
| Expected net revenue | | | $4,602,750 |
| Total Investment | | | $4,329,870 |

**Total Project Income**

| | | |
|---|---|---|
| Conservative | | $272,880 |
| Projected | | $486,630 |
| Upside | | $700,380 |

## SCHEDULE C

### (Distribution Example)

| Investor Income Distribution - Stage 1 | | | | | |
|---|---|---|---|---|---|
| | Total Investor's Distribution | | $1,788,889 | | |
| | Conservative | $538 | Projected | $563 | Upside | $588 |
| Investor's Income | Share from profit | | Share from Delta | | Share from Delta | |
| | 60.0% | $163,728 | 50.0% | $106,875 | 30.0% | $64,125 |
| Accumulated income | $163,728 | | $270,603 | | $334,728 | |
| ROI for Investors | 9.15% | | 15.13% | | 18.71% | |
| Yearly yield for Investors | 12.20% | | 20.17% | | 24.95% | |

## EXHIBIT A

(Architect Plans)