<u>Appendix C – Investor LLC Agreement</u>

## OPERATING AGREEMENT
## OF
## 3 SPEC INVESTORS LLC

This **OPERATING AGREEMENT** of **3 SPEC INVESTORS LLC** (the "**Company**") is entered into as of this ___ day of April, 2015, by and among, **613 Summit Corp.,** a New York corporation with an address at 100 Merrick Road, Suite 400, East Rockville Center, New York, New York 11570 (**"Summit"**), and the Members listed in the Register (as defined herein) as of the date hereof, and such other persons, corporations, partnerships or other entities as shall hereafter become Members as hereinafter provided (collectively, the **"Investor Members";** and together with Summit, each referred to as a **"Member"** and collectively referred to as the **"Members")** and, as the context requires, any other Persons that shall hereafter become parties hereto as hereinafter provided.

### EXPLANATORY STATEMENT

**WHEREAS**, the Members desire to form and operate a limited liability company under the Delaware Limited Liability Company Act (6 Del. §18-101 et seq.), as amended from time to time (the "**Act**"), pursuant to the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

### Article I.   MEMBERS

Section 1.01  **Definitions.**  Each of the following capitalized terms shall have the meaning specified in this Section 1.  Other terms are defined in the text of this Agreement and those terms shall have the meanings respectively ascribed to them throughout this Agreement.

(a) "**Act**" has the meaning set forth in the preamble to this Agreement.

(b) "**Affiliate**" means any person or entity which directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with a specified person or entity.  For purposes hereof, the terms "control", "controlled", or "controlling" with respect to a specified person or entity shall include, without limitation, (i) the ownership, control or power to vote ten percent (10%) or more of (x) the outstanding shares of any class of voting securities or (y) beneficial interests, of any such person or entity, as the case may be, directly or indirectly, or acting through one or more persons or entities, (ii) the control in any manner over the managing member(s) or the election of more than one director or trustee (or persons exercising similar functions) of such person or entity, or (iii) the power to exercise, directly or indirectly, control over the management or policies of such person or entity.

17

(c) **"Agreement"** means this Operating Agreement, and the Exhibits and Schedules annexed hereto, all as amended from time to time in accordance with the provisions hereof.

(d) **"Capital Account"** means the account to be maintained by the Company for each Member as described in Section 6.2.

(e) **"Capital Contribution"** means the total amount of cash and the fair market value of any other asset contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject, as determined by the Manager.

(f) **"Capital Commitment"** of a Member shall mean the amount set forth in such Member's Subscription Agreement with the Company.

(g) **"Closing"** shall mean the closing of the purchase of the Properties under the Purchase Contract.

(h) **"Code"** means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision or provisions of any succeeding law.

(i) **"Company"** has the meaning set forth in the preamble to this Agreement.

(j) **"Developer"** shall mean EHNY LLC, the developer of the Properties and a member of the Property Owner.

(k) **"Distributable Cash"** has the meaning set forth in Section 8.1(a).

(l) **"Distribution"** means any cash and other property paid to a Member by the Company from the operations of the Company, including the sale of the Properties.

(m) **"Fiscal Year"** means the fiscal year of the Company, which shall be the year ending December 31.

(n) **"Investor Members"** has the meaning set forth in the preamble to this Agreement.

(o) **"Manager"** shall mean Summit.

(p) **"Member"** has the meaning set forth in the preamble to this Agreement.

(q) **"Membership Interests"** means all of the rights of a Member in the Company, including such Member's: (i) right to share in the profits and losses of the Company; (ii) right to inspect the Company's books and records; (iii) the right to participate in the management of and vote on matters coming before the Members, to the extent provided in this Agreement, and (iv) to the extent permitted under this Agreement, the right to act as an agent of the Company.

(r) **"Person"** means any individual, corporation, governmental authority, limited liability company, partnership, trust, unincorporated association or other entity.

(s) **"Properties"** means, collectively, Property 1, Property 2 and Property 3.

(t) **"Property 1"** means the premises located at 180 Schaefer Street, Brooklyn, New York 11207, and any other property (real or personal), rights or interests appurtenant or relating thereto.

(u) **"Property 2"** means the premises located at 120 Marcus Garvey Boulevard, Brooklyn, New York 11206, and any other property (real or personal), rights or interests appurtenant or relating thereto.

(v) **"Property 3"** means the premises located at 354 Stuyvesant Avenue, Brooklyn, New York 11233, and any other property (real or personal), rights or interests appurtenant or relating thereto.

(w) **"Property Owner"** means 180 MARSTUY LLC, a New York limited liability company.

(x) **"Property Owner Agreement"** means that certain operating agreement of the Property Owner dated on or about the date hereof, as may be amended from time to time, a copy of which is attached hereto as **Exhibit A**.

(y) **"Register"** has the meaning set forth in Section 3.1.

(z) **"Subscription Agreement"** shall mean the Subscription Agreement among the Manager, a Member and the Company, pursuant to which such Member has subscribed for Membership Interests in the Company.

(aa) **"Subscription Amount"** means the dollar amount set forth on an Investor Member's Signature Page of the Subscription Agreement.

(bb) **"Transfer Agreements"** means, collectively, the Purchase Contract, Assignment Agreement 1 and Assignment Agreement 2.

- **"Purchase Contract"** means that certain purchase contract entered into as of _____ between Right Choice Holding Inc., as seller (the **"Seller"**) and the Property Owner, whereby the Seller has agreed to sell to the Property Owner and the Property Owner has agreed to purchase from the Seller Property 1.

- **"Assignment Agreement 1"** means that certain assignment and assumption of membership interests agreement entered into as of _____ between Tomer Dafna, as assignor (the **"Assignor"**) and the Property Owner, whereby the Assignor has agreed to assign 100% of the membership interests in 120 Marcus Garvey LLC to the Property Owner and the Property Owner has agreed to assume from the Assignor all membership interests including ownership of Property 2.

