FILED
IN CLERK'S OFFICE
U.S. _____ E.D.N.Y.

★ SEP 0 6 2019 ★

CR 19-408

AES:SCJ
F. #2017R01691     BROOKLYN OFFICE

JOHNSON, J.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

GOLD, M.J.

- - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

ISKYO ARONOV,
  also known as "Isaac Aronov,"
MICHAEL KONSTANTINOVSKIY,
  also known as "Michael Kay,"
TOMER DAFNA,
AVRAHAM TARSHISH,
  also known as "Avi Tarshish," and
MICHAEL HERSKOWITZ,

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - X

<u>I N D I C T M E N T</u>

Cr. No. _____
(T. 18, U.S.C., §§ 2, 981(a)(1)(C),
  982(a)(2), 982(b)(1), 1343, 1349 and
  3551 <u>et seq.</u>; T. 21, U.S.C., § 853(p); T.
  28, U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

INTRODUCTION

      At all times relevant to this Indictment, unless otherwise indicated:

I.    <u>The Defendants and Relevant Entities</u>

      1.    The defendant ISKYO ARONOV, also known as "Isaac Aronov," was a resident of Queens, New York.   He was the President of My Ideal Property Inc. ("MIP"). ARONOV also controlled a number of other corporate entities formed to buy and sell real property, including MIP Management Inc., LL Organization Inc., LL Fund Inc., IA Investors LLC, AG2 Equities, Inc., PIM Equities Inc. and IJ Development LLC.

2.     The defendant MICHAEL KONSTANTINOVSKIY, also known as "Michael Kay," was a resident of Queens, New York.   He was a New York-licensed real estate broker, the President of National Homeowners Assistance Inc. ("NHA") and Manager of Settle NY Corp.

3.     The defendant TOMER DAFNA was a resident of Great Neck, New York.   He was an owner of Exclusive Homes Realty Group Inc. and Exclusive Homes NY, LLC (collectively, "Exclusive Homes") and Homeowners Solutions Group LTD ("Homeowners Solutions").   DAFNA also controlled 5 Borough Construction Management LLC and a number of corporate entities formed to buy and sell real property.

4.     The defendant AVRAHAM TARSHISH, also known as "Avi Tarshish," was a resident of Queens, New York.   He first worked for MIP and then became an owner of Exclusive Homes and Homeowners Solutions.   TARSHISH also controlled a number of other corporate entities formed to buy and sell real estate, including My Ideal Holdings LLC, Eliya Properties LLC and 1319 Holdings LLC.

5.     The defendant MICHAEL HERSKOWITZ was a resident of Brooklyn, New York.   He was a New York-licensed attorney who represented parties involved in real estate transactions.

6.     MIP was a New York corporation with its principal place of business located at 116-55 Queens Boulevard, Suite 206, Forest Hills, New York.   The defendant ISKYO ARONOV formed MIP on or about December 5, 2012.   MIP marketed itself as a real estate development company that was focused on rehabilitating distressed properties.

MIP claimed that it built, maintained and marketed properties, and that it had developed a list of professionals it worked with, including mortgage bankers, inspectors, engineers, attorneys, insurance representatives, short sale processors and other professionals who were involved in the process of buying and selling property.

7.      NHA and Settle NY Corp. were New York corporations with their principal places of business located at 116-55 Queens Boulevard, Suite 206, Forest Hills, New York.   The defendant MICHAEL KONSTANTINOVSKIY formed NHA or on about December 3, 2012 and Settle NY Corp. on or about July 3, 2015.   NHA and Settle NY Corp. were short sale processing companies that purported to represent distressed home owners in negotiations with their mortgage lenders.

8.      The Exclusive Homes were companies with their principal places of business located at 914 Bedford Avenue, Suite 1, Brooklyn, New York.   The defendant AVRAHAM TARSHISH formed Exclusive Homes NY, LLC on or about May 19, 2014 and Exclusive Homes Realty Group Inc. on or about July 25, 2014.   Exclusive Homes engaged in real estate investment.

9.      Homeowners Solutions was a company with its principal place of business located at 893 Bedford Avenue, Brooklyn, New York.   The defendant AVRAHAM TARSHISH formed Homeowners Solutions on or about July 23, 2014.   Homeowners Solutions purported to represent distressed homeowners who sought to sell their properties in short sales.

II.    Definitions and Regulatory Framework

10.    A mortgage loan was a loan from a financial institution to a borrower

for the purchase of a real property, typically a home, which secured the loan.   Mortgage

loans were often sold by the financial institution that originated the loan, and the final holder

of a mortgage loan is referred to as "lender" herein.   A servicer handled the administrative

functions of a mortgage loan for the lender, such as collecting the borrower's payments and

communicating with the borrower.   A lender could either be the servicer or have a third

party as the servicer.   Lenders and servicers often were financial institutions, such as

federally insured banks or mortgage lending businesses.

11.    "Loss mitigation" was a process in which a borrower and a lender or

servicer worked together to lessen the loss to the lender resulting from the borrower's default

on a mortgage loan.   One loss mitigation program was a pre-foreclosure sale, otherwise

known as a "short sale," which allowed a borrower to give up his or her property without a

foreclosure.   In a short sale, with the approval of the lender or servicer, a borrower sold his

or her home for less than the outstanding balance of the mortgage loan.   The proceeds from

the short sale, minus approved closing costs, were applied to the outstanding mortgage loan

balance owed to the lender, who typically agreed to forgive the borrower's remaining

mortgage loan balance.

