UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------

UNITED STATES OF AMERICA,

                                            **MEMORANDUM & ORDER**

– against –                                 19-CR-408 (MKB)


TOMER DAFNA, AVRAHAM TARSHISH a/k/a
AVI TARSHISH, and MICHAEL HERSKOWITZ,

                        Defendants.

----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

On September 6, 2019, a grand jury returned an indictment against Defendants Avraham

Tarshish, Tomer Dafna, and Michael Herskowitz[1] charging them with two counts of conspiracy

to commit wire and bank fraud in violation of 18 U.S.C. §§ 1349 and 3551 *et seq.*, and multiple

substantive counts of wire fraud related to specific transactions in violation of 18 U.S.C.

§§ 1343, 2, and 3551 *et seq.*[2] (Indictment ("Ind.") ¶¶ 36–42, Docket Entry No. 1; Grand Jury

Investigations Covering Mem., annexed to Ind. as Ex. 3, Docket Entry No. 1-3.) The Indictment

alleges that Defendants engaged in conspiracies to defraud lenders and certain borrowers

(collectively, the "Short Sale Victims") "by providing them with false, misleading and

incomplete information to induce them to execute short sales at fraudulently depressed prices,

---

[1]  The grand jury also returned the indictment against codefendants Iskyo Aronov and
Michael Konstantinovskiy, both of whom have pleaded guilty to conspiracy to commit wire and
bank fraud. (Min. Entry dated July 11, 2022; Min. Entry dated July 29, 2024.) The Government
later filed a Superseding Information as to Herskowitz, charging him with a single count of
conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 371 and 3551 *et seq.* (Superseding
Information, Docket Entry No. 330.)

[2]  The Indictment was unsealed on September 12, 2019. (Order dated Sept. 12, 2019,
Docket Entry No. 8.)

thereby causing losses to the lenders and, at times, the borrowers" (the "Short Sale Schemes"). (Ind. ¶ 18.)  Following a twelve-day trial, a jury found Tarshish guilty on all counts on November 21, 2024.  (Min. Entry dated Nov. 21, 2024; Verdict Sheet, Docket Entry No. 417.)  Prior to trial, Dafna pleaded guilty to conspiracy to commit wire and bank fraud as charged in the Indictment, (Min. Entry dated Oct. 24, 2024), and Herskowitz pleaded guilty to conspiracy to commit bank fraud as charged in the Superseding Information, (Min. Entry dated June 27, 2024).

The Government seeks restitution in the amount of $10,577,653 for Tarshish and Dafna, and $10,034,986 for Herskowitz; Tarshish, Dafna, and Herskowitz oppose the Government's proposed methodology and its application to several transactions.[3]  On September 25, 2025, the Court directed the parties to, among other things, "confer and provide an agreed-upon list of transactions which (1) have at least one identifiable victim, and (2) closed in short sales that resulted in a victim's loss" (the "September 2025 Order").  (Order dated Sept. 25, 2025.)  For the reasons explained below, the Court finds that the Government has not provided sufficient information for the Court to determine restitution and therefore orders the Government to supplement its restitution submission consistent with this Memorandum and Order and the September 2025 Order.

## I.    Background

### a.    Indictment allegations

According to the Indictment, from approximately December of 2012 to January of 2019, Defendants worked "to purchase hundreds of properties at fraudulently depressed prices and then

---

[3] (Gov't Restitution Methodology Ltr. ("Gov't Ltr."), Docket Entry No. 464; Tarshish Restitution Methodology Ltr. ("Tarshish Ltr."), Docket Entry No. 482; Herskowitz Restitution Methodology Ltr. ("Herskowitz Ltr."), Docket Entry No. 483; Dafna Restitution Methodology Ltr. ("Dafna Ltr."), Docket Entry No. 484; Tarshish Revised Restitution Methodology Ltr. ("Tarshish Revised Ltr."), Docket Entry No. 486-1; Tarshish Suppl. Restitution Methodology Ltr. ("Tarshish Suppl. Ltr."), Docket Entry No. 491; Gov't Restitution Methodology Reply Ltr. ("Gov't Reply"), Docket Entry No. 488.)

resell or 'flip' the properties for large profits." (Ind. ¶ 18.) The Short Sale Schemes "originated at [My Ideal Property ("MIP")] under the direction of . . . [Aronov] with the assistance of . . . [Tarshish], Short-Sale Co-Conspirators 1, 2 and 3, and others" (the "MIP Scheme") and the MIP Scheme was later replicated by Tarshish and Dafna "at Exclusive Homes with the assistance of Short-Sale Co-Conspirator 2 and others" (the "Exclusive Homes Scheme"). (*Id.* ¶ 19.) Herskowitz "was a real estate attorney who assisted the Short-Sale Co-Conspirators in completing certain fraudulent short sale transactions originated by both MIP and Exclusive Homes." (*Id.*)

The Indictment alleges that Defendants conspired to defraud lenders and certain borrowers by "providing them with false, misleading and incomplete information to induce them to execute short sales at fraudulently depressed prices, thereby causing losses to the lenders and, at times, the borrowers . . . ." (*Id.* ¶ 18.) Defendants and others "typically promised to pay or paid the borrower money to induce him or her also to sign (a) an agreement with a real estate broker to list the property for sale; (b) an authorization to allow a third-party negotiator to negotiate the short sale with the lender on the borrower's behalf; and (c) a contract to sell the property to a corporate entity controlled by the Short Sale Co-Conspirators," (*id.* ¶ 20), and that "[a]fter the borrower agreed to participate in a short sale of a property with the Short Sale Co-Conspirators, the Short Sale Co-Conspirators often took control of the property, evicted or paid any tenants living in the property to move out and, on occasion, arranged to damage the property to lower its appraised value," (*id.* ¶ 21).

**b.    Superseding information allegations**

On July 1, 2024, the Government filed the Superseding Information as to Herskowitz, charging him with conspiracy to commit bank fraud. (Superseding Information, Docket Entry No. 330.) The Superseding Information alleges that from approximately March of 2013 and

November of 2018, Herskowitz, together with others, "conspire[d] to execute a scheme . . . to defraud one or more financial institutions, and to obtain moneys, funds, credits and other property owned by . . . such financial institutions, by means of one or more materially false and fraudulent pretenses, representations and promises." (*Id.* ¶ 1.)  Herskowitz committed several overt acts in furtherance of the conspiracy, including wiring approximately $884,131.88 in total to mortgage loan servicers and a co-conspirator.[4]  (*Id.* ¶¶ 2–6.)

    **c.   Defendants' convictions**

Prior to trial, Dafna pleaded guilty to conspiracy to commit wire and bank fraud in connection with the Exclusive Homes Scheme as charged in the Indictment, (Min. Entry dated Oct. 24, 2024), and Herskowitz pleaded guilty to conspiracy to commit bank fraud as charged in the Superseding Information, (Min. Entry dated June 27, 2024; Superseding Information).  The trial of Tarshish commenced on November 4, 2024, and the Government rested its case on November 19, 2024.  (Min. Entry dated Nov. 4, 2024; Min. Entry dated Nov. 19, 2024.)[5]  On November 21, 2024, the jury found Tarshish guilty of two counts of conspiracy to commit wire and bank fraud and four substantive counts of wire fraud related to specific transactions in connection with the MIP Scheme and Exclusive Homes Scheme.  (Min. Entry dated Nov. 21,

---

[4]  The Superseding Information alleges that Herskowitz wired money on at least four separate occasions: (1) on July 23, 2014, he wired approximately $252,755 to a mortgage loan servicer; (2) on May 1, 2015, he wired approximately $239,483.88 to a mortgage loan servicer; (3) on August 24, 2016, he wired approximately $238,798 to a mortgage loan servicer's designated bank account; and (4) on August 24, 2016, he wired approximately $153,095 to a co-conspirator's bank account.  (Superseding Information ¶¶ 3–6.)

[5]  "Trial Tr." refers to the consecutively paginated trial transcripts dated November 4, 2024, through November 20, 2024.  (*See* Nov. 4 Trial Tr. 1–304; Nov. 5 Trial Tr. 305–554, Docket Entry No. 415; Nov. 6 Trial Tr. 555–789, Docket Entry No. 416; Nov. 7 Trial Tr. 790–985; Nov. 8 Trial Tr. 986–1201; Nov. 12 Trial Tr. 1202–1461; Nov. 13 Trial Tr. 1462–1750; Nov. 14 Trial Tr. 1751–2028; Nov. 18 Trial Tr. 2029–2329; Nov. 19 Trial Tr. 2330–2539, Docket Entry No. 410, Nov. 20 Trial Tr. 2540–2779, Docket Entry No. 411; Nov. 21 Trial Tr. 2780–2881, Docket Entry No. 412.)

2024; Verdict Sheet, Docket Entry No. 417.)  On May 6, 2025, the Court sentenced Herskowitz

to a term of eighteen months' imprisonment to be followed by two years of supervised release.