- "**Assignment Agreement 2**" means that certain assignment and assumption of membership interests agreement entered into as of _____ between Assignor and the Property Owner, whereby the Assignor has agreed to assign 1005 of the membership interests in 354 Stuyvesant LLC to the Property Owner and the Property Owner has agreed to assume from the Assignor all membership interests including ownership of Property 3.

(cc) "**Treasury Regulations**" means the treasury regulations, including any temporary regulations, promulgated under the Code from time to time, as the same may be amended from time to time.

## Article II.   MEMBERS

Section 2.01 **Formation.**  The Company was formed upon the filing of the Certificate of Formation with the Delaware Secretary of State pursuant to the Act.

Section 2.02 **Name.**  The name of the Company is **3 SPEC INVESTORS LLC**.  The Manager is authorized to make any variations in the name of the Company and may otherwise conduct the business of the Company under any other name, upon compliance with all applicable laws, which in either case the Manager may deem necessary or advisable.  In the case of a change of name of the Company pursuant to this Section 2.2, specific references herein to the name of the Company shall be deemed to have been amended to the name as so changed.

Section 2.03 **Principal Place of Business.**  The principal place of business of the Company shall be at 100 Merrick Road, Suite 400, East Rockville Center, New York, New York 11570.  Notwithstanding the foregoing, the Company may at any time change the location of Company's offices and may establish additional offices as the Manager may from time to time deem advisable. Notice of any such change shall be given to the Members.

Section 2.04 **Registered Office and Registered Agent.**  The Company's initial registered offices shall be at the office of its registered agent Incorp Services Inc., having an office at 1201 Orange Street, Suite 600, Wilmington, DE 19899.  The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State pursuant to the Act.

Section 2.05 **Term.**  The term of the Company commenced upon the filing of its Certificate of Formation with the Secretary of State of Delaware and shall continue indefinitely, such that the Company shall have perpetual existence, unless sooner dissolved in accordance with the provisions of this Agreement or the Act.

Section 2.06 **Purposes.**

(a) The Company is formed for any lawful business purpose or purposes.

(b) The specific purpose for which the Company has been formed is to (i) acquire and own and hold a portion of the ownership interests of the Property Owner in accordance with the Property Owner Agreement and thereby own a portion of the beneficial interests in the Property, (ii) to act as a member of the Property Owner and to enter into and perform to the fullest extent permitted by law, the Property Owner Agreement, (iii) to acquire, own, hold, lease, sell, transfer, exchange, operate, finance and manage or otherwise deal with its limited liability company interest in the Property Owner, publicly or privately, together with such activities as may be necessary or advisable in connection therewith; (iv) to cause the Property Owner to acquire, own, hold, lease, sell, transfer, exchange, operate, finance and manage or otherwise deal with the Properties, publicly or privately, together with such activities as may be necessary or advisable in connection therewith; (v) engage in such other activities as are necessary, advisable or incidental to the foregoing; and (vi) engage in any other lawful acts or activities consistent with the foregoing for which companies may be formed under the Act.

(c) Legal title to all property of the Company shall be held, vested and conveyed in the name of the Company and no real or other property of the Company shall be deemed to be owned by the Members individually. The Membership Interests of each Member shall constitute personal property.

## Article III.  MEMBERS

Section 3.01  **Names and Addresses.**  The names, addresses and Capital Contributions by, the Members shall be maintained in a register maintained by the Manager and held in the principal office of the Company (the "**Register**"). A Person shall be deemed admitted as a Member of the Company at the time (a) such Person has executed this Agreement (or a counterpart signature page to this Agreement) and the Subscription Agreement, and (b) the Manager countersigns such Subscription Agreement.  Unless admitted to the Company as a Member, as provided in this Agreement, no Person shall be considered a Member.

Section 3.02  **Additional Members.**  A Person may be admitted as a Member after the date of this Agreement only upon the consent of the Manager.  Any new Membership Interests in the Company shall be issued to a new Member for such consideration and on such terms and conditions as the Manager shall determine in his sole and absolute discretion.  Upon the issuance of Membership Interests to new Member(s), the Membership Interests of the then existing Members shall be adjusted to reflect the changes thereto, if any, resulting from the admission of such additional Member(s).

Section 3.03  **Books and Records.**  The Company shall keep books and records of accounts and minutes of all meetings of the Members, which shall be kept by the Manager at the principal place of business of the Company, or at such other office as the Manager may designate. The Members will have a right to review the books and records during ordinary business hours.

Section 3.04  **Information.**  Each Member may inspect during ordinary business hours and at the principal place of business of the Company, or at such other office as the Manager may designate, this Agreement, the minutes of any meeting of the Members and any tax returns of the Company for the immediately preceding three Fiscal Years.

Section 3.05  **Limitation of Liability.**

(a) Each Member's liability shall be limited as set forth in this Agreement, the Act and other applicable law. A Member shall not be personally liable for any indebtedness, liability or obligation of the Company, except that such Member shall remain personally liable for the payment of the Capital Contribution of such Member and as otherwise set forth in this Agreement, the Act and any other applicable law.

(b) If, notwithstanding the terms of this Agreement, it is determined under applicable law that any Member has received a distribution which is required to be returned to or for the account of the Company or the Company's creditors, then the obligation under applicable law of any Member to return all or any part of a distribution made to such Member shall be the obligation of such Member and not of any other Member.

Section 3.06 **Priority and Return of Capital.** Except as provided in Article 7 and Article 8, no Member shall have the right or be entitled to demand, withdraw or receive any return of such Member's Capital Contribution. Except as provided in Article 7 and Article 8, no Member shall have priority over any other Member, whether for the return of a Capital Contribution or for profits, losses or a distribution; provided, however, that this Section shall not apply to loans or other indebtedness (as distinguished from a Capital Contribution) made by a Member to the Company.