12.    Prior to approving a short sale, lenders and servicers typically required

the preparation of an objective appraisal of the property, either in the form of a broker price

opinion or an appraisal, to compare against the proposed short sale price.   In addition,

lenders and servicers typically required the parties to a proposed short sale to submit documents and information to show that, among other things, (a) the borrower was unable to pay the mortgage loan; (b) the borrower had listed the property on the open market for a set period of time before accepting the short sale offer; (c) the sale was an "arm's length transaction," defined as one between two unrelated parties without hidden terms or special understandings; and (d) all the funds paid in connection with the short sale were disclosed to the lender or servicer.

13.     The United States Department of Housing and Urban Development ("HUD") was a department of the Executive branch of the federal government.   The mission of HUD was to aid individuals and communities in the development and purchase of affordable housing.   The Federal Housing Administration ("FHA") was an agency of HUD. FHA provided mortgage insurance to FHA-approved lenders who provided mortgage loans to borrowers that met certain eligibility requirements.

14.     The Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") were federally chartered, stockholder-owned corporations that bought mortgage loans from lenders to provide liquidity, stability and affordability to the mortgage loan market.   After purchasing a mortgage loan, Fannie Mae and Freddie Mac either held the mortgage loan or packaged it with other mortgage loans into a mortgage-backed security.   Fannie Mae and Freddie Mac guaranteed the timely payment of principal and interest on the mortgage loans it securitized. Profits generated by Fannie Mae and Freddie Mac were paid to the United States.

15.     HUD permitted short sales of properties with FHA-insured mortgage loans under its Pre-Foreclosure Sale ("PFS") Program if the lender or servicer determined that the borrower and the short sale transaction met HUD's requirements.   Among other things, HUD required the parties to a short sale to certify to the lender or servicer in a Pre-Foreclosure Sale Addendum ("PFS Addendum"), sometimes referred to as a Short Sale Affidavit or an Arm's Length Transaction Affidavit, that the sale was an arm's length transaction characterized by a selling price and other conditions that would prevail in an open market environment.   The PFS Addendum typically required the parties to a short sale to affirm, among other things, that: (1) there were no hidden terms or special understandings between any of the parties involved in the transaction; (2) any relationship or affiliation among the parties involved in the transaction had been disclosed to the lender or servicer; (3) neither the buyer nor the seller would receive any funds or commissions from the sale; (4) there were no current or pending higher offers, or contracts relating to the current sale or subsequent sale of the property that had not been disclosed to the lender or servicer; (5) all amounts paid to any person or entity in connection to the sale were approved and reflected on the HUD-1 Settlement Statement; and (6) the property had been listed for sale for a certain amount of time before any offers were evaluated and the presented offer yielded the highest net return to the lender.   Lenders and servicers relied on the parties' representations in the PFS Addendum and other transaction documents to ensure that any short sale of a property with a FHA-insured mortgage loan met HUD's requirements.

16.     Both Fannie Mae and Freddie Mac also issued rules for servicers to follow to obtain approval of short sales of property secured by mortgage loans that Fannie Mae or Freddie Mac owned or had securitized.   These rules required, among other things, that a short sale be an arm's length transaction.   Fannie Mae and Freddie Mac also required that the parties to a short sale execute a short sale affidavit, which contained similar representations to those required by HUD referenced above.   In addition, Fannie Mae and Freddie Mac typically made the approval of a short sale contingent on the prohibition of any resale of the property for 30 days following the short sale closing, and the prohibition of any resale for more than 120 percent of the short sale price for the period beginning 31 days, and ending 90 days, after the short sale.

17.     The New York Uniform Commercial Code ("UCC") was a set of state laws applicable to commercial transactions in New York, such as the sale of goods.   It also covered secured transactions, where a lender gained the right to foreclose on a borrower's collateral should the borrower default on the loan.   If the borrower's collateral was fixtures to real property, then a UCC-1 Financing Statement was filed with the county where the real property was located.

III.     Overview of the Short Sale Scheme

18.     In or about and between December 2012 and January 2019, the defendants ISKYO ARONOV, MICHAEL KONSTANTINOVSKIY, TOMER DAFNA, AVRAHAM TARSHISH and MICHAEL HERSKOWITZ, together with others, conspired to defraud lenders, including Fannie Mae and Freddie Mac, and certain borrowers

(collectively, the "Short Sale Victims") by providing them with false, misleading and incomplete information to induce them to execute short sales at fraudulently depressed prices, thereby causing losses to the lenders and, at times, the borrowers (the "Short Sale Scheme").   ARONOV, KONSTANTINOVSKIY, DAFNA, TARSHISH, HERSKOWITZ and a number of other individuals, including Short Sale Co-Conspirators 1, 2 and 3, individuals whose identities are known to the Grand Jury (collectively, the "Short Sale Co-Conspirators"), worked both together and separately to purchase hundreds of properties at fraudulently depressed prices and then resell or "flip" the properties for large profits.

19.     The Short Sale Scheme originated at MIP under the direction of the defendant ISKYO ARONOV with the assistance of the defendants MICHAEL KONSTANTINOVSKIY and AVRAHAM TARSHISH, Short-Sale Co-Conspirators 1, 2 and 3, and others.   TARSHISH and the defendant TOMER DAFNA then replicated the Short Sale Scheme at Exclusive Homes with the assistance of Short-Sale Co-Conspirator 2 and others.   The defendant MICHAEL HERSKOWITZ was a real estate attorney who assisted the Short-Sale Co-Conspirators in completing certain fraudulent short sale transactions originated by both MIP and Exclusive Homes.