(Min. Entry dated May 6, 2025.)  The Government and Herskowitz agreed to resolve restitution

"at a later date."[6]  (Tr. of Herskowitz Sent'g Hr'g 5:13–16, Docket Entry No. 462.)

### d.  Restitution positions

On June 18, 2025, the Government submitted its letter addressing the proposed

methodology for calculating restitution and its application to sixty-five specific transactions.

(Gov't Ltr.; *see also* Exhibit A.)  In its letter, the Government proposes three primary methods

for determining the fair market value of each property: (1) "the price paid when a property was

flipped at or shortly after the time of the short sale," (2) "contemporaneous offer for the

property," and (3) "an internal valuation of the fair market value of the property by the

[D]efendants."  (Gov't Ltr. 3–4.)  Where the Government "do[es] not have a contemporaneous

flip, offer or internal valuation for the property," the Government proposes "using the lower of"

two alternative methods for calculating the fair market value: (1) "treat[ing] the known short sale

price as 60% of the fair market value (*i.e.*, divid[ing] the short sale price by 60%)" or (2)

"discount[ing] [by] 60% of a subsequent sale price reflected on [New York City's Department of

Finance, Automated City Register Information System ("ACRIS")] . . . (*i.e.*, multiply[ing] the

subsequent resale price by 60%)."  (*Id.* at 4.)  The Government states that victims' losses can be

---

[6]  On April 22, 2025, in the Government's sentencing memorandum as to Herskowitz, the
Government "request[ed] that the Court set a briefing schedule [regarding restitution], on notice
to Dafna and Tarshish."  (Gov't Sent'g Mem., Docket Entry No. 443.)  On April 23, 2025, the
Court directed Tarshish, Dafna, and Herskowitz "to clarify their restitution position."  (Min.
Entry dated April 23, 2025.)  On April 29, 2025, Tarshish, Dafna, and Herskowitz filed letters
regarding their position on restitution.  (Tarshish Position Ltr., Docket Entry No. 447; Dafna
Position Ltr., Docket Entry No. 446; Herskowitz Position Ltr., Docket Entry No. 448.)  Because
the Government requested a briefing schedule for restitution as to Herskowitz, on notice to
Tarshish and Dafna, the Court subsequently set a briefing schedule to address the Government's
restitution methodology and its application to specific transactions relevant to Tarshish, Dafna,
and Herskowitz only.  (Order dated May 12, 2025.)

approximated by using the difference between the short sale price and the property's fair market value, capped by any outstanding amounts due to the victim for the applicable mortgage loan. (*Id.* at 2.)

On August 1, 2025, Tarshish, Dafna, and Herskowitz submitted their oppositions to the Government's proposed restitution calculations.  (Tarshish Ltr.; Dafna Ltr.; Herskowitz Ltr.) Tarshish submitted a revised restitution letter on August 8, 2025, and a supplemental letter on September 10, 2025.[7]  (Tarshish Revised Ltr.; Tarshish Suppl. Ltr.)  On September 25, 2025, the Court directed the parties to, among other things, "confer and provide an agreed-upon list of transactions which (1) have at least one identifiable victim, and (2) closed in short sales that resulted in a victim's loss" (the "September 2025 Order").  (Order dated Sept. 25, 2025.)

## II.  Discussion

### a.  Standard of review

The Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, is one of several federal statutes under which a court may impose restitution on a criminal defendant.  The "primary and overarching goal of the MVRA is to make victims of crime whole: to compensate these victims for their losses and to restore the[m] to their original state of well-being." *United States v. Yalincak*, 30 F.4th 115, 121 (2d Cir. 2022) (alteration in original) (quoting *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015)).  The MVRA provides that "the court shall order . . . that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate."  18 U.S.C. § 3663A(a)(1); *United States v. Goodrich*, 12 F.4th 219, 228 (2d

---

[7]  Tarshish "mistakenly stated" in his original opposition to restitution "that the property located at 398 Cochran Place was included on Exhibit A to the [G]overnment's" restitution letter filed on June 18, 2025.  (Tarshish Revised Restitution Methodology Cover Ltr. ("Tarshish Cover Ltr."), Docket Entry No. 486; *see also* Restitution Calculations ("Exhibit A"), annexed to Gov't Ltr. as Ex. A, Docket Entry No. 464-1.)  Because Tarshish's revised restitution methodology letter is otherwise substantially the same as his original letter filed on August 1, 2025, the Court refers only to his revised restitution letter unless otherwise noted.

Cir. 2021) (same). The MVRA defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2); *United States v. Fishman*, --- F.4th ---, ---, 2025 WL 2692069, at *14 (2d Cir. Sept. 22, 2025) (quoting 18 U.S.C. § 3663A(a)(2)); *Goodrich*, 12 F.4th at 228 (quoting 18 U.S.C. § 3663A(a)(2)). "Under the MVRA, any 'restitution order must be tied to the victim's actual, provable loss.'" *Fishman*, 2025 WL 2692069, at *14 (quoting *United States v. Zangari*, 677 F.3d 86, 91 (2d Cir. 2012)); *see also United States v. Maynard*, 743 F.3d 374, 378 (2d Cir. 2014) ("Only a 'victim' (or the victim's estate) is entitled to restitution . . . . And only a victim's 'actual loss' is compensable, not losses that are hypothetical or speculative." (citing *United States v. Gushlak*, 728 F.3d 184, 194–95 (2d Cir. 2013))). "[E]xpenses other than those enumerated in § 3663A(b) are [not] compensable under the MVRA." *Maynard*, 743 F.3d at 378–79 ("If Congress intended to include all harms directly and proximately caused by a defendant's offense, it could have done so with wording more simple and categorical."); *see also United States v. Hastings*, No. 20-CR-534, 2022 WL 1785579, at *7 (S.D.N.Y. May 31, 2022) ("Not all harms caused by a defendant's offense are compensable under the MVRA — only those articulated in the statute." (citing *Maynard*, 743 F.3d at 379)).

Because "expenses other than those enumerated in § 3663A(b) are [not] compensable under the MVRA," *Maynard*, 743 F.3d at 378, the sentencing court "cannot award the victim 'a windfall,' i.e., more in restitution than he actually lost.'" *United States v. Boccagna*, 450 F.3d 107, 117 (2d Cir. 2006) (quoting *United States v. Arutunoff*, 1 F.3d 1112, 1121 (10th Cir. 1993)); *see also United States v. Coriaty*, 300 F.3d 244, 252 (2d Cir. 2002) ("Unlike loss calculations, 'a court's power to order restitution is limited to actual loss.'" (citation omitted)). "The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). "Any dispute as to the proper amount or type

of restitution shall be resolved by the court by the preponderance of the evidence." *Id.*; *Fishman*, 2025 WL 2692069, at \*14 ("The government bears the burden of proof as to the amount of restitution, and '[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence.'" (quoting 18 U.S.C. § 3664(e)) (alteration in original)).  Although "[a]n order of restitution does not have to be "mathematically precise,'" the court "must make a 'reasonable estimate . . . based on the evidence before it.'"  *Fishman*, 2025 WL 2692069, at \*14 (quoting *United States v. Rainford*, 110 F.4th 455, 490 (2d Cir. 2024)); *United States v. James*, --- F.4th ---, ---, No. 24-849-CR, 2025 WL 2486539, at \*13 (2d Cir. Aug. 29, 2025) ("While a restitution amount need not be 'mathematically precise' and 'a reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable,' the approximation must be 'supported by a sound methodology.'" (quoting *United States v. Gushlak*, 728 F.3d 184, 195–96 (2d Cir. 2013)) (internal citations omitted); *see also Rainford*, 110 F.4th at 490 (explaining that "ordering restitution requires a delicate balance of diverse, sometimes incomparable, factors, some of which not only lack certainty but may indeed be based on mere probabilities, expectations, guesswork, even a hunch").

> **b.  The Government's proposed restitution methodology is a reasonable approximation of the victims' losses**

The Government proposes three primary methods for determining the fair market value of each of the sixty-five properties on Exhibit A: (1) the flip price, (2) a contemporaneous offer, and (3) Defendants' internal valuation.  (Gov't Ltr. 3–4.)  Where evidence of a contemporaneous flip, offer, or internal valuation is unavailable, the Government proposes using the lesser of two alternative methods: (1) dividing the short sale price by 60% or (2) multiplying the subsequent resale price as reflected on ACRIS by 60%.  (*Id.* at 4.)

Defendants argue that the Government's proposed methodology is not a reasonable approximation of the victims' losses, that not all transactions resulted in a loss to an identifiable

victim, and that restitution is not appropriate in view of the complexity of calculating restitution in this case.  (*See generally* Tarshish Revised Ltr. 4–8; Tarshish Cover Ltr. 1; Dafna Ltr. 4–6; Herskowitz Ltr. 1 n.2.)  In addition, Dafna argues that Government is seeking restitution for transactions beyond his offense of conviction, (Dafna Ltr. 2–3), and Herskowitz argues that the Court should award a lower restitution amount for him because he is less culpable than his codefendants and is unable to pay more than $10,000,000 in restitution, (Herskowitz Ltr. 1–3).  The Court addresses each of these arguments below.