Section 3.07 **Liability of a Member to the Company.** A Member who or which rightfully receives the return of any portion of a Capital Contribution is liable to the Company only to the extent now or hereafter provided by the Act. A Member who or which receives a Distribution made by the Company in violation of this Agreement or made when the Company's liabilities exceed its assets (after giving effect to such Distribution) shall be liable to the Company for the amount of such Distribution.

Section 3.08 **Financial Adjustments.** No Members admitted after the date of this Agreement shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Members may, in their discretion, at the time a new Member is admitted, close the books and records of the Company (as though the Fiscal Year had ended) or make pro rata allocations of loss, income and expense deductions to such Member for that portion of the Fiscal Year in which such Member was admitted in accordance with the provisions of the Code.

Section 3.09 **Additional Funding for the Properties.**

(a) One Million Six Hundred Ten Thousand Dollars ($1,610,000.00) (the "**Initial Capital Contribution**") to the escrow account of the Manager's escrow counsel no later than three (3) days prior to Closing or in the event Property Owner already purchased the Properties, within forty-five (45) days from the date hereof (or such earlier date as has been agreed upon by the Members), which shall be released to the Company at Closing.

22

(b)  If Capital Contributions by Members and available cash of the Company do not suffice to fund a capital call or other funding obligations to the Property Owner (including funding obligations relating to indemnification), then the Company may use proceeds distributed from the Property Owner or borrow from third parties or Affiliates of the Manager to the extent necessary to comply with any funding obligations to the Property Owner. The Company may pledge its interest in distributions from the Property Owner to secure such borrowed funds.

(d)  In the event that additional funding (each such additional funding, the "**Additional Capital Contribution**") shall be required or requested by the Property Owner for the development or operation of the Properties, then the Manager may, in its sole and absolute discretion, offer the Investor Members (in accordance with their percentage Membership Interests) or third parties, including Affiliates of the Manager or of the Company, on such terms as the Manager may determine in its sole discretion, the opportunity to make such Additional Capital Contribution or loans to the Company. The Members hereby consent to the admission of any person(s) as Members in connection with any Additional Capital Contribution(s) made to the Company.  Effective as of the date of any such Additional Capital Contribution, the Membership Interests of the Members shall automatically be adjusted to reflect the new ratio of Capital Contributions of the respective Members to the total of all Capital Contributions of the Members.  The Members consent to an amendment to this Agreement to reflect the terms of such contributions and the adjustment to the Members' Membership Interests pursuant to the terms herein.

Section 3.10  **Anti-Money Laundering Provisions.**

(a)  Upon the Manager's request, each Member shall provide the Manager with such information as may be required by the Manager to enable the Company, the Manager and their respective Affiliates to comply with applicable law, including applicable anti-money laundering or anti-terrorism financing measures and to make any filing, statement, report or disclosure required under U.S. and other applicable securities laws. Each Member hereby acknowledges and agrees that the Manager may disclose any such information to any governmental authority.

(b)  Each Member hereby agrees to ensure that none of the funds that such Member contributes to the Company shall be derived from, or related to, any activity that can reasonably be deemed to be criminal under applicable law and undertakes that it will comply with all applicable anti-money laundering laws.

(c)  Each Member shall promptly notify the Manager if, to the knowledge of such Member, there has been any violation of this Section 3.10. If the Manager has reasonable grounds (based on the advice of counsel) to believe that a Member is in breach of Section 3.10(a) such Member shall provide the Manager, promptly upon receipt of the Manager's written request therefore, with any additional information regarding such Member or its beneficial owner(s) that the Manager deems necessary or advisable in order to ensure compliance with all applicable laws, regulations and administrative pronouncements concerning money laundering and other criminal activities.

(d) Each Member understands and agrees that if, at any time, the requirements of this Section 3.10 are not satisfied, or if otherwise required by any applicable law, regulation or administrative pronouncement related to money laundering or other criminal activities, the Manager may take those actions that the Manager determines are necessary to ensure that the Company and the Manager are in compliance with such applicable laws, regulations and pronouncements; provided however, that, in taking such actions, the Manager shall use reasonable efforts to minimize, to the maximum extent consistent with such applicable laws, regulations and pronouncements, the adverse impact on the affected Member and shall be indemnified by the Company with respect to the taking of such action or omission of such action.

Section 3.11 **Use of Capital Contributions.**   Subject to the second sentence of this Section 3.11, each Member acknowledges and agrees that the Manager shall invest the Capital Contributions of the Company, on behalf of the Company, in the Property Owner. The Members hereby acknowledge and agree that Capital Contributions may be used by the Company to invest in the Property Owner and to pay the organizational expenses and other operational expenses of the Company subject to the Company's purposes.

## Article IV.   MANAGEMENT

Section 4.01 **Management.**

(a) Except as otherwise expressly provided herein or by law, the Manager is hereby vested with the full, exclusive and complete right, power and discretion to operate, manage and control the affairs of the Company and to make all decisions affecting the Company affairs, as deemed proper, convenient or advisable by the Manager in pursuit of the business of the Company as described in Section 2.6. Without limiting the generality of the foregoing, all of the Members hereby specifically agree that the Manager at any time, but subject to the express limitations contained in this Agreement, and without further notice to or consent from any Member, may do the following:

(i)   Sign and execute the required documents with respect to the Company's investment in the Property Owner and exercise rights as an interest holder in the Property Owner;

(ii)   Invest in interest bearing accounts, cash pending use or distributions to the Members;

(iii)   Borrow money, make guarantees for borrowed money, pledge, mortgage or other hypothecation of any assets of the Company to secure any borrowing of any amount, or otherwise incur indebtedness in advance of utilizing distributions to cover the Company's liabilities;

(iv)   Distribute to the Members securities or cash, or sell from time to time all or any part of an interest in the Property Owner, if such sale is deemed advisable to the Company, whether for cash, other securities or on such terms as the Manager shall determine to be appropriate in its sole discretion;

(v)   Perform, or arrange for the performance of, the management and administrative services necessary for the operations of the Company;