20.     In the Short Sale Scheme, the Short Sale Co-Conspirators—led by either the defendant ISKYO ARONOV if the short sale transaction originated with MIP, or by the defendants TOMER DAFNA and AVRAHAM TARSHISH if the short sale transaction either originated with Exclusive Homes or moved from MIP to Exclusive Homes—primarily targeted borrowers who owned homes in Brooklyn and Queens, New

York, and who were in default on their mortgage loans and in foreclosure proceedings.   The Short Sale Co-Conspirators contacted borrowers who owned such properties and attempted to persuade the borrowers to sell their homes to the Short Sale Co-Conspirators in short sale transactions.   The Short Sale Co-Conspirators typically promised to pay or paid the borrower money to induce him or her also to sign (a) an agreement with a real estate broker to list the property for sale; (b) an authorization to allow a third-party negotiator to negotiate the short sale with the lender on the borrower's behalf; and (c) a contract to sell the property to a corporate entity controlled by the Short Sale Co-Conspirators.   These documents were typically sent to the lender or servicer, often located outside of New York, by a wire transmittal that originated from Brooklyn or Queens, New York, such as an email or facsimile.

21.     After a borrower agreed to sell his or her property in a short sale coordinated by the Short Sale Co-Conspirators, they did not market the property to other prospective buyers, regardless of any requirement to do so by the lender or servicer. Instead, they worked together to ensure that the Short Sale Co-Conspirators purchased the property for the lowest price that the lender or servicer would accept.   The broker who had listed the property for sale told any potential purchaser who inquired about the property that the property was already "under contract" or otherwise not available for a showing.   The third-party negotiator, identified to the lender or servicer as the borrower's agent and sometimes the same party who purportedly acted as the listing broker for the property, typically worked for the Short Sale Co-Conspirators and often was paid fees by the Short

Sale Co-Conspirators in addition to and above any commission or fee disclosed to the lender or servicer.   If a short sale offer was rejected by the lender or servicer, another corporate entity created by the Short Sale Co-Conspirators would submit another short sale offer after waiting for a period of time.   The longer a property appeared to have been on the market, the greater the likelihood was that the lender or servicer would accept a proposed short sale price below any objective appraisal of the property's value.   After the borrower agreed to participate in a short sale of a property with the Short Sale Co-Conspirators, the Short Sale Co-Conspirators often took control of the property, evicted or paid any tenants living in the property to move out and, on occasion, arranged to damage the property to lower its appraised value.

      22.     On occasion, the Short Sale Co-Conspirators paid a borrower money to transfer the deed of ownership of his or her property to a Short Sale Co-Conspirator while the Short Sale Co-Conspirators negotiated a short sale on behalf of the borrower with the lender or servicer.   The deed transfer provided funds to the borrower, prevented the borrower from selling the property to another purchaser and gave the Short Sale Co-Conspirators control of the property even if the short sale was not approved.   In instances involving such a deed transfer, certain borrowers were told only that they were agreeing to a short sale and did not understand that they were, in fact, transferring their ownership rights to their property. Subsequently, prior to the closing of any approved short sale, the Short Sale Co-Conspirators transferred the deed back to the borrower for no consideration so that title of the property could be conveyed from the borrower to the short sale purchaser at the short sale closing in

conformity with the terms of the sales contract signed by the borrower and provided to the lender or servicer as part of the short sale approval process.

23.     The Short Sale Co-Conspirators also often filed fraudulent UCC-1 Financing Statements on properties the Short Sale Co-Conspirators intended to purchase so as to deter, or to obtain money from, other prospective buyers, who would need the filed UCC-1 Financing Statements terminated to clear the title of the property.

24.     When the Short Sale Co-Conspirators submitted documentation to obtain approval for a short sale, they provided false, misleading and incomplete information to the lender or servicer.   Among other things, in the required short sale affidavit and transaction documents, the Short Sale Co-Conspirators did not disclose when payments had been made to the borrower, that the property was not marketed as required and that the agents for the borrower and purchaser were affiliated by commercial enterprise with the buyer.   These documents were typically sent to the lender or servicer, often located outside of New York, by a wire transmittal that originated from Brooklyn or Queens, New York, such as an email or facsimile.   Furthermore, the Short Sale Co-Conspirators did not disclose all the past and future payments, including fees and commissions, to be paid to the Short Sale Co-Conspirators in connection with the short sale.   The money due to the lender from a short sale often was transmitted by a wire transfer to the lender's or servicer's bank account after the closing.

25.     During different and sometimes overlapping periods of time, various groupings of Short Sale Co-Conspirators worked together in the Short Sale Scheme.   From

approximately December 2012 through December 2016, the defendants ISKYO ARONOV,

MICHAEL KONSTANTINOVSKIY and AVRAHAM TARSHISH, together with others,

worked on fraudulent short sales coordinated by ARONOV where the primary beneficiaries

of the Short Sale Scheme were the owners of MIP, including ARONOV (the "MIP

Scheme").   From approximately January 2014 through January 2019, the defendants ISKYO

ARONOV, AVRAHAM TARSHISH, TOMER DAFNA and MICHAEL HERSKOWITZ,

together with others, worked on fraudulent short sales where the primary beneficiaries of the

Short Sale Scheme were DAFNA and TARSHISH (the "Exclusive Homes Scheme").   The

MIP Scheme and the Exclusive Homes Scheme both involved fraudulent short sales as

described in the paragraphs above.   Multiple Short Sale Co-Conspirators participated in both

schemes.

IV.    Select Transactions

26.    The following are examples of short sale transactions executed by the

Short Sale Co-Conspirators as part of the Short Sale Scheme.

A.    175 Vernon Avenue, Brooklyn, New York

27.    The defendants ISKYO ARONOV and MICHAEL

KONSTANTINOVSKIY, together with others, coordinated a short sale transaction to

purchase a residence located at 175 Vernon Avenue, Brooklyn, New York ("175 Vernon

Avenue"), for a price of $222,000 on or about December 26, 2013, as follows:

(a)    In or about early 2013, representatives of MIP initiated contact

with the borrower who had defaulted on his mortgage loan for 175 Vernon Avenue (the "175

Vernon Avenue Seller"), and offered him money to sell 175 Vernon Avenue in a short sale

coordinated by ARONOV at MIP and KONSTANTINOVSKIY at NHA.   Fannie Mae held

the mortgage loan for 175 Vernon Avenue.   On or about March 21, 2013, Short Sale Co-

Conspirator 1, who was affiliated with MIP, wrote the 175 Vernon Avenue Seller a check for

$10,000 from LL Fund Inc., an entity controlled by ARONOV.