### i.    Fair market value methods

The Government seeks restitution in the amount of $10,577,653 for Tarshish and Dafna, and $10,034,986 for Herskowitz.  (Gov't Ltr. 5–6; Gov't Reply 1.)  The Government argues that the victims' losses "should be calculated as the difference between the short sale price and a reasonable approximation" of the property's fair market value and proposes five methods for calculating the fair market value.  (Gov't Ltr. 2–4.)  The Government argues that its proposed methods are "appropriate to arrive at a reasonable estimate of the victims' losses, which is all that is required" because "courts have routinely issued restitution orders based on calculations that extrapolate a total loss from a formula or average derived from an observed sample" and because "a precise calculation of each victim's losses is not necessary under the MVRA." (Gov't Reply 2–3.)  In support, the Government argues that (1) "[a]ll [sixty-five] of these properties were included on the Bill of Particulars provided to all [D]efendants on June 7, 2021," (2) Exhibit A "does not include all completed Exclusive Homes short sales, but nevertheless presents a reasonable restitution figure" that "likely underrepresents the full extent of . . . [Defendants'] fraudulent conduct" since it "does not include any attempted short sales,"[8] (3) "[a]

---

[8]  The Government explains that the Bill of Particulars provided to all Defendants on June 7, 2021 is a "list of completed or attempted short sales that the [G]overnment alleged were

flip price, where available, is the best indicator of the property's [fair market value] at the time of the short sale," and (4) "extrapolat[ing] that, on average, the short sale price was 60% of the [fair market value]" based on a sample of ninety-five MIP transactions is appropriate because "the Exclusive Homes scheme was a spin-off of the MIP scheme" involving overlapping co-conspirators, neighborhoods, and timeframes.  (*Id.* at 6–10 (citing *Boccagna*, 450 F.3d at 115).) In addition, the Government argues that restitution "should also be capped at the outstanding amount due to the lender at the time of the short sale," or, "[w]here the [G]overnment has not been able to ascertain the exact amount due" to the lender, "the original principal amount of the loan as reflected on ACRIS, minus the short sale price."  (Gov't Ltr. 5.)

Tarshish "urge[s] the Court to disregard the [G]overnment's unwieldy methodology" and argues that "the Court should find that it is overly burdensome to determine restitution in this case, or that additional procedures set forth in [section] 3664(d) are required to arrive at reasonable approximation of actual victim loss."  (Tarshish Revised Ltr. 1, 13.)  Tarshish contends that the Government's five methods of calculating the fair market value do not establish losses by a preponderance of the evidence and are "marred by serious flaws" based in "conjecture and speculation."  (*Id.* at 4–8; Tarshish Suppl. Ltr. 2.)  Tarshish argues that the first method — using flip price of the property — is not a reasonable approximation of the fair market value because (1) "Aronov conceded on cross-examination, in many instances, what the [G]overnment describes as a 'flip' is Aronov buying out his other partners and assigning an arbitrary value to the property," and (2) that "even in the case of an outside buyer," using the flip

---

part of the MIP [Scheme] and [the] Exclusive Homes . . . Scheme[]."  (Letter dated Sept. 25, 2025, Docket Entry No. 496.)  The Government further explains that "all [sixty-five] of the[] properties [on Exhibit A] were included on the Bill of Particulars," and that "Exhibit A does not include any attempted short sales."  (Gov't Reply 6–7.)  Accordingly, the Court understands that Exhibit A includes only completed short sales associated with the MIP Scheme and Exclusive Homes Scheme.

price "makes the mistake of using [D]efendants' gain in place of the financial institution's loss, which is not permitted under the MVRA." (Tarshish Revised Ltr. 5–6.) In support, Tarshish argues that "money paid by a 'flip' buyer . . . is not money that would have or should have gone to the bank" and that the flip price "often includes amounts that [D]efendants invested in the short sale process, such as payments to clear liens, outstanding water and tax bills, and cash for keys." (*Id.* at 6 (emphasis omitted).) Tarshish argues that the second method — using a contemporaneous offer — is not a reasonable approximation of the fair market value because "the amount is speculative and there is no proof of what portion of the offer would have gone to the financial institution as opposed to covering other liens, expenses, and labor that has already gone into the short sale." (*Id.*) Tarshish argues that the third method — Defendants' internal valuation — is not a reasonable approximation of the fair market value because "the document relied on by the [G]overnment, GX1055, suggests that [D]efendants believed th[e] property [at 549 Miller] was worth $600,000 . . . fifteen months after the short sale closed" during a period when "the real estate market [was] steadily climbing" and fails to "take into consideration" any improvements Defendants made while "they held the property." (*Id.* at 7.) Tarshish argues that the two alternative methods for calculating the fair market value do not represent a reasonable approximation of the fair market value because (1) "as the government concedes," the Exclusive Homes transactions to which the Government applies the alternative methods "are *not flips* at all, but instances in which the properties were held for a significant period of time and renovated before being sold," (2) "the premise that the 60% average is a meaningful number" to Exclusive Homes transactions "is fundamentally flawed" since the number is based on "a preexisting partial spreadsheet" of ninety MIP transactions with "purchase ranges from 25–90% of a flip price," and (3) "there is no basis on which to conclude that MIP's metrics, even if accurate, would translate to a different company in which Aronov was not involved." (*Id.* at 8.) Tarshish

11

"submits that," to meet its burden, "the [G]overnment should make the following inquiries of the financial institutions: (a) whether they still own the loans that were the subject of these transactions; (b) the institutions' assessment of the property's [fair market value] at or about the time of the short sale; and (c) whether any recovery has already been received against the loss." (*Id.* at 13–14.)  Tarshish joins the arguments of Dafna to the extent applicable.  (Tarshish Cover Ltr. 1.)

Dafna requests that the Court decline restitution or, in the alternative, require the Government "to prove its restitution claim at an evidentiary hearing."  (Dafna Ltr. 6.)  Dafna argues the Government methodology has a "myriad [of] problems," including that (1) "given the low ratio of 'flips' in the Exclusive Homes deals, it makes no sense to apply a blanket formula based on the average of 90 'flips'" associated with the MIP scheme, and (2) the Government's methodology "appears to assume that all short sale transactions resulted in an economic loss to the banks."  (*Id.* at 4–5.)

Herskowitz joins the arguments of Tarshish "to the extent they are applicable to him." (Herskowitz Ltr. 1 n.2.)

"In most circumstances, fair market value will be the measure most apt to serve th[e] [MVRA's] statutory purpose."  *Boccagna*, 450 F.3d at 115.  "Fair market value" is the "price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction."  *Id.* (quoting *Black's Law Dictionary* 1587 (8th ed. 2004)); *Gillespie v. United States,* 23 F.3d 36, 40 (2d Cir. 1994) ("Fair market value is commonly defined as 'the price at which the property would change hands between a willing buyer and a willing seller'" (quoting *United States v. Cartwright,* 411 U.S. 546, 551 (1973))).  However, "[w]hile it is true that an arm's length transaction — the so-called 'willing buyer-willing seller' test — is the best evidence of (and often the easiest method to determine) fair market value, it is, by no means, the

only such evidence." *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 387 (2d Cir. 2006).

"[I]n some circumstances other measures of value may more accurately serve the statutory

purpose to ensure a crime victim's recovery of the full amount of [its] loss." *Boccagna*, 450 F.3d

at 116; *Boyce*, 464 F.3d at 387 (collecting cases).

### 1.    Flip price

The Government's proposal of using the flip price to determine the fair market value for

a property is supported by sound methodology.  The Government appears to use the flip price for

approximately twenty-three of the sixty-five properties on Exhibit A.  (Gov't Reply 7; *see also*

Exhibit A.)  Aronov testified that he, Tarshish, and others would "flip" properties at the table by

"find[ing] a buyer that is *willing to pay* a higher price" than which the bank agreed.  (Trial Tr.

383:4–20; 395:2–9 (emphasis added).)  Because "the price that a seller is willing to accept and a

buyer is *willing to pay* on the open market and in an arm's-length transaction" is the "most apt"

method for determining fair market value, *Boccagna*, 450 F.3d at 115 (quoting *Black's Law

Dictionary* 1587 (8th ed. 2004)), the Court finds that the "flip" price — the price that a willing

buyer paid for the property — is a sound method for determining the fair market value of the

property.  *See Gushlak*, 728 F.3d at 195–196 ("[T]he MVRA requires only a reasonable

approximation of losses supported by a sound methodology."); *Boccagna*, 450 F.3d at 115–16

("Because th[e] price [that a seller is willing to accept and a buyer is willing to pay] reflects the

value of property's greatest economic use, it generally provides the most reliable measure of

both the full loss sustained by a victim when his property is damaged, lost, or destroyed, and the

degree to which that loss is mitigated by recouped property."); *In re Glob. Fertility & Genetics,

N.Y., LLC*, 663 B.R. 584, 613 (Bankr. S.D.N.Y. 2024) ("[O]ne calculates market value by

considering what a willing buyer is willing to pay a willing seller" (citation omitted)).  Although

Tarshish argues that "in many instances, what the [G]overnment describes as a 'flip' is Aronov

buying out his other partners and assigning an arbitrary value to the property," (Tarshish Ltr. 5), the evidence at trial shows that Aronov was willing to "match" the flip price of other potential buyers or would buy the property and flip it to himself using "various LLCs." (Trial Tr. 637:15–17 ("A I said, 'Hi, I'm willing to match 525 K.' Q What does that mean? A That I'm willing to pay a flip price of [$]525,000."); *see also id.* at 395:4–396:11 (describing how Aronov, Tarshish, and others would flip properties for Aronov to purchase under "new LLCs, all separate").) Accordingly, the property's flip price is a reasonable approximation of the fair market value for the transactions identified by the Government in Exhibit A.