24

(vi)     Manage the investment of the Company in the Property Owner, including exercising all rights and complying with all obligations applicable to the Company under the Property Owner Agreement or otherwise;

(vii)    Make tax and other elections on behalf of the Company, including as a member in the Property Owner;

(viii)   Vote on any matter presented to the Company by the Property Owner, as shall be determined by the Manager in its sole discretion;

(ix)     Incur all expenditures permitted by this Agreement, and, to the extent that funds of the Company are available, pay all expenses, debts and obligations of the Company;

(x)      Employ and dismiss from employment any and all consultants, custodians of the assets of the Company or other agents;

(xi)     Enter into, execute, amend, supplement, acknowledge and deliver any and all contracts, agreements or other instruments as the Manager shall determine to be appropriate in furtherance of the purposes of the Company, including entering into acquisition agreements to make or dispose of investments and entering into management and administrative service agreements with third parties;

(xii)    Admit an assignee of all or any portion of a Member's Interest to be a substituted Member in the Company;

(xiii)   Open bank accounts for the Company;

(xiv)    Accept additional capital commitments or borrow money, as further provided in Section 3.9;

(xv)     Settle or prosecute litigation on behalf of the Company;

(xvi)    Grant or withhold any consent under the Property Owner Agreement; or

(xvii)   Take any other action reserved to a Manager under the Act.

(b)  No Member other than the Manager shall have any authority to bind the Company to any third party with respect to any matter, except pursuant to a resolution expressly authorizing such action which resolution is duly adopted by the Manager.

(c)  Subject to Section 4.1(d) below, the Manager shall be responsible for policy setting, approving the overall direction of the Company and making all decisions affecting the business and affairs of the Company. The Investor Members are passive investors and therefore acknowledge that the Manager will conduct all daily operations.

(d)  Notwithstanding any other provision of this Agreement, the Manager shall not have the authority to take the following actions on behalf of the Company without the prior written consent of the Investor Members holding at least sixty-six and two thirds percent (66 2/3%) of the Membership Interests (a "**Majority In Interest**"):

25

(i)any amendment to this Agreement which adversely affects the rights of the Members;

(ii)any change in the nature or character of the business of the Company; or

(iii)conduct any sale, reorganization or recapitalization of the Company, whether directly or pursuant to a merger, consolidation, share exchange or otherwise.

(e) The Manager may resign at any time by written notice thereof to the Members.   In the event of such resignation, the Members owning a Majority In Interest of the Membership Interests may appoint a replacement Manager for the Company. The resignation of a Member as a Manager shall not affect such Member's rights or status as a Member.

Section 4.02        **Duties and Obligations of the Manager.** The Manager shall take any action which may be necessary or appropriate for the continuation of the Company's valid existence and authority to do business as a Company under the Act and of each other jurisdiction in which such authority to do business is necessary or, in the judgment of the Manager, advisable to protect the limited liability of the Members or to enable the Company to conduct the business in which it is engaged. The Manager shall not intentionally violate any law applicable to the Company.  Neither the Manager nor its principals or beneficial owners shall have any liability to the Company or any other Person by reason of being or having been the Manager unless the liability shall have been the result of gross negligence or willful misconduct by the Manager.   The Manager does not in any way guarantee the return of Capital Contributions to the Members or the making of Distributions by the Company.

Section 4.03  **Other Businesses of the Manager; Conflicts of Interest.**

(a) The Manager shall devote to the Company such business time as the Manager, in its sole and absolute discretion, deems to be necessary to conduct the Company's business and affairs in accordance with the terms of this Agreement and the Company's obligations as a Member of the Property Owner. It is expressly understood and agreed that neither the Manager, its Affiliates nor their respective managers, partners, members, interest holders, officers or directors are required to devote their entire time or attention to the business of the Company nor are any of them restricted in any manner from participating in other businesses or activities.

(b) Each Member acknowledges and agrees that the Manager, its Affiliates and their respective members, partners, directors, officers, partners, employees, interest holders and agents may exercise investment responsibility, or otherwise engage, directly or indirectly, in any other business, irrespective of whether any such business is similar to, or identical with, the business of the Company, which may include purchasing, selling, holding or otherwise dealing with investments, notwithstanding any provision to the contrary at law or in equity. The Manager and its directors, officers, employees, partners, members, interest holders and agents may form investment vehicles, with purposes similar to those of the Company, or with other purposes, or any other investment vehicle, directly or indirectly purchase, sell, hold or otherwise deal with investments for their own accounts, for their family members or for other clients. A Member will not, solely by reason of being a Member in the Company, have any right to participate in any manner in any profits or income earned or derived by or accruing to the Manager from the conduct of any business other than the business of the Company or from any transaction or other investment effected by any such person for any account other than that of the Company.

26

(c) The Developer and Manager have disclosed that they (or their Affiliates) will receive a portion of the purchase price to be paid by the Property Owner for the Properties pursuant to the Purchase Contract.

Section 4.04 **Officers, Agents and Manager.** The Manager may from time to time designate such officers, agents and manager as they may deem necessary to carry out the day-to-day operations of the Company. Such officers and agents shall have such duties, powers, responsibilities and authority as may from time to time be prescribed by the Manager, and may be removed at any time, with or without cause, by the Manager.

Section 4.05 **Indemnification.** The Company shall indemnify and hold harmless any such officer, agent and manager (including, without limitation, the Manager) from and against all claims and demands made by third parties as a consequence of such person's good faith actions or activities on behalf of the Company. The Company shall not indemnify the Manager, its principals or any other person acting on behalf of the Company, if the claim for indemnification arises from their willful or wanton acts. This indemnification shall survive the termination or amendment of this Agreement and/or the termination of the Company. The indemnification rights set forth in this Section 4.5 shall be cumulative of and in addition to, any and all rights, remedies, and recourse to which it shall be entitled whether pursuant to the provisions of this Agreement, at law or in equity.