   (b) Between approximately February 2013 and October 2013,

KONSTANTINOVSKIY submitted to the servicer for 175 Vernon Avenue several offers

from corporate entities that were owned or controlled by ARONOV to purchase 175 Vernon

Avenue in a short sale.   On or about November 29, 2013, the servicer approved a short sale

of 175 Vernon Avenue to an entity called 175 Vernon Ave. Inc., which was controlled by

ARONOV, for $222,200.   The approval was contingent on a number of conditions,

including the receipt of a final HUD-1 Settlement Statement approved by the servicer and the

receipt of an Arm's Length Transaction Affidavit.   The short sale closed on or about

December 26, 2013.

   (c) After the short sale closed, the final HUD-1 Settlement

Statement and an Arm's Length Transaction Affidavit, both dated December 26, 2013, were

transmitted to the servicer.   The Affidavit was signed by the 175 Vernon Avenue Seller,

KONSTANTINOVSKIY and ARONOV, and it contained material misrepresentations,

including that "[n]either the Seller(s) nor the purchaser(s) will receive any funds or

commissions from the sale of the [property]," and "[t]here are no agreements, understandings

or contracts relating to the current sale or subsequent sale of the [property] that have not been

disclosed to you."   ARONOV also signed a HUD-1 Settlement Statement, dated December 26, 2013, which indicated that the borrower/seller received only a $1,000 incentive payment from the sale.   In reality, all of the payments to the 175 Vernon Avenue Seller and certain Short Sale Co-Conspirators were not disclosed to the servicer.

(d)       On January 24, 2014, relying on the representations in the Arm's Length Transaction Affidavit and HUD-1 Settlement Statement, the servicer submitted an FHA insurance claim to HUD on behalf of Fannie Mae for the remaining balance of the mortgage loan not covered by the short sale.   On February 6, 2014, HUD paid Fannie Mae approximately $697,226 on the FHA insurance claim.

(e)       On May 7, 2014, less than five months after purchasing 175 Vernon Avenue for $222,200, ARONOV signed a contract of sale to sell the property to a third party for $965,000.   On August 26, 2014, that sale closed for $965,000.

B.      1219 Jefferson Avenue, Brooklyn, New York

28.     The defendants ISKYO ARONOV, MICHAEL KONSTANTINOVSKIY, TOMER DAFNA, AVRAHAM TARSHISH and MICHAEL HERSKOWITZ, together with others, coordinated a short sale transaction to purchase a residence located at 1219 Jefferson Avenue, Brooklyn, New York ("1219 Jefferson Avenue"), for a price of $275,000 on or about July 22, 2014, as follows:

(a)       In or about July 2013, Short Sale Co-Conspirator 2 initiated contact with the borrower who had defaulted on the mortgage loan for the property (the "1219 Jefferson Avenue Seller"), and persuaded her to sell 1219 Jefferson Avenue in a short

sale coordinated by ARONOV at MIP and KONSTANTINOVSKIY at NHA.   Financial

Institution 1, an entity the identity of which is known to the Grand Jury, held the mortgage

loan for 1219 Jefferson Avenue.   On or about July 2, 2013 and October 21, 2013, the 1219

Jefferson Avenue Seller signed a contract to sell 1219 Jefferson Avenue to an entity called

1219 Jefferson Ave. Inc., which was controlled by ARONOV.

       (b)    In or about 2014, the 1219 Jefferson Avenue Seller also began

working with representatives of Exclusive Homes, while KONSTANTINOVSKIY and

others at NHA continued to work on getting the short sale to 1219 Jefferson Ave. Inc.

approved by the servicer.   As a condition of the short sale approval, the servicer required the

parties to the transaction to sign a Short Payoff Arms-Length Affidavit, which stated, among

other things, that "there are no agreements, understandings, or contracts relating to the

current or subsequent sale of [the property] that have not been disclosed to the Servicer," and

that "all amounts to be paid to any party . . . in connection with the short payoff transaction

have been disclosed to and approved by the Servicer and will be reflected on the HUD-1

Settlement Statement."

       (c)    Prior to the short sale closing but after it had been approved by

the servicer, in or about July 2014, DAFNA, TARSHISH and ARONOV agreed to sell 1219

Jefferson Avenue for approximately $625,000 to a purchaser ("Subsequent Purchaser 1")

located by ARONOV.   As part of this transaction, ownership of 1219 Jefferson Ave. Inc.,

the entity ARONOV controlled that had entered into the contract to purchase the property, was transferred to Subsequent Purchaser 1 on or about July 23, 2014.

(d)     On or about July 23, 2014, the short sale closed at a purchase price of $275,000, and the 1219 Jefferson Avenue Seller transferred the property to 1219 Jefferson Ave. Inc.   Also on or about July 23, 2014, HERSKOWITZ wired approximately $252,755 to the servicer's bank account to satisfy the short sale payoff amount due.

(e)     On or about August 28, 2014, ARONOV emailed TARSHISH a spreadsheet entitled "1219 Jefferson Avenue, Brooklyn Recap 8-26-14."   The spreadsheet reflected the property's "sales price" of $625,000, and deducted both the "purchase price" of $275,000 and various expenses that had not been reflected on the HUD-1 Settlement Statement, for a total "net profit" from the transaction of $158,772.01.   The spreadsheet further noted that of the "net profit," $79,386 was due to ARONOV, $47,631.60 was due to TARSHISH and $31,754.40 was due to Short Sale Co-Conspirator 2.   Subsequent emails between Short Sale Co-Conspirator 2, TARSHISH and DAFNA indicate that TARSHISH and DAFNA paid Short Sale Co-Conspirator 2 the $31,754.40 due to her from this transaction in installments between approximately October 2014 and December 2014.