### 2. Contemporaneous offer

The Government's proposal of using contemporaneous offers to determine the fair market value for a property is also supported by sound methodology. The Government appears to use contemporaneous offers to determine the fair market value of approximately eleven of the sixty-five properties in Exhibit A. (Exhibit A; *see generally* Gov't Reply 9; Gov't Ltr. 4.) Where a flip price is unavailable, evidence of a contemporaneous offer is reasonable approximation of the fair market value because a buyer's offer is the best estimate of the price a buyer may be willing to pay. *See Fairy-Mart v. Marathon Petroleum Co., LP*, No. 17-CV-1195, 2017 WL 5140514, at *11 (D. Conn. Nov. 6, 2017) ("[W]hen a third party's offer is in the form of a single transaction . . . , the court can justifiably infer that the amount of an arms' length offer represents the value of the station." (quoting *Ellis v. Mobil Oil*, 969 F.2d 784, 786 (9th Cir. 1992))); *see also United States v. Hild*, No. 19-CR-602, 2024 WL 4263143, at *5 (S.D.N.Y. Sept. 23, 2024) (explaining that the "evidence provide[d] a strong argument that [the lender] sold the bonds for fair market value" in part because the bonds were sold "to the highest bidder"), *aff'd*, 147 F.4th 103 (2d Cir. 2025). Although Tarshish argues that the contemporaneous value method is "speculative," (Tarshish Revised Ltr. 6), because calculations "may be based on

14

guesswork, or even a hunch," *Rainford*, 110 F.4th at 490–91 (internal citations and quotation marks omitted), using evidence of a contemporaneous offer is a sufficiently sound method to determine the fair market value of a property.

### 3.    Internal valuations

The Government's proposal of using Defendants' internal valuation of a property to determine the fair market value for a property is also supported by sound methodology.  The Government appears to use Defendants' internal valuation for only one transaction in Exhibit A. (*See* Exhibit A (indicating that the Government used the "EHNY Internal Valuation" to determine the fair market value of 549 Miller Avenue).)  Due to the nature of Defendants' scheme, which involved fraudulently depressing properties values in advance of a financial institutions' assessment, (*see* Trial Tr. 1850:1–3, 1880:3–1881:17), Defendants — not the financial institutions — are best-positioned to estimate the fair market value of a home.  *See United States v. Hild*, 147 F.4th 103, 106, 111–12 (2d Cir. 2025) (relying in part on evidence showing that the corporation's "internal valuation" of its bonds were  "well above market value" to affirm the defendant's fraud and conspiracy convictions involving a scheme to "secure cash loans by fraudulently inflating the value of the bonds used as collateral"); *Rainford*, 110 F.4th at 490–91 (explaining that "restitution requires a delicate balance of diverse, sometimes incomparable factors, some of which not only lack certainty but may indeed be based on mere probabilities, expectations, guesswork, even a hunch" (quoting *United States v. Rossi*, 592 F.3d 372, 376 (2d Cir. 2024))).  Accordingly, Defendants' internal valuation of a short sale property is a reasonable approximation of fair market value.

Although Tarshish argues that the restitution calculation should begin with "the victim financial institution's own assessment" and proposes his own restitution calculation, (Tarshish Revised Ltr. 1, 12–13 (emphasis omitted)), Belinda Brandimarti and Emilienne Brown,

15

Tarshish's employees, testified that Tarshish would coordinate with others to take actions that would fraudulently depress the financial institution's valuation of short sale properties, (*see* Trial Tr. 1850:1–3, 1880:3–1881:17, 1357:9–23, 1375:9–1376:6).  Brandimarti testified at trial that getting a property "ready" for a Broker Price Opinion ("BPO") or "pretty" meant damaging the house so "the value [of the property] would become lower," (*id.* at 1880:3–1881:17), and that Tarshish would ask "Tony" to "make the houses pretty for the BPOs," (*id.* at 1881:3–9; *see also* GX4243 (emails between Tarshish and others about ensuring that 177 Lewis was "bpo ready prior to bpos").)  Brown testified that they would "wait for a BPO to expire" so that "the price that the bank came up with during their BPO" would be "lower," (Trial Tr. 1375:9–17), "vacat[e] the homes that [they] were processing through short sales," (*id.* at 1467:22–23), and "backdat[e] the listing on the properties to make them appear as if they've been on the market longer than they actually had," (*id.* at 1467:23–25).  Accordingly, because of Defendants' efforts to lower the victims' valuations of the properties, the victims' assessment of the property values or its losses is not an appropriate methodology for determining restitution.  *See In re Lehman Bros Holdings Inc.*, No. 08-CV-13555, 2015 WL 7194609, at *21 (S.D.N.Y. Sept. 16, 2015) (explaining that because a corporation's internal accounting valuation for a "[t]ransaction may be an imperfect reflection of the [t]ransaction's true planned economic impact, such methodology cannot . . . constitute undisputed evidence that [the corporation's] calculation of its [l]oss is reasonable").[9]

---

[9] Tarshish argues that the victims' valuation documents are representative of the fair market value of the properties in Exhibit A because (1) "Defendants sought to *secure access* to properties in order for agents/appraisers to perform their valuation," (2) "Defendants boarded up properties to prevent squatters from entering," (3) "Defendants provided examples of lower comparable listings and sales as a standard and permissible part of the short sale negotiation process," and (4) there was "[l]imited evidence of widespread damage to properties."  (Tarshish Revised Ltr. 10–12.)  Tarshish contends that a "sound methodology," "based on comparing the banks' internal valuations to the short sale prices," "yields restitution in the of $2,103,017."  (*Id.* at 12–13.)  As the Government argues, and as discussed above, *see supra* section II.b.i.3., Tarshish's calculations "underestimate[]" victims' losses because the internal valuation

## 4.    Alternative methods

The Government's alternative methods for calculating restitution are supported by sound methodology because restitution orders may be based on calculations that extrapolate a total loss from an observed sample.  The Government has, "[b]ased on a review of approximately [ninety] documented flipped transactions at MIP" determined that "the average short sale price was 60% of the flipped price."  (Gov't Ltr. 4.)  Given significant overlap between the MIP Scheme and the Exclusive Homes Scheme, including the fact that Tarshish, Dafna, and others replicated the MIP Scheme at Exclusive Homes, (Ind. ¶ 19; Trial Tr. 422:12–423:25, 445:5–446:25), using the average flip price from MIP to extrapolate victims' losses for Exclusive Homes is a sound methodology.  *See Rainford*, 110 F.4th at 490–91 (affirming restitution order in an insurance fraud scheme where the court "credited" a witness's testimony that "[eighty] percent of the cases he managed were fraudulent" in order to extrapolate the eighty percent figure to all insurance claims submitted by the defendants); *Gushlak*, 728 F.3d at 196–97 (affirming restitution order which relied on an expert's statistical model to estimate the fair market value of a stock compared to the artificially inflated value); *United States v. Romano*, No. 09-CR-168, 2021 WL 1711633, at *2, *7 (E.D.N.Y. Apr. 29, 2021) (ordering restitution in a coin-selling scheme where the defendants "sold coins at highly inflated prices by using falsely represented" coin values based on the average losses of nine of the 220 victims)*, aff'd sub nom. United States v. Mosca*, No. 21-1209, 2023 WL 6799293 (2d Cir. Oct. 16, 2023).

Accordingly, the Government's proposed methodology for determining fair market value, which is subsequently subtracted from the short sale price and capped by any outstanding

---

documents rely on fraudulently depressed prices and Defendants "prevented the victims from having" information regarding "what price the market would bear for a property in an arms-length transaction not tainted by collusion and fraud."  (Gov't Reply 10–13.)  Because the Court finds that the Government's proposed methods for calculating fair market value are sound, the Court declines to further address Tarshish's proposed methodology for calculating restitution.

amounts due to the victim on the applicable mortgage loan to determine the total loss amount, is a sound methodology for calculating restitution in this case. *See United States v. Rivernider*, 828 F.3d 91, 103 (2d Cir. 2016) (finding no reversible error in the district court "adopting in large part the government's proposed [restitution] methodology" where "[t]o calculate [the] losses to lenders, the government identified the total unpaid principal for each of the 104 loans, and reduced the total unpaid principal by funds generated by the sale of the property or, where the property had not been sold, the fair market value of the property").