Section 4.06 **Member Approval**. In furtherance of the foregoing, the Company and the Members, each hereby approve, authorize and consent to the following: (1) the purchase of the Properties pursuant to the Transaction Agreements by the Property Owner and the taking of any loan or loans that the Property Owner intends to obtain for the purpose of funding the acquisition, construction and development of the Properties, (ii) the execution and delivery of any document or instrument by the Manager shall be conclusive evidence that the terms and conditions contained therein have been determined to be appropriate by the Company and are binding upon the Company, (iii) that the Manager shall execute, deliver and perform in the name of and on behalf of the Company, and under the Company's seal or otherwise, any and all documents required or appropriate to effectuate the transactions contemplated herein and to take any and all further actions of any kind or nature whatsoever (including the payment or authorization of payment of necessary costs and expenses) as the Manager may deem necessary or advisable to carry out the intent and accomplish the purpose of the foregoing and the transactions contemplated thereby, all upon such terms and conditions as the Manager deems appropriate, and (iv) any and all other actions heretofore taken by the Manager on behalf of the Company, in furtherance of or to effectuate any of the actions authorized herein are hereby approved, ratified and confirmed in all respects.

### Article V. FEES

Section 5.01 **Registration Fee.** Along with the equity investment, each Member will pay a non-refundable fee of five percent (5%) of the Subscription Amount to Summit (the "**Registration Fee**"). The Registration Fee will be paid in addition to the Subscription Amount and will not be considered a Capital Contribution to the Company.

Section 5.02 **Project Management Fee.** After Closing, the Property Owner will pay a project management fee (the "**Project Management Fee**") in the aggregate amount equal to one and 49/100 percent (1.49%) of the estimated total project costs as stated in the Business Plan to the Manager.

## Article VI.   CAPITAL CONTRIBUTIONS

Section 6.01 **Capital Contributions.**

(a) Each Member has contributed or shall contribute the amount set forth in Exhibit B to this Agreement as the initial Capital Contribution to be made by such Member.

(b) The Members hereby acknowledge that there is no assurance that they will receive a return of their Capital Contributions from the Company.

(c) No Member shall be paid interest on any Capital Contribution to the Company or on such Member's Capital Account. Furthermore, no Member shall have any right to demand the return of its Capital Contributions, or to receive property other than cash from the Company.

(d) All Capital Contributions must be made in cash. Any Capital Contribution made in a currency other than USD shall be converted to USD by the Company and the amount of such Capital Contribution shall for all purposes be the amount so obtained by the Company, less applicable exchange and bank fees.

Section 6.02 **Capital Accounts.** A Capital Account shall be maintained for each Member. Each Member's Capital Account shall be increased by the value of each Capital Contribution made by the Member, the amount of any Company liabilities assumed by the Member (or which are secured by Company property distributed to such Member), allocations to such Member of the profits and any other allocations to such Member of income pursuant to the Code. Each Member's Capital Account will be decreased by the value of each Distribution made to the Member by the Company, the amount of any liabilities assumed by the Company (or which are secured by property contributed to the Company by such Member), allocations to such Member of Losses and other allocations to such Member pursuant to the Code.

Section 6.03 **Transfers.** Upon a permitted sale or other transfer of a Membership Interest in the Company in accordance with the provisions of Article 10, the Capital Account of the Member transferring such Member's Membership Interest shall become the Capital Account of the Person to which or whom such Membership Interest is sold or transferred in accordance with Section 1.704-1 (b)(2)(iv) of the Treasury Regulations.

Section 6.04 **Modifications.** The manner in which Capital Accounts are to be maintained pursuant to this Section is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder. If in the opinion of the Members the manner in which Capital Accounts are to be maintained pursuant to this Agreement should be modified to comply with Code Section 704(b) or the Treasury Regulations, then the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

Section 6.05 **Deficit Capital Account.** Except as otherwise required under the Act or this Agreement, no Member shall have any liability to restore all or any portion of a deficit balance in a Capital Account.

Section 6.06 **Withdrawal or Reduction of Capital Contributions.** A Member shall not receive from the Company any portion of a Capital Contribution until all indebtedness, liabilities of the Company, except any indebtedness, liabilities and obligations to Members on account of their Capital Contributions, have been paid or there remains property of the Company, in the sole discretion of a Majority In Interest of the Members, sufficient to pay them.

## Article VII. ALLOCATIONS

Section 7.01 **Allocations of Profits and Losses.** Except as otherwise provided in this Agreement, all items of income, gain, loss and deduction comprising the profits and losses of the Company for each Fiscal Year will be allocated among the Members in accordance with each Members economic interest in the respective item, as determined by the Manager.

Section 7.02 **Tax Allocations and Other Tax Matters.** Each item of income, gain, loss or deduction recognized by the Company shall be allocated among the Members for tax purposes in the same manner that each such item is allocated to the Members' Capital Accounts or as otherwise provided herein; provided, that, the Manager may adjust such allocations as long as such adjusted allocations have substantial economic effect or are in accordance with the Membership Interests in the Company. All tax matters, including accounting procedures, not expressly provided for by the terms of this Agreement shall be determined by the Manager in its sole discretion.

## Article VIII. DISTRIBUTIONS

Section 8.01 **Distributions.**

(a)     The Manager shall periodically review the available cash of the Company received by the Company from the Property Owner. On a quarterly basis, the Manager shall distribute the portion of such amount which the Manager reasonably determines is not required by the Company for payment of the Company's expenses, liabilities and other obligations (whether fixed or contingent), and the establishment of appropriate reserves for such expenses, liabilities and obligations as may arise, and for the maintenance of adequate working capital for the continued conduct of the Company's operations (such portion, **"Distributable Cash"**), as follows:

(i)     First, to the Investor Members, pro rata in accordance with their Membership Interests, until each Investor Member has received a return of its entire Capital Contributions; and

(ii)     Thereafter, to the Investor Members, pro rata in accordance with their Membership Interests.