C.     1319 Jefferson Avenue, Brooklyn, New York

29.     The defendants ISKYO ARONOV, MICHAEL KONSTANTINOVSKIY, TOMER DAFNA and AVRAHAM TARSHISH, together with others, coordinated a short sale transaction to purchase a residence located at 1319 Jefferson

Avenue, Brooklyn, New York ("1319 Jefferson Avenue"), for a price of $550,000 on or

about September 17, 2014, as follows:

(a)      In or about April 2013, Short Sale Co-Conspirator 2 initiated

contact with the borrower who had defaulted on the mortgage loan for the property (the

"1319 Jefferson Avenue Seller"), and persuaded him to sell 1319 Jefferson Avenue in a short

sale coordinated by ARONOV at MIP and KONSTANTINOVSKIY at NHA.   Fannie Mae

held the mortgage loan for 1319 Jefferson Avenue.   In or about 2014, the 1319 Jefferson

Avenue Seller also began working with representatives of Exclusive Homes.   On or about

April 28, 2014, TARSHISH incorporated 1319 Holdings LLC, which was created to

purchase 1319 Jefferson Avenue.

(b)      To establish control over the property, on or about July 15,

2014, TARSHISH wrote the 1319 Jefferson Avenue Seller a $20,000 check from Eliya

Properties LLC, an entity controlled by TARSHISH.   In return for the $20,000, the 1319

Jefferson Avenue Seller provided the deed to 1319 Jefferson Avenue to Eliya Properties

LLC.

(c)      In or about August 2014, ARONOV and

KONSTANTINOVSKIY convinced the servicer to approve a short sale of 1319 Jefferson

Avenue to 1319 Holdings LLC for a price of $550,000.   The approval was contingent on a

number of conditions, including the receipt of a final HUD-1 Settlement Statement approved by the servicer and the receipt of a Short Sale Affidavit.

(d)     Prior to the short sale closing but after it had been approved by the servicer, in or about September 2014, DAFNA, TARSHISH and ARONOV agreed to sell the property to a purchaser ("Subsequent Purchaser 2") located by ARONOV for approximately $720,000.   On or about September 15, 2014, Short Sale Co-Conspirator 2 emailed TARSHISH and objected to selling 1319 Jefferson Avenue to Subsequent Purchaser 2 instead of a different purchaser from whom she had also received a $720,000 offer for the property.   On or about September 15, 2014, TARSHISH emailed Short Sale Co-Conspirator 2 in response and stated, "[What] is the deferent [sic]?   720 it's 720, I'm trying to get more."

(e)     Eliya Properties LLC transferred the deed back to the 1319 Jefferson Avenue Seller immediately prior to the short sale closing so that title of the property could transfer directly from the 1319 Jefferson Avenue Seller to 1319 Holdings LLC, the corporate entity approved to purchase the property.   On or about September 17, 2014, the short sale closed.

(f)     After the short sale closed, the final HUD-1 Settlement Statement and Short Sale Affidavit, both dated September 17, 2014, were transmitted to the servicer.   The Short Sale Affidavit was signed by the 1319 Jefferson Avenue Seller, KONSTANTINOVSKIY and Subsequent Purchaser 2, and it contained material misrepresentations, including that there were no "agreements, understandings, or contracts relating to the current or subsequent sale of the property that have not been disclosed to the

Servicer," and that "all amounts to be paid to any person or entity . . . in connection with the short sale have been disclosed to and approved by the Servicer and will be reflected on the HUD-1 Settlement Statement." In reality, neither the actual purchase price paid by Subsequent Purchaser 2 nor the past and future payments to the 1319 Jefferson Avenue Seller and the Short Sale Co-Conspirators, including ARONOV, KONSTANTINOVSKIY, TARSHISH and DAFNA, had been disclosed to the servicer.

(g)      Fannie Mae calculated its loss on the mortgage loan for 1319 Jefferson Avenue to be approximately $290,268.

D.      1055 Herkimer Street, Brooklyn, New York

30.      The defendants ISKYO ARONOV, MICHAEL KONSTANTINOVSKIY, TOMER DAFNA and AVRAHAM TARSHISH, together with others, coordinated a short sale transaction to purchase a residence located at 1055 Herkimer Street, Brooklyn, New York ("1055 Herkimer Street"), for a price of $405,000 on or about November 12, 2014, as follows:

(a)      In or about November 2013, Short Sale Co-Conspirator 2 initiated contact with a representative of a borrower who had defaulted on his mortgage loan for 1055 Herkimer Street (the "1055 Herkimer Street Seller"), and persuaded the 1055 Herkimer Street Seller to sell his property in a short sale coordinated by ARONOV at MIP and KONSTANTINOVSKIY at NHA. Fannie Mae held the mortgage loan for 1055

Herkimer Street.   In or about 2014, the Herkimer Street Seller also began to work with representatives of Exclusive Homes.

   (b) On or about October 7, 2014, the servicer approved a short sale of 1055 Herkimer Street to an entity called Cooper St. Management, LLC, which was controlled by TARSHISH and ARONOV, at a purchase price of $405,000.   The approval was contingent on a number of conditions, including the receipt of a final HUD-1 Settlement Statement approved by the servicer and the receipt of a Short Sale Affidavit.