### ii.    Identifiable victims

The Government argues that, although "some of the original mortgage holders have been purchased by or merged into other entities," it is still appropriate to award restitution to these entities because "the new entity retains the rights of the victim entity."  (Gov't Reply 3.)

Tarshish argues that the Government has not met its burden under the MVRA because Exhibit A "identifies victims that no longer exist."  (Tarshish Revised Ltr. 4.)  Dafna also argues that "some of the purported victims identified by the [G]overnment in Exhibit A to its restitution calculation no longer exist and thus have no need for restitution."  (Dafna Ltr. 5.)  Herskowitz joins the arguments of Tarshish "to the extent they are applicable to him."  (Herskowitz Ltr. 1 n.2.)

As discussed above, *see supra* section II.a., only a victim is entitled to restitution.  *See Maynard,* 743 F.3d at 378 ("Only a 'victim' (or the victim's estate) is entitled to restitution . . . . And only a victim's 'actual loss' is compensable, not losses that are hypothetical or speculative." (citation omitted)).  A victim bank's right to restitution merges with the rights of its corporate successor or the subsequent purchaser of the applicable mortgage.  12 U.S.C.A. § 215a(e) (explaining that, once one or more national banking associations or one or more state banks merge, "[t]he corporate existence of each of the merging banks or banking associations

participating in such merger shall be merged into and continued in the receiving association and such receiving association shall be deemed to be the same corporation as each bank or banking association participating in the merger"); *Rivernider*, 828 F.3d at 116 (finding no reversible error where the court ordered restitution in a real estate scheme where "some of the mortgage loans involved in the scheme were sold prior to foreclosure" to downstream lenders); *United States v. Hundley*, No. 02-CR-441, 2013 WL 12384285, at *1–2 (S.D.N.Y. Oct. 8, 2013) (finding that the victim bank's restitution payments "should go to [its] corporate successor" and explaining that the "[f]ederal statute . . . govern[ing] mergers of national banks" "fully resolves this question" (citing 12 U.S.C.A. § 215a(e))).

The Government has not provided sufficient information for the Court to determine whether it is appropriate to award restitution for each of the victims identified in Exhibit A. The Government requests restitution on behalf of several victims, including "Frem[o]nt Investment & Loan," and Wells Fargo Bank, N.A.  (*See generally* Exhibit A.)  In many cases, the Government indicates that the mortgage holder is a "trustee" or "nominee" for other loan servicing an investment entity.  (*See, e.g.*, Exhibit A (indicating that Wells Fargo Bank, N.A. is a "[t]rustee for the [p]ooling and [s]ervicing [a]greement for SABR 2006 FR3 by OcWen Loan Servicing, LLC ($451,064)" and that "MERS" is a "nominee for Fremont Investment & Loan ($112,766)").)  However, in some cases, the Government refers to a victim mortgage holder that no longer exists without reference to any successor entity or mortgage purchaser.  (*See id.* (indicating only that Fremont Investment & Loan is the mortgage holder and victim for the transaction involving 2093 Union Street)); Bloomberg, *Fremont Investment & Loan Company Profile*, https://www.bloomberg.com/profile/company/7416Z:US (last accessed Oct. 3, 2025) (noting that Fremont Investment & Loan was a California-based savings bank that "voluntarily liquidated and closed").  Although the Court finds that restitution is appropriate where the

19

mortgage holder is the original victim, a successor entity, or subsequent purchaser, there must be "an identifiable victim or victims" that has "suffered a physical injury or pecuniary loss."  18 U.S.C § 3663A(c)(1)(B); *Hundley*, 2013 WL 12384285, at *1–2 (explaining that the victim bank's restitution payments "should go to [its] corporate successor").  Consistent with this Memorandum and Order and the September 2025 Order, the Court directs the parties to confer and provide the Court with an agreed-upon list of transactions that "closed" in fraudulent short sales that resulted in loss to an identifiable victim.  *See James*, 2025 WL 2486539, at *13 (vacating the district court's restitution order where the court's "methodology for calculating restitution failed to separate legitimate from fraudulent revenue"); *Thompson*, 792 F.3d at 279 ("[The Second Circuit has] recognized that any restitution paid by a defendant to a third party insurer cannot exceed the amount the defendant could lawfully be ordered to pay the original victim.").  In the event the parties are unable to agree regarding a particular victim, the Court directs the parties to submit documentation on a transaction-by-transaction basis regarding whether the entity is or is not a victim.

### iii.   Restitution is appropriate in this case

The Government argues that the Court should not "take the extraordinary step of not providing restitution in this case."  (Gov't Reply 3.)  In support, the Government argues first, that it is "irrelevant" that it is "challenging to calculate each victim's actual loss" because "a precise calculation of each victim's losses is not necessary under the MVRA" and there is "no 'one-size-fits all standard of precision for application in restitution cases.'"  (*Id.* (quoting *Gushlak*, 728 F.3d at 195).)  Second, the Government argues that there is "no reason why any of the [Government's] proposed method[s] would prevent resolution of the restitution question in a timely fashion without any further significant expenditure of judicial time or resources."  (*Id.*)

Tarshish argues that "[b]ased on the limited data the [G]overnment has provided to date, the Court should find that it is overly burdensome to determine restitution in this case." (Tarshish Revised Ltr. 13.)  Dafna argues that the Court should decline to award restitution given the complexity of calculating actual loss because (1) "there is little evidence of the need to provide restitution to the victims," and (2) "[a]bsent any uniform methodology to arrive at the fair market value determination, the calculation of loss is complex and highly burdensome." (Dafna Ltr. 6.)  Herskowitz also joins the arguments of Tarshish "to the extent they are applicable to him."  (Herskowitz Ltr. 1 n.2.)

Courts may decline to order restitution under the MVRA if "(A) the number of identifiable victims is so large as to make restitution impracticable," or "(B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  18 U.S.C. § 3663A(c)(3); *Zangari*, 677 F.3d at 93 ("Ultimately, if the court finds that 'complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process,' then the court may, in the exercise of its sound discretion, decide not to order restitution at all."); *United States v. Reifler*, 446 F.3d 65, 135 (2d Cir. 2006) (noting that section 3663A(c)(3)(B) provides a "limitation on the scope of the MVRA").  Awarding restitution may outweigh the burden on the sentencing process where there are "tens of thousands of victims" or "the amount of losses . . . has not been established and doing so would indisputably take a great deal of time."  *In re W.R. Huff Asset Mgmt. Co., LLC*, 409 F.3d 555, 563 (2d Cir. 2005); *Gushlak*, 728 F.3d at 192 (explaining that the Second Circuit understood that one of "Congress's purposes in enacting section [3663A(C)(3)(b)]" was to "ensure 'that the process of determining

21

an appropriate order of restitution be "streamlined"'" and "that the sentencing phase[s] of criminal trials [would] not become fora for the determination of facts and issues better suited to civil proceedings" (citations omitted)).  However, "section 3663A(c)(3)(B) plainly does not require the district court to surrender whenever one or more complex issues of causation or loss calculation appear." *Gushlak*, 728 F.3d at 192.

Ordering restitution is appropriate in this case.  Because of the extensive discovery, trial testimony, and the fact the Government is only seeking restitution for sixty-five transactions involving Tarshish, Dafna, and Herskowitz, calculating restitution does not present such "complex issues of fact related to the cause or amount of the victim's losses" to warrant the Court declining to award restitution.  *Zangari*, 677 F.3d at 93; *In re W.R. Huff Asset Mgmt. Co., LLC*, 409 F.3d 555, 563–64 (2d Cir. 2005) (finding that "the district court did not abuse its discretion by deciding to accept the provisions of the [s]ettlement [a]greement as reasonable substitute restitution" where it was "undisputed that there are potentially tens of thousands of victims of the  . . . crime").  However, the Government has not presented sufficient evidence to support its restitution calculations.  The Government, "[i]n response to a request from defense counsel, . . . provided an annotated version of Exhibit A, [which] include[s] references to documents purporting to support its restitution calculations on a transaction-by-transaction basis."  (Dafna Ltr. 4.)  The Government provided a copy of an annotated spreadsheet to the Court, which identifies several documents produced in discovery or at trial that support its restitution calculations for thirty of the sixty-five properties.  Although the Government included "[a]ll 65 of the[] properties" on Exhibit A in "the [B]ill of Particulars provided to all [D]efendants on June 7, 2021" and notes that it "has fewer records" for Exclusive Homes Scheme than the MIP Scheme, (Gov't Reply 6; *see also* Letter dated June 7, 2021, Docket Entry No. 190; Bill of Particulars, annexed to Letter dated Sept. 25, 2025, Docket Entry No. 496-1),