(b) The Members acknowledge that the Company's only source of net cash flow will be payments received from the Property Owner. The Members further acknowledge that the Property Owner Agreement provides for the payment of certain construction fees, project management fees and other expenses that are payable to Affiliates of the manager of the Property Owner and which may be shared with the Manager or payable directly thereto. Such amounts are payable prior to and as a priority to distributions to be made to the Members of the Company.

(c) The Members acknowledge that the Property Owner Agreement provides that once the members of the Property Owner have received certain distributions as provided for therein, the Developer and the Manager will be entitled to receive a portion of the remaining amounts distributable by the Property Owner, which amounts will be paid prior to and as a priority over payment of distributions to the Members of the Company. The Members also acknowledge that the Property Owner will be incurring debt and loans from third parties that may exceed market interest rates and that any distributions by the Property Owner will be subject to the terms of such debt and loans.

Section 8.02 **Limitation Upon Distributions.** No Distribution shall be declared and paid unless, after such Distribution is made, the assets of the Company are in excess of all liabilities of the Company, unless so decided by the Manager.

Section 8.03 **Interest on and Return of Capital Contributions.** No Member shall be entitled to interest on such Member's Capital Account or to a return of such Member's Capital Contribution, except as specifically set forth in this Agreement.

Section 8.04 **Accounting Period.** The accounting period of the Company shall be the Fiscal Year.


## Article IX.  TAXES

Section 9.01 **Tax Returns.**

(a) Each Member shall cause to be prepared and filed all necessary federal, state and foreign income tax returns for such Member in connection with its Capital Contribution and Distributions made from the Company. The Manager shall assist the Members in selecting a qualified accountant and shall furnish to the Members all pertinent information in its possession relating to Company operations that is necessary to enable the Members' income tax returns to be prepared and filed. The Company shall provide the Members with K-1 tax returns for the Company within ninety (90) following the end of each calendar year.

(b) The Manager shall cause to be prepared and filed all necessary federal and state income tax returns for the Company. Each Member shall furnish to the Company all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed. Any accounting expenses incurred in connection with preparing the Company's tax returns or filings shall be paid by the Company.

Section 9.02 **Tax Elections.** The Company shall make the following elections on the appropriate tax returns:

(a) To adopt the calendar year as the Fiscal Year;

(b) To elect to amortize the organizational expenses of the Company and the start-up expenditures of the Company under Code Section 195 ratably over a period of sixty months as permitted by Code Section 709(b); and

(c) Any other election that the Company may deem appropriate and in the best interests of the Members.

(cc) Neither the Company nor any Member may make an election for the Company to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state law, and no provisions of this Agreement shall be interpreted to authorize any such election.

Section 9.03    **Tax Matters Partner.**  The Manager shall be the "**tax matters partner**" of the Company pursuant to Code Section 6231(a)(7).  Any Member who is designated "tax matters partner" shall take any action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Code Section 6223.  The Tax Matters Partner shall reasonably take into account the tax positions of all other Members prior to taking any actions that could likely affect the tax position of such Members.

Section 9.04    **Withholding.** The Manager in its sole discretion may withhold and pay any taxes with respect to any Member, and any such taxes may be withheld from any distribution otherwise payable to such Member or, if no sufficiently large distribution is imminent, the Manager may require the relevant Member to promptly reimburse the Company for the amount of such tax withheld and paid over by the Company. No such reimbursement will be considered a Capital Contribution for purposes of this Agreement. Taxes withheld on amounts directly or indirectly payable to the Company and taxes otherwise paid by the Company shall be treated for purposes of this Agreement as distributed to the appropriate Members and shall be paid by the appropriate Members to the relevant taxing jurisdiction.

## Article X.    TRANSFERABILITY

Section 10.01    **General**.

(a) **Transfers of Membership Interests**.  A Member may not gift, bequeath, sell, assign, pledge, hypothecate, exchange or otherwise transfer ("**Transfer**") to another Person all or any portion of such Member's Membership Interest without the prior written consent of the Manager.

(b) **Transfers Subject to Terms of Agreement**.    Any Membership Interest Transferred pursuant to any of the provisions of this Section 10 shall be subject to all of the terms, restrictions, liabilities and rights of this Agreement, all of which shall survive the closing of such Transfer.  As a condition of the effectiveness of any Transfer to a Person not theretofore a party to this Agreement, such transferee shall indicate his agreement to become a party to this Agreement and to receive and hold such Membership Interest subject to all of the terms, restrictions, liabilities and rights of this Agreement and any other terms reasonably required by Manager by executing an appropriate written agreement to that effect and delivering a copy thereof to the Company and to each Member.

Section 10.02 **Transferee Not a Member**.  No Person acquiring a Membership Interest pursuant to this Section 10 shall become a Member unless such Person is approved by the Manager.  A transferee of a Membership Interest who has not been admitted as a Member shall have no right to vote or participate in the management of the business and affairs of the Company or to become a Member, but shall be entitled to receive the share of profits, losses and distributions to which the transferor would otherwise be entitled with respect to the transferred Membership Interest.  Furthermore, such transferee is not entitled to have access to information concerning Company transactions, or to inspect or copy any of the Company's books or other records.

## Article XI.  DISSOLUTION

Section 11.01 **Dissolution.**  The Company shall be dissolved and its affairs shall be wound up upon the first to occur of the following:

(a)  The termination of the legal existence of the last remaining Member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining Member of the Company in the Company unless the business of the Company is continued in a manner permitted by this Agreement or the Act; or

(b)  The written consent of the Manager and the Investor Members holding a Majority In Interest to dissolve, wind up or liquidate the Company; or

(c)  The entry of a decree of judicial dissolution under the Act.

Section 11.02 **Bankruptcy of Member.**  Notwithstanding any other provision of this Agreement, the bankruptcy of a Member shall not cause such Member to cease to be a Member of the Company and upon the occurrence of such an event, the business of the Company shall continue without dissolution.