   (c) Prior to the short sale closing but after it had been approved by the servicer, in or about October 2014, DAFNA, TARSHISH and ARONOV agreed to sell the property to a purchaser ("Subsequent Purchaser 3") located by ARONOV for approximately $425,000.   On or about November 10, 2013, Short Sale Co-Conspirator 2 emailed ARONOV, TARSHISH, DAFNA and Short Sale Co-Conspirator 3, and asked "Do we have an update on this closing?   What is the offer on the table?"   In response, on the same day, Short Sale Co-Conspirator 3 replied, "425.   Is the seller available for Wednesday?"

   (d) The short sale closed on or about November 14, 2014.   After the closing, the final HUD-1 Settlement Statement and Short Sale Affidavit, both dated November 12, 2014, were transmitted to the servicer.   The Short Sale Affidavit was signed by the 1055 Herkimer Seller, KONSTANTINOVSKIY and ARONOV, and it contained material misrepresentations, including that there were no "agreements, understandings, or contracts relating to the current or subsequent sale of the property that have not been

disclosed to the Servicer," and that "all amounts to be paid to any person or entity . . . in connection with the short sale have been disclosed to and approved by the Servicer and will be reflected on the HUD-1 Settlement Statement."   ARONOV also signed the HUD-1 Settlement Statement.   In reality, neither the actual purchase price paid by Subsequent Purchaser 3 nor the past and future payments to the Short Sale Co-Conspirators, including ARONOV, KONSTANTINOVSKIY, TARSHISH and DAFNA, had been disclosed to the servicer.

(e)     Fannie Mae calculated its loss on the mortgage loan for 1055 Herkimer Street to be approximately $237,748.

E.     177 Lewis Avenue, Brooklyn, New York

31.     The defendants ISKYO ARONOV, TOMER DAFNA and AVRAHAM TARSHISH, together with others, coordinated a short sale transaction to purchase a residence located at 177 Lewis Avenue, Brooklyn, New York ("177 Lewis Avenue"), for a price of $275,000 on or about April 30, 2015, as follows:

(a)     In or about July 2014, Short Sale Co-Conspirator 2 initiated contact with the borrower who had defaulted on his mortgage loan for 177 Lewis Avenue (the "177 Lewis Avenue Seller"), and persuaded him to sell his property in a short sale to DAFNA and TARSHISH at Exclusive Homes in exchange for money.

(b)     In or about July 2014, the 177 Lewis Avenue Seller signed a contract to sell 177 Lewis Avenue to 177 Lewis LLC, an entity controlled by DAFNA.   In

addition, the 177 Lewis Avenue Seller transferred his deed for 177 Lewis Avenue to Eliya

Properties LLC, an entity controlled by TARSHISH, in exchange for approximately $25,000.

(c)     On or about April 6, 2015, the servicer approved a short sale of

177 Lewis Avenue to 177 Lewis LLC for $275,000, contingent on receiving the required

minimum payoff of $238,483.88, a final signed HUD-1 Settlement Statement and a Short

Sale Affidavit signed by all the parties.

(d)     Prior to the short sale closing but after it had been approved,

DAFNA and TARSHISH offered the property for sale and agreed to sell it to another

individual ("Subsequent Purchaser 4") for over $700,000.

(e)     After the short sale closed on or about April 30, 2015, on or

about May 1, 2015, HERSKOWITZ wired $239,483.88 to the servicer in connection with

this short sale transaction.

(f)     On or about May 18, 2015, Short Sale Co-Conspirator 2 sent

DAFNA and TARSHISH an email titled "177 Lewis Ave. Breakdown," which listed the

"purchase price" as $775,000 and deducted both the "bank/closing costs/broker fees" and

various expenses that had not been reflected on the HUD-1 Settlement Statement, for a total

"profit" from the transaction of $338,800.   The email indicated that, of the total "profit,"

$271,040 was to be split between ARONOV and DAFNA, and $28,800 was due to Short

Sale Co-Conspirator 2, with the remaining $38,800 to be shared between two others who had assisted in the sale.

      F.     2403 Dean Street, Brooklyn, New York

      32.     The defendants ISKYO ARONOV, TOMER DAFNA, AVRAHAM TARSHISH and MICHAEL HERSKOWITZ, together with others, coordinated a short sale transaction to purchase a residence located at 2403 Dean Street, Brooklyn, New York ("2403 Dean Street"), for a price of $265,000 on or August 24, 2016, as follows:

      (a)     In or about 2013, Short Sale Co-Conspirator 2 initiated contact with a representative of a borrower who had defaulted on his mortgage loan for 2403 Dean Street (the "2403 Dean Street Seller"), and persuaded the 2403 Dean Street Seller to sell his property in a short sale coordinated by ARONOV at MIP and KONSTANTINOVSKIY at NHA.   In or about 2014, the 2403 Dean Street Seller also began to work with representatives of Exclusive Homes.   ARONOV arranged to have a fraudulent UCC-1 Financing Statement filed on the property to secure his interest in this transaction.

      (b)     On or about August 15, 2016, the servicer approved a short sale transaction from the 2403 Dean Street Seller to 2403 Dean Holding LLC, an entity created by Short Sale Co-Conspirator 2, at a purchase price of $265,000.   This approval was

contingent on receiving a final signed HUD-1 Settlement Statement and a Short Sale Affidavit signed by all the parties.

(c)     Prior to the short sale closing but after it had been approved by the servicer, Short Sale Co-Conspirator 2 offered the property for sale and received multiple offers at or above $525,000, including an offer from ARONOV that was accepted.

(d)     The short sale closed on or about August 24, 2016. Subsequently, the final signed HUD-1 Settlement Statement and a required Short Sale Affidavit, both dated August 24, 2016, were transmitted to the servicer.   The Short Sale Affidavit was signed by the 2403 Dean Street Seller and Short Sale Co-Conspirator 2, and it contained material misrepresentations, including there were "no agreements, understandings, contracts or offers relating to the current sale or subsequent sale of the Property that have not been disclosed to the Servicer;" "[n]either the Seller(s) nor the Buyer(s) will receive any funds or commissions from the sale of the Property, except [any relocation assistance] reflected on the HUD-1 Settlement Statement;" and "[a]ll amounts to be paid to any person or entity … in connection with the short sale have been disclosed and approved by the Servicer and will be reflected on the HUD-1 Settlement Statement."   In reality, neither the actual purchase price paid by ARONOV nor the past and future payments to the 2403 Dean Street Seller and the Short Sale Co-Conspirators had been disclosed to the servicer.