the Government must still meet its "burden of demonstrating the amount of the loss sustained by [each] victim." 18 U.S.C. § 3664(e); *Fishman*, 2025 WL 2692069, at *14 (explaining that "[t]he government bears the burden of proof as to the amount of restitution" (citation omitted)); *United States v. Pickett*, 387 F. App'x 32, 36 (2d Cir. 2010) (affirming restitution order where the district court "relied on the trial testimony of a case agent along with a chart prepared by that agent summarizing the losses incurred by the victim banks"); *United States v. Carmona*, No. 22-CR-551, 2025 WL 315907, at *6 (S.D.N.Y. Jan. 28, 2025) (excluding transactions from a forfeiture where "[t]he [g]overnment d[id] not provide any basis for the [c]ourt to conclude that these transactions were part of the .[ ] scheme beyond its representation that those transactions should be attributed to the scheme" (citing *Rainford*, 110 F.4th at 489)); *United States v. Romano*, No. 09-CR-170, 2022 WL 2666914, at *3 (E.D.N.Y. July 11, 2022) (finding the government's proposed methodology sufficient in a coin-selling scheme where the government requested loss affidavits from each victim and "checked them against the defendants' records of coin sales," as well bank records, invoices, and sales journals), *aff'd*, No. 15-992, 2022 WL 17097587 (2d Cir. Nov. 22, 2022). As noted above, consistent with this Memorandum and Order and the Court's September 2025 Order, the Court directs the parties to confer and provide an agreed-upon list of transactions that closed in fraudulent short sales that resulted in loss to an identifiable victim. In the event the parties are unable to agree regarding a particular transaction, the parties must submit documentation on a transaction-by-transaction basis regarding whether the transaction is or is not a fraudulent short sale that resulted in a victim's loss so that the Court may issue an order on the amount of restitution for Tarshish, Dafna, and Herskowitz.

>    iv.    **Dafna's offense of conviction encompasses transactions made in between January of 2014 and November of 2018 in connection with the Exclusive Homes Scheme**

The Government argues that Dafna's offense of conviction encompasses the restitution transactions because (1) "the Indictment describes the 'Short Sale Scheme' as stretching from 2012 through early 2019," (2) trial testimony established that Dafna, Tarshish and Aronov "agreed to open a branch office of MIP at 914 Bedford," an office space which "Dafna found" and "was open[ed] by October [of 2013]," and that "Dafna and Tarshish continued to work on short sales out of the 914 Bedford office" under the name "Exclusive Homes" after Dafna, Tarshish and Aronov "decided to no longer be partners," and (3) Dafna is "liable for all losses flowing from the reasonably foreseeable actions of his co-conspirators," not only the short sales in which Dafna had a "profit stake." (Gov't Reply 4–6.)

Dafna first argues that the Government's proposed restitution calculations exceed the bounds of the MVRA because Dafna cannot be liable for losses that were not caused by his offense of conviction. (Dafna Ltr. 2.) In support, Dafna argues that "the scope of Mr. Dafna's offense conduct" is limited to (1) conduct that occurred between 2014 and 2018 and (2) his participation in the Exclusive Homes Scheme. (*Id.*) Second, Dafna argues that the Government has not established that the claimed losses were directly and proximately caused by Dafna because (1) Dafna had no profit stake in at least nine deals, (2) "it is unclear whether the scope of Mr. Dafna's criminal conduct" reached all the Exclusive Homes transaction on Exhibit A because Dafna "walked away from Exclusive Homes and the deal pipeline before the end of the conspiracy," and (3) Exhibit A "include[s] references to documents purporting to support its restitution calculations . . . only as to [thirty-seven] of the transactions." (Dafna Ltr. 3–4.) In support, Dafna argues that "of the [fifty-six] post-2013 transactions identified on the [G]overnment's chart, approximately [seventeen] originated at MIP, and, based on internal

summary spreadsheets maintained by Mr. Aronov, Mr. Dafna had no profit stake in at least [nine] of those deals."  (*Id.* at 3.)

Tarshish joins the arguments of Dafna to the extent applicable.  (Tarshish Cover Ltr. 1.) Because Tarshish's and Herskowitz's offenses of conviction encompass conduct as early as March of 2013 associated with the MIP Scheme and the Exclusive Homes Scheme, the Court only addresses the scope of conduct covered by Dafna's offense of conviction.[10]

A "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including . . . any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  18 U.S.C. § 3663A(a)(2); *Goodrich*, 12 F.4th at 228 (quoting 18 U.S.C. § 3663A(a)(2)).  The court must (1) "identify the 'offense' of conviction" and (2) "ascertain whether the putative 'victim' was 'directly and proximately harmed' by the defendant's commission of that 'offense.'"  *Goodrich*, 12 F.4th at 228; *United States v. Calderon*, 944 F.3d 72, 95 (2d Cir. 2019) (explaining that a victim "must have endured a financial loss that was 'directly and proximately' *caused* by a defendant's [crime]"); *United States v. Vilar*, 729 F.3d 62, 97 (2d Cir. 2013) (explaining that restitution may only be imposed for losses derived from "the specific conduct that is the basis of the offense of conviction" (quoting *Hughey v. United States*, 495 U.S. 411, 413 (1990))); *United States v. Battista*, 575 F.3d 226, 231 (2d. Cir. 2009) ("[I]n determining whether one qualifies as a victim, a sentencing court can only consider the offense or offenses for which the defendant was

---

[10]  In November of 2024, a jury found Tarshish guilty of conspiracy to commit wire fraud and bank fraud for his involvement in the MIP Scheme and Exclusive Homes Scheme between March of 2013 and November of 2018, as well as several substantive wire fraud offenses.  (Ind. ¶¶ 36–39; Jury Verdict, Docket Entry No. 417.)  In addition, in June of 2024, Herskowitz pleaded guilty to conspiracy to commit bank fraud between March of 2013 and November of 2018, and the Superseding Information did not limit the conduct to the MIP Scheme or Exclusive Homes Scheme.  (Min. Entry dated June 27, 2024; Superseding Information.)  Accordingly, Tarshish's and Herskowitz's offenses of conviction include conduct related to both schemes that occurred as early as March of 2013.

convicted.").  "Where . . . the offense of conviction is conspiracy, [courts] look to 'the defendant's criminal conduct in the course of' that conspiracy as the basis for restitution," including the "reasonably foreseeable acts of all co-conspirators."  *Goodrich*, 12 F.4th at 228 (quoting *United States v. Boyd*, 222 F.3d 47, 50–51 (2d Cir. 2000)); *In re Loc. #46 Metallic Lathers Union & Reinforcing Iron Workers & Its Associated Benefit & Other Funds*, 568 F.3d 81, 87 (2d Cir. 2009) ("While the language [of the MVRA] expands what it is that will give rise to a compensable loss when a scheme, conspiracy or pattern is involved, the reference point to which such conspiracy is tied remains the 'offense' of which the defendant has been convicted.").

Dafna pleaded guilty to conspiracy to commit wire and bank fraud in connection with the Exclusive Homes Scheme for conduct occurring approximately between January of 2014 and November of 2018, (Ind. ¶ 39; Min. Entry dated Oct. 24, 2025; Tr. of Dafna Plea Hr'g ("Dafna Plea Tr.") 14:10–15:6, 35:2–37:23, Docket Entry No. 473), and specifically allocuted to participating in a conspiracy to "provide[] false information about the sale and marketing of property in order to induce the lender to approve the short sale transaction" "[w]ithin the period of 2014 to 2018," (Dafna Plea Tr. 35:17–23).  Dafna did not allocute to conduct occurring prior to 2014 or conduct relating to the MIP Scheme.  (*See generally id.*)  In addition, the Indictment specifies that the conspiracy to which Dafna pleaded guilty occurred "[i]n or about and between January [of] 2014 and November [of] 2018" in connection with the Exclusive Homes Scheme. (Ind. ¶ 39.)  Thus, Dafna may be liable for restitution for participating in a conspiracy to provide false information to lenders to induce them to approve short sales in connection with Exclusive Homes Scheme between January of 2014 and November of 2018, as well as the "'reasonably foreseeable acts of all co-conspirators' advancing that plan."  *Goodrich*, 12 F.4th at 228 & n.8 (internal citation omitted); *United States v. Vilar,* 729 F.3d 62, 97 (2d Cir. 2013) ("Restitution is

not permitted for loss caused by 'relevant conduct,' even though such conduct may be 'properly included in offense level calculation' under the Sentencing Guidelines."); *United States v. Morrison,* 685 F. Supp. 2d 339, 348 (E.D.N.Y. 2010) ("Given that both the legislative history behind the enactment of the MVRA and recent Second Circuit case law indicate that the boundaries of restitution are to be circumscribed by the conduct underlying the offense of conviction, it logically follows that these limits include the specific temporal scope of the criminal conduct as outlined in the indictment.").  Although the Government argues that "Dafna is fully responsible" for short sale transactions that occurred after Dafna and Tarshish opened the 914 Bedford Avenue office in approximately October of 2013, (Gov't Reply 3–4), and the Indictment incorporated by reference conduct occurring as early as 2012, (Ind. ¶¶ 18–19, 38), Aronov testified that Tarshish and others were operating "under the [MIP] umbrella" through at least December of 2013, (Trial Tr. 517:22–519:4, 564:21–24, 624:5–10).  Accordingly, it is only appropriate for Dafna to be liable for restitution for the conduct covered by his allocution — the conduct of himself and those reasonably foreseeable acts by his co-conspirators between January of 2014 and November of 2018 in connection with the Exclusive Homes Scheme.  *See United States v. Seabrook*, 968 F.3d 224, 237 (2d Cir. 2020) (explaining that the association's "losses could not have been caused by the convicted wire-fraud conduct because the wire fraud postdated [the association's] investment"); *United States v. Oladimeji*, 463 F.3d 152, 158 (2d Cir. 2006) (explaining that "'the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order'" and that "a court may order 'an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction'" (quoting *Hughey v. United States,* 495 U.S. 411, 413, 420 (1990))); *United States v. Dharia*, 284 F. Supp. 3d 262, 272–73 (E.D.N.Y. 2018) (finding that "[t]he claimants ha[d] made no showing" that their losses were "related to the charged offense conduct" where the

27

government charged the defendant "with two counts of bank fraud" related to two separate banks and explaining that the claimants "were not harmed by *this* scheme, even if they were victims of some bank fraud scheme").