Section 11.03 **Deficit Capital Account.**  Upon a liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other adjustments for all Fiscal Years, including the Fiscal Year in which such liquidation occurs), the Member shall have no obligation to make any Capital Contribution, and the negative balance of any Capital Account shall not be considered a debt owed by the Member to the Company or to any other Person for any purpose.

Section 11.04 **Nonrecourse to Other Members.**  Except as provided by applicable law or as expressly provided in this Agreement, upon dissolution, each Member shall receive a return of such Member's Capital Contribution solely from the assets of the Company.  If the assets of the Company remaining after the payment or discharge of the debts and liabilities of the Company are insufficient to return any Capital Contribution of any Member, such Member shall have no recourse against the Company or any other Member.

32

Section 11.05 **Termination.** In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act. The Company shall terminate when (a) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Members in the manner provided for in this Agreement and (b) the Certificate of Formation shall have been cancelled in the manner required by the Act.

## Article XII. POWER OF ATTORNEY

Section 12.01 **Power of Attorney.**

(a) Each Member, by its execution as a deed of this Agreement or any other agreement incorporating this Agreement by reference, hereby irrevocably makes, constitutes and appoints the Manager, any successor Manager and the liquidating trustee, if any, in such capacity as liquidating trustee for so long as it acts as such, as its true and lawful agent and attorney-in-fact, with full power of substitution and full power and authority in its name, place and stead, to make, execute, sign, acknowledge, swear to, record and file (i) this Agreement and any amendment to this Agreement which has been duly adopted as herein provided; (ii) all certificates and other instruments deemed advisable by the Manager or the liquidating trustee to carry out the provisions of this Agreement and applicable law or to permit the Company to become or to continue as a Company wherein the Members have limited liability in each jurisdiction where the Company may be doing business; (iii) all instruments that the Manager or the liquidating trustee deems appropriate to reflect a change or modification of this Agreement, including, without limitation, the admission of substituted Members pursuant to the provisions of this Agreement; (iv) all conveyances and other instruments or papers deemed advisable by the Manager or the liquidating trustee to effect the dissolution and termination of the Company (consistent with Article 11); (v) all alternative name certificates required (in light of the Company's activities) to be filed on behalf of the Company; and (vi) all other instruments or papers which may be required or permitted by law to be filed on behalf of the Company which are not legally binding on the Members in their individual capacity and are necessary to carry out the provisions of this Agreement. The foregoing power of attorney:

(i)     is deemed to be coupled with an interest, shall be irrevocable and shall survive and shall not be affected by the subsequent death, disability or incapacity of any Member;

(ii)     may be exercised by the Manager or the liquidating trustee, as appropriate, either by signing separately as attorney-in-fact for each Member or by a single signature of the Manager or the liquidating trustee, as appropriate, acting as attorney-in-fact for all of them; and

(iii)     shall survive the delivery of an assignment by a Member of the whole or any portion of its Membership Interests; except that, where the assignee of the whole of such Member's interests has been approved by the Manager for admission to the Company as a substituted Member, the power of attorney of the assignor shall survive the delivery of such assignment for the sole purpose of enabling the Manager or the liquidating trustee, as appropriate, to execute, swear to, acknowledge and file any instrument necessary or appropriate to effect such substitution.

33

(b) Each Member shall execute and deliver to the Manager within fifteen (15) days after receipt of the Manager's request therefor such other instruments as the Manager reasonably deems necessary to carry out the terms of this Agreement. The Manager shall notify each Member for which it has exercised a power-of-attorney as soon as practicable thereafter.

## Article XIII. GENERAL PROVISIONS

Section 13.01 **Notices.**   Any notice, demand or other communication required or permitted to be given pursuant to this Agreement shall have been sufficiently given for all purposes if (a) delivered personally to the party or to an executive officer of the party to whom such notice, demand or other communication is directed or (b) sent by registered or certified mail, postage prepaid, addressed to the Member or the Company at his, her or its address set forth in this Agreement.  Except as otherwise provided in this Agreement, any such notice shall be deemed to be given three business days after the date on which it was deposited in a regularly maintained receptacle for the deposit of mail, addressed and sent as set forth in this Section.

Section 13.02 **Amendment.**   This Agreement may be amended by the written consent of the Manager and a Majority In Interest of the Members; provided, however, that amendments which do not materially adversely affect any Member or the Company may be made to this Agreement, from time to time, by the Manager, without the consent of any of the Members, (i) to amend any provision of this Agreement which requires any action to be taken by or on behalf of the Manager or the Company pursuant to requirements of the Act if the provisions of the Act are amended, modified or revoked so that the taking of such action is no longer required, (ii) to take such action in light of changing regulatory conditions, as the case may be, as is necessary in order to permit the Company to continue in existence, (iii) to add to the representations, duties or obligations of the Manager, or to surrender any right granted to the Manager herein, for the benefit of the Members, (iv) to cure any ambiguity, or to correct any clerical mistake or to correct or supplement any immaterial provision herein which may be inconsistent with any other provision herein or therein, or correct any printing, stenographic or clerical errors or omissions, which shall not be inconsistent with the provisions of this Agreement or the status of the Company as a Membership for tax purposes, (v) to change the name of the Company, (vi) to amend the Register and this Agreement to give effect to changes in the Membership Interest holders of the Company and any terms applicable to the acceptance of additional capital contributions pursuant to Section 3.9; or (vii) to make any change which is for the benefit of, or not materially adverse to the interests of, the Members.

Section 13.03 **No Right to Partition.** To the extent permitted by law, and except as otherwise expressly provided in this Agreement, the Members, on behalf of themselves and their shareholders, members, partners, heirs, executors, administrators, personal or legal representatives, successors and assigns, if any, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, to seek, bring or maintain any action in any court of law or equity for partition of the Company or any asset of the Company, or any interest which is considered to be Company property, regardless of the manner in which title to any such property may be held.