(e)     Pursuant to the arrangement between ARONOV, TARSHISH, DAFNA and Short Sale Co-Conspirator 2 that was reached prior to the short sale closing, ARONOV acquired 2403 Dean Holding LLC on or about August 24, 2016, paying both the

amount required by the servicer to close the short sale and a portion of the difference between that amount and $525,000 to Short Sale Co-Conspirator 2, DAFNA and TARSHISH.

(f)     On or about August 24, 2016, HERSKOWITZ, on behalf of ARONOV, wired approximately $238,798 to a bank account designated by the servicer and approximately $153,095 to Short Sale Co-Conspirator 2's bank account, both in connection with the short sale transaction.

(g)     On or about August 26, 2016, Short Sale Co-Conspirator 2 emailed ARONOV and referenced the "breakdown we discussed."   The email indicated that the price for 2403 Dean Street was $540,000.   It further indicated that, in connection with the short sale, Short Sale Co-Conspirator 2 should have been wired $155,177.61, including $20,862.93 for TARSHISH and DAFNA, but that she only received $153,095.22.   In the email, Short Sale Co-Conspirator 2 asked ARONOV to pay her the additional $2,082.39.

(h)     Subsequently, in or about January 2017, ARONOV sold 2403 Dean Street for approximately $840,000.

G.     65 Glen Street, Brooklyn, New York

33.     The defendants ISKYO ARONOV, TOMER DAFNA and AVRAHAM TARSHISH, together with others, coordinated a short sale transaction to purchase a

residence located at 65 Glen Street, Brooklyn, New York ("65 Glen Street"), for a price of $200,000 on or about March 15, 2018, as follows:

(a)     In or about 2017, Short Sale Co-Conspirator 2 initiated contact with the borrower who had defaulted on her mortgage loan for 65 Glen Street (the "65 Glen Street Seller"), and persuaded her to sell her property in a short sale coordinated by DAFNA and TARSHISH at Exclusive Homes.   Freddie Mac held the mortgage loan for 65 Glen Street.

(b)     Prior to the short sale closing but after it had been approved by the servicer, DAFNA and TARSHISH agreed to sell the property to a purchaser ("Subsequent Purchaser 5") for a price above the short sale price.   The short sale approval was contingent on a number of conditions, including the receipt of a final HUD-1 Settlement Statement approved by the servicer and the receipt of a Short Sale Affidavit.

(c)     On or about March 9, 2018, DAFNA's assistant emailed Short Sale Co-Conspirator 2, copying TARSHISH and DAFNA, and provided the name and attorney information for Subsequent Purchaser 5.   On or about March 15, 2018, Short Sale Co-Conspirator 2 emailed a number of individuals, including TARSHISH, DAFNA and counsel for Subsequent Purchaser 5, and provided "an itemized list of expenses NOT ON THE HUD that are needed for the closing today," which totaled approximately $180,000.

(d)     The short sale closed on or about March 15, 2018.   After the closing, the final HUD-1 Settlement Statement and a Short Sale Affidavit, both dated March 15, 2018, were transmitted to the servicer.   The Short Sale Affidavit was signed by the 65

Glen Street Seller, Subsequent Purchaser 5 and an agent, and it contained material misrepresentations, including that "[n]either the Seller(s) nor the Buyer(s) will receive any funds or commissions from the sale of the Property, except [any relocation assistance] reflected on the Closing Disclosure;" there were no "agreements, understandings, or contracts relating to the current or subsequent sale of the property that have not been disclosed to the Servicer," and that "all amounts to be paid to any person or entity . . . in connection with the short sale have been disclosed to and approved by the Servicer and will be reflected on the Closing Disclosure."   In reality, neither the actual purchase price paid by Subsequent Purchaser 5 nor the past and future payments to the 65 Glen Street Seller and the Short Sale Co-Conspirators, had been disclosed to the servicer.

(e)     On or about March 15, 2018, Subsequent Purchaser 5 also signed a mortgage loan agreement, secured by 65 Glen Street, for $525,000.   Counsel for the mortgage lender to Subsequent Purchaser 5 provided Short Sale Co-Conspirator 2 with a check for $55,000 dated March 15, 2018, which included the notation "65 Glen."

(f)     Freddie Mac calculated its loss on the mortgage loan for 65 Glen Street as approximately $665,593.

34.     In total, the Short Sale Co-Conspirators made millions of dollars in profits by selling properties for far more money than the short sale prices they had paid for the properties.

35.     HUD paid millions of dollars in insurance claims to lenders who were victimized by the Short Sale Scheme, and Freddie Mac and Fannie Mae also lost millions of

dollars as a result of the Short Sale Scheme in connection with mortgage loans that they owned or guaranteed.

## COUNT ONE
(Conspiracy to Commit Wire Fraud and Bank Fraud – The MIP Scheme)

36.     The allegations contained in paragraphs one through 35 are realleged and incorporated as if fully set forth in this paragraph.