In addition, the victims' losses on transactions which closed between January of 2014 and November of 2018 in connection with Exclusive Homes, including transactions that originated at MIP but closed with Exclusive Homes, were caused by Dafna's participation in the Exclusive Homes Scheme or the reasonably foreseeable acts of his co-conspirators in advancing the Exclusive Homes Scheme. *See Vilar*, 729 F.3d at 97 (explaining that "Congress has 'authorize[d]' an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction'" and that "restitution is not permitted for loss caused by 'relevant conduct'"); *see also Goodrich*, 12 F.4th at 228 n.8 (discussing *Vilar* and noting that the court's "statement in *Vilar* that restitution must flow from 'the loss caused by the specific conduct that is the basis of the offense of conviction' . . . . continues to apply" (quoting *Vilar*, 729 F.3d at 62, 97)); *United States v. Paul*, 634 F.3d 668, 676 (2d Cir. 2011) ("In determining the proper amount of restitution, a court must keep in mind that '[t]he loss must be the result of the fraud.'" (citation omitted)).  Although Dafna argues that he is not responsible for transactions that "originated at MIP" or in which "[he] had no profit stake," (Dafna Ltr. 3), there is evidence Dafna partnered with Tarshish and others in connection with the Exclusive Homes Scheme, (Trial Tr. 1569:1–20, 1574:2–6, 1861:19–1862:1, 1965:13–16), was one of the "bosses" of Exclusive Homes, (Trial Tr. 446:13–22, 1851:9–15, 2418:20–23, 2429:6–10), and was the "owner" of certain files, (GX4231).  Dafna was responsible for "handl[ing] some . . . of the development," "bring[ing] in investors and money," was copied on emails during the conspiracy because he was a "partner[]" of Aronov and Tarshish, and was one of the "bosses" involved in creating a short sale package and instructing others involved in the co-conspiracy on short sale

processing. (Trial Tr. 422:2–5, 576:5–10, 1435:13–1436:1, 2445:3–12.) Thus, as one of the bosses aware of the activities of the Exclusive Homes Scheme, the victims are entitled to restitution for Dafna's acts as well as the reasonably foreseeable acts of Dafna's co-conspirators in advancing the plan to "provide false information about the sale and marketing of property in order to induce the lender to approve" short sale transactions. (Dafna Plea Tr. 35:17–23.) *Goodrich*, 12 F.4th at 232 (explaining that proximate cause under the MVRA is assessed "based on whether losses are 'foreseeable' to a defendant"); *United States v. Smith*, 513 F. App'x 43, 45 (2d Cir. 2013) (explaining that "because [the defendant] was convicted of a *conspiracy* to commit access device fraud, the district court properly ordered restitution for all losses caused by [defendant], as well as by the reasonably foreseeable actions of her [co-conspirators]" where she was "aware" of her co-conspirator's actions); *Paul*, 634 F.3d at 677–78 (finding that the court did not abuse its discretion in ordering restitution for the brokers' losses where the defendant admitted at his plea allocution that the loans were a "significant part of the greater fraud" because "[t]he brokerage houses would not have made the loans to [the defendant] had they known that the collateral for the loans was the stock he manipulated through the nominee accounts"); *Battista*, 575 F.3d at 231–32 (finding that a basketball association was "directly and proximately harmed" by the defendant's wagering conspiracy because the defendant used the association's nonpublic information conveyed by his co-conspirators to place illegal wagers). Accordingly, Dafna is only liable for restitution for losses caused by the conduct of himself and those reasonably foreseeable acts of his co-conspirators between January of 2014 and November of 2018 in connection with the Exclusive Homes Scheme, including transactions that originated at MIP but later closed with Exclusive Homes during that time period.

29

###### v.    Herskowitz's joint and several liability and his financial resources

The Government argues that (1) the Court should impose joint and several liability for all Defendants, and (2) restitution is required regardless of Herskowitz's ability to pay.  (Gov't Reply 13–14.)  The Court addresses each argument below.

###### 1.    Herskowitz is jointly and severally liable for restitution

The Government contends joint and several liability is appropriate because (1) "courts routinely order joint and several restitution against co-conspirators for the full amount of losses," (2) "[Herksowitz's] participation in the scheme was crucial to its success," and (3) Herskowitz "had a clear understanding of the dollar amounts involved in the fraud."  (Gov't Reply 13–14 (citations omitted).)

Herskowitz argues that the Court should "order that he pay $125,000 in restitution, an amount equal to the sum he was paid for the legal work he did in furtherance of the conspiracy." (Herskowitz Ltr. 3.)  First, Herskowitz argues "the Court should apportion restitution on the basis of role and profit" because "Herskowitz was less involved in, and less knowledgeable about, the scheme and profited substantially less than the other defendants."  (*Id.*)  In support, he argues that the Court found that "[he] had only a minor role in the conspiracy" and that "apportionment of restitution is meant to be a fact-specific and case-specific exercise."  (*Id.* at 1– 2.)  Herskowitz argues that "[r]ather than . . . order all [D]efendants jointly and severally liable," the Court should follow the approach of other district court judges in the Second Circuit who have apportioned liability based on the defendant's role in a bank fraud conspiracy.  (*Id.* at 2–3 (first citing *United States v. Okeke*, 22-CR-20 (E.D.N.Y. Apr. 16, 2025), Docket Entry No. 71; then citing *United States v. Charlene Wint*, No. 21-CR-477 (E.D.N.Y. March 10, 2023), Docket Entry No. 27; and then citing *United States v. Wieselththier*, 15-CR-396 (S.D.N.Y. May 22, 2017), Docket Entry No. 116).)

The MVRA authorizes district courts to hold co-conspirators jointly and severally liable for restitution owed to victims of the conspiracy. *Yalincak*, 30 F.4th at 122 (explaining that the Second Circuit "ha[s] long recognized that an order imposing full restitution on multiple participants in a single crime will normally be deemed to impose 'joint and several' liability — although the MVRA does not use that term"); *United States v. Tsirlina*, No. 13-CR-305, 2014 WL 6632477, at *2 (E.D.N.Y. Nov. 21, 2014) ("The MVRA authorizes district courts to hold co-conspirators jointly and severally liable for restitution owed to the victims of a conspiracy." (citing *United States v. Nucci*, 364 F.3d 419, 423 (2d Cir. 2004))).  "Where a defendant 'was a member of the conspiracy,' his 'offense was committed pursuant to the common plan of the conspiracy,' and he 'could reasonably have foreseen that a co-conspirator would commit the substantive offense,' he is liable for restitution arising out of those offenses." *Tsirlina*, 2014 WL 6632477, at *2 (quoting *Boyd*, 222 F.3d at 51); *see Yalincak*, 30 F.4th at 122 (explaining that district courts may "either . . . require each defendant to pay 'the full amount of restitution,'" or may "apportion liability among defendants according to the level of responsibility each defendant has for the victim or victims' losses."); *Boyd*, 222 F.3d at 50 ("Where . . . a conspiracy has multiple victims, the [MVRA] allow[s] the sentencing court to order a single defendant to pay restitution for all losses caused by the actions of that defendant as well as by the actions of that defendant's co-conspirators, or, in its discretion, to allocate restitution proportionately among culpable parties.").  Being unaware of a co-conspirator's specific actions in furtherance of the conspiracy does not preclude a finding that the resulting losses were foreseeable. *See Smith*, 513 F. App'x at 45 (affirming district court's finding that because the defendant was aware that her co-conspirators were also stealing credit card information, it was reasonably foreseeable to the defendant "that the conspiracy would cause substantial losses . . . resulting from the actions of her coconspirators in furtherance of the conspiracy"); *United States v. Li*, No. 15-CR-252,

31

2019 WL 919545, at *3 (E.D.N.Y. Feb. 24, 2019) (finding that having pled to the RICO

conspiracy, the defendant was responsible for all reasonably foreseeable losses to the victims

resulting from the conspiracy, including the fees and costs incurred by one of the victim

organizations in investigating and prosecuting the conspiracy, not just the fees and costs

associated with investigating and prosecuting the defendant's case).  Moreover, "[i]t has long

been the law of this circuit that the restitution obligation may be ordered to be joint and several,"

*Nucci*, 364 F.3d at 422 (citing *United States v. Tzakis,* 736 F.2d 867, 871 (2d Cir. 1984)), and

"the decision whether to apportion restitution among defendants is a discretionary one," *id.*

(citing 18 U.S.C. § 3664(h)); *see also United States v. Ketabchi*, 832 F. App'x 41, 48 (2d Cir.