34

Section 13.04 **Counsel.** Each Member hereby acknowledges and agrees that any law firm retained by the Manager in connection with the legal aspects of the organization of the Company, the offering of Membership Interests in the Company, the investment in the Property Owner, the management and operation of the Company, or any dispute between the Manager and any Member, is acting as counsel to the Manager and as such does not represent or owe any duty to such Member or to the Members as a group in connection with such retention. Each Member further acknowledges that the foregoing law firms shall owe no direct duties to such Member. Each Member further represents and acknowledges that such Member was either represented by its own separate and independent counsel or had an opportunity to be so represented in connection with the execution and delivery of this Agreement. In the event that any dispute or controversy arises between any Member and the Company, or between any Member and the Manager or any of their Affiliates that either of the foregoing law firms represents, then each Member agrees that such law firm may represent the Company or the Manager or their Affiliates in any such dispute or controversy to the extent permitted by applicable rules relating to professional ethics, and each Member hereby consents to such representation. Each Member jointly and severally forever waive any claim that said law firm's representation of the Company and the Manager hereunder, and of the Company, Manager and/or their respective Affiliates now and in the future on matters for which said law firm is retained as counsel by the Company, Manager and/or their respective Affiliates constitutes a conflict of interest.

Section 13.05 **Construction.** Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

Section 13.06 **Headings.** The headings in this Agreement are for convenience only and shall not be used to interpret or construe any provision of this Agreement.

Section 13.07 **Waiver.** No failure of a Member to exercise, and no delay by a Member in exercising, any right or remedy under this Agreement shall constitute a waiver of such right or remedy. No waiver by a Member of any such right or remedy under this Agreement shall be effective unless made in a writing duly executed by all of the Members and specifically referring to each such right or remedy being waived.

Section 13.08 **Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law. However, if any provision of this Agreement shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

Section 13.09 **Binding.** This Agreement shall be binding upon and inure to the benefit of all Members, and each of the successors and assigns of the Members, except such right or obligation of a Member under this Agreement that may not be assigned by such Member to another Person without first obtaining the written consent of all other Members.

Section 13.10 **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. A facsimile or electronic mail signature hereof shall be deemed an original.

Section 13.11 **Governing Law.**  This Agreement shall be governed by, and interpreted and construed in accordance with, the laws of the State of Delaware, without regard to principles of conflict of laws.

Section 13.12   **Subscription Agreement Representations/Warranties.**   All of the representations, warranties and covenants made by the Investor Members (each such Investor Member defined in the Subscription Agreement as a "**Subscriber**") in the Subscription Agreement are hereby incorporated into this Agreement by reference and shall have the same force and effect as if the same were repeated herein in their entirety.  All such representations, warranties and covenants shall survive the execution and delivery of the Subscription Agreement, this Agreement and the issuance and sale of the Membership Interests.   The Investor Members shall and hereby do indemnify and hold harmless the Company, the Manager or any Affiliate of the foregoing, and the members, managers, stockholders, other beneficial owners, officers, directors, employees and agents of any of the foregoing, from and against any and all losses, expenses, liabilities and other claims and damages relating to or arising out of any breach of any such representation, warranty or covenant made by such Investor Member. This indemnification shall survive the termination or amendment of this Agreement, the Subscription Agreement and/or the termination of the Company.

Section 13.13 **Securities Law.**   THE MEMBERSHIP INTERESTS (THE "**INTERESTS**") OF THE COMPANY HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), THE ISRAELI SECURITIES LAW, 5728-1968, AS AMENDED (THE "**SECURITIES LAW**"), OR THE SECURITIES LAWS OF ANY OTHER STATE OR COUNTRY OR ANY OTHER APPLICABLE SECURITIES LAWS (COLLECTIVELY, THE "**APPLICABLE SECURITIES LAWS**"), IN EACH CASE IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE INTERESTS MUST BE ACQUIRED FOR INVESTMENT ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THIS AGREEMENT, THE SECURITIES ACT, THE SECURITIES LAW AND THE APPLICABLE SECURITIES LAWS. THEREFORE, PURCHASERS OF INTERESTS WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENTS FOR AN INDEFINITE PERIOD OF TIME. EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT AND UNDER THE SECURITIES ACT, THE SECURITIES LAW AND THE APPLICABLE SECURITIES LAWS, A MEMBER MAY NOT SELL, ASSIGN, TRANSFER, PLEDGE OR OTHERWISE DISPOSE OF ALL OR ANY PART OF ITS INTERESTS IN THE COMPANY UNLESS THE MANAGER HAS CONSENTED THERETO AND SUCH SALE, ASSIGNMENT OR OTHER TRANSFER IS IN FULL COMPLIANCE WITH ALL SUCH LAWS.  EXCEPT AS MAY BE PERMITTED BY THE SECURITIES LAW, AS IN EFFECT FROM TIME TO TIME, THE INTERESTS IN THE COMPANY WILL NOT BE OFFERED DURING ANY 12 MONTH PERIOD TO MORE THAN 35 ISRAELI PERSONS THAT ARE NOT INVESTORS LISTED IN THE FIRST SCHEDULE TO THE SECURITIES LAW.

Section 13.14 **Entire Agreement**.  This Agreement shall constitute the entire agreement among the Members with respect to the subject matter hereof and shall supersede all previous promises, agreements, conditions, understandings, representations and warranties among the Members with respect to the Company and the business of the Company.  To the extent there are any inconsistencies between the terms and provisions of this Agreement and the Subscription Agreement or any other document entered into by the Members, or any one of them, with respect to the Company, the terms and conditions of this Agreement shall govern and be binding.

[THE REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGES TO FOLLOW]

37

**IN WITNESS WHEREOF**, the parties have signed or caused this Agreement to be duly signed as of the date first above written.

COMPANY

**3 SPEC INVESTORS LLC**

By:    613 Summit Corp., its manager

By: _____
Name: Aaron Harow & Tzvi Ben David
Authorized Signatory

MEMBER

**613 SUMMIT CORP.**

By: _____
Name: Aaron Harow & Tzvi Ben David
Title: Authorized Signatory

38