37.     In or about and between March 2013 and December 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ISKYO ARONOV, also known as "Isaac Aronov," MICHAEL KONSTANTINOVSKIY, also known as "Michael Kay," TOMER DAFNA, AVRAHAM TARSHISH, also known as "Avi Tarshish," and MICHAEL HERSKOWITZ, together with others, did knowingly and intentionally conspire (a) to devise a scheme and artifice to defraud one or more of the Short Sale Victims, which included financial institutions, and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343; and (b) to execute a scheme and artifice to defraud one or more financial institutions, and to obtain moneys, funds, credits and other property owned by, and under the custody and control of, such financial institutions, by means of one or more materially false and fraudulent pretenses, representations and

promises, in connection with the MIP Scheme, contrary to Title 18, United States Code,

Section 1344.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

<u>COUNT TWO</u>
(Conspiracy to Commit Wire and Bank Fraud – The Exclusive Homes Scheme)

38.    The allegations contained in paragraphs one through 35 are realleged

and incorporated as if fully set forth in this paragraph.

39.    In or about and between January 2014 and November 2018, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants ISKYO ARONOV, also known as "Isaac Aronov," MICHAEL

KONSTANTINOVSKIY, also known as "Michael Kay," TOMER DAFNA, AVRAHAM

TARSHISH, also known as "Avi Tarshish," and MICHAEL HERSKOWITZ, together with

others, did knowingly and intentionally conspire (a) to devise a scheme and artifice to

defraud one or more of the Short Sale Victims, which included financial institutions, and to

obtain money and property from them by means of one or more materially false and

fraudulent pretenses, representations and promises, and for the purpose of executing such

scheme and artifice, to transmit and cause to be transmitted by means of wire communication

in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to

Title 18, United States Code, Section 1343; and (b) to execute a scheme and artifice to

defraud one or more financial institutions, and to obtain moneys, funds, credits and other

property owned by, and under the custody and control of, such financial institutions, by

means of one or more materially false and fraudulent pretenses, representations and

promises, in connection with the Exclusive Homes Scheme, contrary to Title 18, United

States Code, Section 1344.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNTS THREE THROUGH SEVEN
(Wire Fraud)

40.     The allegations contained in paragraphs one through 35 are realleged

and incorporated as if fully set forth in this paragraph.

41.     In or about and between March 2013 and November 2018, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants ISKYO ARONOV, also known as "Isaac Aronov," MICHAEL

KONSTANTINOVSKIY, also known as "Michael Kay," TOMER DAFNA, AVRAHAM

TARSHISH, also known as "Avi Tarshish," and MICHAEL HERSKOWITZ, together with

others, did knowingly and intentionally devise a scheme and artifice to defraud one or more

of the Short Sale Victims, which included financial institutions, in connection with the Short

Sale Scheme, including the MIP Scheme and the Exclusive Homes Scheme, to obtain money

and property from them by means of materially false and fraudulent pretenses,

representations and promises.

42.     On or about the dates set forth below, for the purpose of executing such

scheme and artifice, the defendants ISKYO ARONOV, MICHAEL

KONSTANTINOVSKIY, TOMER DAFNA, AVRAHAM TARSHISH and MICHAEL

HERSKOWITZ, together with others, did transmit and cause to be transmitted, by means of

wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, as set forth below:

| COUNT | DEFENDANTS | APPROX. WIRE DATE | SCHEME(S) | DESCRIPTION |
|---|---|---|---|---|
| THREE | ARONOV and KONSTANTINOVSKY | December 27, 2013 | MIP Scheme | Interstate bank wire transfer of $202,588.00 related to the short sale of 175 Vernon Avenue, Brooklyn, New York |
| FOUR | ARONOV, DAFNA, TARSHISH and HERSKOWITZ | July 22, 2014 | MIP Scheme and Exclusive Homes Scheme | Interstate bank wire transfer of $252,755.00 related to the short sale of 1219 Jefferson Avenue, Brooklyn, New York |
| FIVE | ARONOV, KONSTANTINOVSKY, DAFNA and TARSHISH | November 13, 2014 | MIP Scheme and Exclusive Homes Scheme | Interstate bank wire transfer of $374,030.00 related to the short sale of 1055 Herkimer Street, Brooklyn, New York |
| SIX | ARONOV, DAFNA, TARSHISH and HERSKOWITZ | May 4, 2015 | Exclusive Homes Scheme | Interstate bank wire transfer of $239,483.88 related to short sale of 177 Lewis Avenue, Brooklyn, New York |
| SEVEN | ARONOV, DAFNA, TARSHISH and HERSKOWITZ | August 25, 2016 | MIP Scheme and Exclusive Homes Scheme | Interstate bank wire transfer of $238,798.00 related to short sale of 2403 Dean Street, Brooklyn, New York |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION

43.     The United States hereby gives notice to the defendants that, upon their conviction of any of the offenses charged herein, the government will seek forfeiture in accordance with: (a) Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses; and (b) Title 18, United States Code, Section 982(a)(2), which requires any person convicted of such offenses to forfeit any property constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

44.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        (a)     cannot be located upon the exercise of due diligence;

        (b)     has been transferred or sold to, or deposited with, a third party;

        (c)     has been placed beyond the jurisdiction of the court;

        (d)     has been substantially diminished in value; or

        (e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any

other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2) and 982(b)(1); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL



FOREPERSON

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY:
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.136

F.#: 2017R01691
FORM DBD-34
JUN. 85

No.

## UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

ISKYO ARONOV, MICHAEL KONSTANTINOVSKIY, TOMER DAFNA,
AVRAHAM TARSHISH AND MICHAEL HERSKOWITZ,

Defendants.

## INDICTMENT

(T. 18, U.S.C. §§ 981(a)(1)(C), 982(a)(2), 982(b)(1), 1349 and
3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill*

_____
*Foreperson*

*Filed in open court this* _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ *day,*

*of* _ _ _ _ _ _ _ _ _ _ _ _ _ *A.D. 20* _ _ _ _ _

_____
*Clerk*

*Bail, $* _ _ _ _ _ _ _ _ _ _ _

*Shannon C. Jones, Assistant U.S. Attorney (718) 254-6379*