2020) ("If 'more than [one] defendant has contributed to the loss of a victim, the court *may* make

each defendant liable for payment of the full amount of restitution or *may* apportion liability

among the defendants to reflect the level of contribution to the victim's loss and economic

circumstances of each defendant.'" (citation omitted)); *Smith*, 513 F. App'x at 45 (noting that the

district court was aware pursuant to 18 U.S.C. § 3664(h) "that it had the discretion to apportion

liability among [the defendant] and her coconspirators or to hold [the defendant] jointly and

severally liable for the full loss caused by the conspiracy," and further noting that the district

court considered the defendant's "level of contribution to the victim's losses and her economic

circumstances").  A court may also adopt a "hybrid approach" to restitution, where the court

exercises its discretion to "combine apportionment of liability to limit the restitution obligation

for some participants in a crime while concurrently holding other participants liable for the full

amount of the loss."  *Yalincak,* 30 F.4th at 125–26.

The Court exercises its discretion to hold Herskowitz jointly and severally liable for a

portion of the victims' losses.  Herskowitz, as an attorney, had a necessary role in the bank fraud

conspiracy to which he pleaded guilty.  Herskowitz "participated as an attorney at closings for

properties that were the subject of short sales," and admitted to "kn[owing] that false information was provided to banks" and knowing that the banks relied upon "the false information in determining whether to permit the relevant short sale to take place and whether to agree for the sale of the relevant property to be made for . . . less than the value of the balance of the mortgage the bank held on that prompt."  (Tr. of Herskowitz Plea Hr'g ("Herskowitz Plea Tr."), 26:7–14; Min. Entry dated June 27, 2024.)  However, Herskowitz is less culpable than his co-defendants. Unlike Tarshish and Dafna, who were the "bosses" of Exclusive Homes, and partners of Aronov, (Trial Tr. 422:2–5, 576:5–10, 446:13–22, 1851:9–15, 2418:20–23, 2429:8–10), Herskowitz's primary role was his services as an attorney at short sale closings and to wire money to financial institutions or co-conspirators.  (Herskowitz Plea Tr. 26:7–14; Superseding Information.) Accordingly, Herskowitz's joint and several liability for the amount of restitution owed to Defendants' victims will be capped in view of his lower level of culpability.  *Yalincak*, 30 F.4th at 125–26 (holding "that district courts may combine apportionment of liability to limit the restitution obligation for some participants in a crime while concurrently holding other participants liable for the full amount of the loss"); *United States v. Hwang*, --- F.4th ---, ---, 2025 WL 1823995, at *3 (S.D.N.Y. July 2, 2025) (finding that "the defendant's joint and several liability would be capped at one-third of the total amount of restitution owed to [the d]efendants' victims, reflecting [the defendant's] lower level of culpability as compared to [his codefendant]"); *United States v. Kerekes*, No. 09-CR-137, 2012 WL 3526608, at *4 (S.D.N.Y. Aug. 15, 2012), *aff'd*, 531 F. App'x 182 (2d Cir. 2013) (explaining that it was appropriate for the court to "exercise [its] discretion and apportion liability individually . . . based primarily on his relatively modest role in th[e] conspiracy" to defraud the Internal Revenue Service and holding the defendant responsible for the amount of his bonus).  In order to determine the cap for Herskowitz's joint and several liability for restitution, the Court directs the Government to (1)

33

provide supporting documentation sufficient to show on a transaction-by-transaction basis the role Tarshish, Dafna, and Herskowitz had in each transaction, and (2) provide a revised version of Exhibit A that identifies the documentation on which the Government relies for each transaction.

### 2. Herskowitz's limited financial resources are not relevant to whether restitution is appropriate

The Government argues "under the MVRA, the victims are entitled to a restitution for their loss, regardless of . . . [D]efendants' ability to pay it." (Gov't Reply 14.)

Herskowitz argues that he has no ability to pay a judgment that is more than $10,000,000. (Herskowitz Ltr. 1–2.)

"[A] defendant's limited financial resources at the time restitution is imposed is not dispositive of whether restitution is proper, particularly where the defendant has a reasonable potential for future earnings." *Battista*, 575 F.3d at 232 (quoting *United States v. Ben Zvi*, 242 F.3d 89, 100 (2d Cir. 2001)); *see also United States v. Carney*, No. 23-6591, 2024 WL 4983601, at *2 (2d Cir. Dec. 5, 2024) ("[E]ven indigent defendants have an obligation to pay restitution, and therefore a court does not err or abuse its discretion by ordering restitution from a defendant with limited financial resources." (citing *United States v. Mortimer*, 52 F.3d 429, 436 (2d Cir. 1995))); *Mortimer*, 52 F.3d at 436 ("Even an indigent defendant may be subject to the duty to pay restitution when and if funds are eventually acquired."). In general, "full restitution remains the norm. . . . When there is doubt about [the defendant's] ability to pay, the court should order full restitution." *United States v. Kowalewski*, 8 F. App'x 19, 21 (2d Cir. 2001) (alteration in original) (quoting *United States v. Mattice*, 186 F.3d 219, 231 (2d Cir. 1999)); *see also Ben Zvi*, 242 F.3d at 100 ("A defendant's limited financial resources at the time restitution is imposed is not dispositive of whether restitution is proper, . . . particularly where the defendant has a reasonable potential for future earnings. . . . Furthermore, in the absence of a defendant showing

34

a restricted future earnings potential by a preponderance of the evidence, it is entirely reasonable for a district judge to presume future earnings in ordering restitution." (quoting 18 U.S.C. § 3664(e)) (internal citations omitted)).

The Court acknowledges Herskowitz's representation that he is unable to pay restitution at the amount the Government requested.  However, given the impact of Herskowitz's crime, as well as his future earning potential, the Court imposes restitution.  *See United States v. Torres*, No. 23–6377, 2024 WL 5165508, at *1–2 (2d Cir. Dec. 19, 2024) (upholding a sentencing court's restitution award where the district court had adequately considered the defendant's financial condition by declining to impose a fine and creating a payment schedule that accounted for his limited resources); *Carney*, 2024 WL 4983601, at *2–3 (upholding a restitution award that accounted for the defendant's financial resources by imposing a monthly payment plan); *United States v. Uppal,* 797 F. App'x 17, 22–23 (2d Cir. 2019) (finding that the district court considered the defendant's "ability to pay restitution despite the absence of any recorded discussion on that topic . . . because the [d]istrict [c]ourt tailored the payment schedule [to 10% of gross monthly income] during supervised release to account for [defendant's] expected financial circumstances"); *United States v. Allen*, 201 F.3d 163, 168 (2d Cir. 2000) (upholding a sentencing court's restitution award that defendant argued "exceeded [her] ability to pay" because the sentencing court created "a monthly payment schedule that accounted for [the defendant's] low earning potential both during her incarceration and upon her release" (alteration in original)); *United States v. Odom*, No. 17-CR-432, 2025 WL 2625040, at *1–2 (E.D.N.Y. Sept. 11, 2025) (denying the defendant's motion for "temporary reprieve" from restitution payments where "restitution [was] payable at the rate of $25 per quarter while in custody and 10% of gross income per month while on supervised release" and there was "[n]othing . . . that would permit a rescheduling of his restitution obligation."); *United States v. Clark*, No. 23-CV-

6021, 2024 WL 406913, at *2 (W.D.N.Y. Jan. 17, 2024) (imposing restitution payable in $25 quarterly installments during the defendant's incarceration and in monthly payments at the rate of 10% of gross monthly income while on supervision), *report and recommendation adopted*, 2024 WL 406325 (W.D.N.Y. Feb. 2, 2024).  Restitution will be due at rate of $25 each quarter while incarcerated and payable at a rate of 10% of Herskowitz's gross monthly income while he is on supervised release.

### III.   Conclusion

For the reasons explained, the Court orders the parties to submit the supplemental information detailed in this Memorandum and Order and in the September 2025 Order within thirty days of the date of this Memorandum and Order.[11]

Dated:  October 3, 2025
        Brooklyn, New York

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

---

[11]  The Court notes that the parties are currently briefing the Government's proposed methodology and its application to specific transactions involving Defendants Aronov and Konstantinovskiy.  To the extent the parties have not already provided the information requested in this Memorandum and Order for Aronov and Konstantinovskiy, the Court directs them to do so.